# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Complainant** | : | |
| | : | |
| **v.** | : | **Criminal Case No.** |
| | : | **1:21-cr-00191 (JEB)** |
| **RYAN ZINK,** | : | |
| | : | |
| **Defendant.** | : | |

_____

## DEFENDANT RYAN ZINK'S MOTION AND MEMORANDUM OF LAW FOR DISMISSAL OF ALL COUNTS OF THE CASE DUE TO GOVERNMENT'S CRIMINAL DESTRUCTION OF EVIDENCE, OBSTRUCTION OF JUSTICE, AND SPOILATION OF EVIDENCE

Defendant RYAN ZINK ("Zink"), by and through undersigned counsel, hereby respectfully moves the Court whether now or on remand from appeal to dismiss all charges and Counts of this prosecution against the Defendant Zink due to the destruction of evidence by the U.S. House of Representatives' "Select Committee to Investigate the January 6 Attack on the Capitol." According to common practice, the Government violated the rules that it would prosecute others for as to destruction of evidence and obstruction of justice.

## I.   REVELATION BY THE HONORABLE U.S. HOUSE OF REPRESENTATIVES MEMBER BARRY LOUDERMILK, CHAIR OF THE HOUSE SUBCOMMITTEE ON OVERSIGHT

The Chairman of the Subcommittee on Oversight for the Committee on House Administration, Barry Loudermilk, revealed on or about August 8, 2023:

The House select committee that investigated the Capitol riot on January 6, 2021 failed to adequately preserve documents, data and video depositions – including communications it had with the Biden White House that are still missing – according to the Republican lawmaker overseeing the GOP investigation into the committee's work.

The now-disbanded "J6" committee, which was run by Democrats and included only two GOP members, has also failed to provide any evidence that it looked into Capitol Hill security failures on the day of the riot, Rep. Barry Loudermilk, R-Ga., chairman of the Subcommittee on Oversight for the Committee on House Administration, told Fox News Digital.

Loudermilk said his staff has had difficulty gathering all the information it needs to investigate Rep. Bennie Thompson's handling of the J6 investigation.

"Part of our task as this oversight subcommittee is to actually address the security failures, look into how did it happen… how were these folks able to get into the Capitol," Loudermilk said. He said the documents they obtained came over in boxes and was completely unorganized.

"Nothing was indexed. There was no table of contents index. Usually when you conduct this level of investigation, you use a database system and everything is digitized, indexed. We got nothing like that. We just got raw data," he said. "So it took us a long time going through it and one thing I started realizing is we don't have anything much at all from the Blue Team."

\* \* \*

What we also realized we didn't have was the videos of all the depositions," Loudermilk added.

Loudermilk said he has been contacted by a defense attorney that needed access to key information in one of the video depositions, and the committee realized it did not have the videos he was seeking
.
Fox News Digital obtained correspondence letters between Loudermilk and Thompson's offices in which the two disagreed on whether the J6 committee preserved what it was required to under House rules.

Loudermilk says Thompson's committee was required by law and House rules to preserve and turn over all data related to their

investigation at the end of the congressional term in December, and
Loudermilk said as much to Thompson in a letter on June 26.

Andrew Mark Miller,"**J6 Committee failed to preserve records, has no data on Capitol Hill
security failures, GOP charges:  The J6 Select Committee disbanded in December 2022 and
was required to preserve documents from its investigation**," <u>Fox News</u>, August 8, 2023,
<u>https://www.foxnews.com/politics/j6-committee-failed-to-preserve-records-has-no-data-on-
capitol-hill-security-failures-gop-charges</u>

## II.   SUMMARY OF RELIEF REQUESTED

After a review of precedents, Defendant suggests that the Court:

A.  Hold an evidentiary hearing however brief to confirm the factual bases reported and
circumstances of this breach, including whether records of the investigation have
been truly destroyed or lost or are merely so disorganized as to be unavailable and
how these records can be used to comply with *Jencks* and *Brady*.

B.  Authorize by order or subpoena, with or without the assistance of a Magistrate Judge
or Special Master, a confirmed inventory of what has or has not been destroyed
including to assist the parties in further refining the Defendant's motion as to what
evidence has been denied to the Defendant.  Given that the Government engaged in
destruction of evidence, the cost should be borne by the party admitted to have
destroyed the evidence.

C.  Order that the charges against the Defendant be dismissed.

D.  Order that any fact, account, explanation, circumstance, or assessment of intent –
including by impeachment witnesses or potential defense witnesses – be established
as a fact for the purposes of this case if it continues to trial to the extent that the
evidence which the Government actually has destroyed was likely to have agreed
with the Defendant's account.  The act of destruction of the evidence tilts the balance

more severely against the spoiler of evidence.  The Court is entitled to conclude that

the Government would not have destroyed the evidence if it would have assisted in

the prosecution of this Defendant.  Because the Government has a strong incentive

and bias to not destroy evidence of the Defendant's guilt while in the midst of

prosecuting the same Defendant, the calculus that the missing evidence is likely to

have benefitted the Defendant is different than when viewed on a blank canvass.

Therefore, if there is the slightest possibility that the missing evidence might

potentially have benefitted the Defendant, the unethical and indeed criminal conduct

of the Government destroying the evidence is sufficient to establish the Defendant's

account as true.

E.  If unsure, this Court should immediately (upon the processing of this motion) certify

an interlocutory appeal and stay these proceedings.  There is no valid reason in any

event for the U.S. Department of Justice to bury this District in an excess of

unanticipated cases and then rush them to trial for no legitimate reason.

F.  If supported by evidentiary hearing(s) and evidence, the Court should institute

contempt of court proceedings for the Select Committee interfering in this Court's

progress of this and similar prosecutions, refer those responsible to the DoJ for

criminal investigation, and to the extent relevant refer the matter to whatever various

professional governing bodies may apply.

### III.   THE U.S. CONGRESS AND THE U.S. CAPITOL POLICE ARE THE COMPLAINING WITNESSES AND ALLEGEDLY VICTIMS

Initially, it must be squarely confronted that the U.S. Congress and the U.S. Capitol

Police ("USCP") are the primary alleged victims of the crimes charged relating to events on

Capitol Hill on or about January 6, 2021.

Judges of this District have frequently offered the excuse that they cannot order Congress (or jails) to do anything.  But that is beside the point, even though doubtful.  The Court does have jurisdiction over and authority over the criminal prosecution in his or her courtroom.  The Judge can and should manage the case before the Court in light of all factors and events.  That is, the Judge can say "Congress can do whatever it wants, but this case in my courtroom is dismissed."

The Select Committee is not some mere bystander or observer.  The strenuous claims about actions taken by a very, very few out of a mostly peaceful and calm crowd of First Amendment demonstrators are allegations of violence, assaults, property damage and disruption against the U.S. Congress.  The USCP was involved in standing between Congress as the primary victim and the very few demonstrators who ran amok and became rioters that day.[1]

Congress, if it has not been forgotten among the public, is the Legislative Branch of our Federal Government.  It is not part of the Executive Branch.  Its security is committed to the Legislative Branch's own security force, USCP, evidently to support this independence.  See 2 U.S.C. §§ 1901 to 1982.

Allegations in January 6-related prosecutions and within the Select Committee itself are of an attack upon the Congress.  (It's in the name of the Select Committee.)

This situation is like a homeowner who reports being robbed in a break-in.  But when the

---

[1]     Because the U.S. Capitol Police estimates that 10,000 demonstrators visited Capitol Hill on January 6, 2021, out of totals demonstrating throughout the District of Columbia in a range disputed (as with every mass demonstration in the city) with estimates of 500,000 to 1 million visitors above what would be normal throughout the City of Washington, the relationship of an individual Defendant to the Congress or USCP will vary from person to person, from Defendant to Defendant, from case to case.  It would be impossible – and completely wrong – to attempt a blanket, or uniform description to apply to all of the roughly 10,000 people at or around the U.S. Capitol on January 6, 2021.  This Motion trying to avoid placing everyone in the same bucket is an attempt at accuracy, not to diminish the few demonstrators who severely misbehaved.

police arrived, the homeowner explains that he wiped down all the surfaces, the door, the door handle, all the cabinets from which things were stolen, the entertainment center where his TV was stolen.  In a later prosecution, a Defendant would be entitled to a presumption that had the homeowner not erased the fingerprint evidence and other evidence, including RING security video, it would have shown that the Defendant was not the person who robbed the house.

While every prosecution has an element of enforcing laws generally, there is almost always a complaining victim or victims or complaining witness.  Here, not only are Congress and its USCP the complaining victims, but the Select Committee was specifically established and charged with investigating these very events.

It would be like the homeowner is asked to create an inventory of everything he believes was stolen from his house.  Instead, the homeowner destroys all photographs, purchase receipts, or other evidence of what was in the house before it was allegedly robbed.

Those not steeped in the workings of the Select Committee might not be aware that the witnesses questioned in public and/or video snippets of other witnesses represent only a tiny fraction of the over 1,000 witnesses interviewed behind closed doors.   Moreover, live witnesses who testified perhaps, for example, for ten minutes did so after private testimony behind closed doors of a day or days.  The Select Committee records would contain the vast majority the testimony.

## IV.    ANALYSIS REQUIRES CONFRONTING DIFFERENT COUNTS CHARGES SEPARATELY, INDIVIDUALLY

At the moment, the problems revealed by Chairman Loudermilk would taint all of the Counts charged against most January 6 Defendants.  However, it is still a source of great and commonplace confusion that people fail to consider the different Counts alleged independently.  Different Counts require proof of different types of intent, motivation, knowledge, etc.  Elements

of different Counts might be proven in various ways, some elements being subject to impeachment or contradiction from the now-missing or misplaced evidence.  The temptation to imagine what we do not know cannot be confused with the need to analyze each criminal Count charged under its own terms.  Here, the possibility that witnesses interviewed by the Select Committee would completely debunk all of the prosecution's accusations is extremely high.  However, the Court and the prosecution cannot wave away the problem by thinking only of one particular Count charged and not others.  If one Count would side-step the problem that would not salvage other Counts from this problem.

## V.    THE CONGRESSSIONAL COMMITTEE AGREED TO PROVIDE THIS INFORMATION TO THE DEPARTMENT OF JUSTICE BUT NOT TO DEFENDANTS

Recall that the first arrests relating to events of January 6, 2021, were on January 6 and on January 7 as well.  Dozens of indictments had been issued before the Select Committee was ever organized.  By the time the U.S. House of Representatives voted on June 30, 2021, to establish the Select Committee, prosecutions for the same events were already underway.  And these were widely-publicized.  Again, the purpose of the Select Committee was to investigate and review information, so they would necessarily have to know that these prosecutions were on-going.

Therefore, the Select Committee knew that the information it was collecting was material to on-going criminal prosecutions – by material by the design of the Select Committee.  The DoJ has indicted and prosecuted persons for the same conduct of destroying evidence with awareness that Grand Jury might be considering a matter, even if "destroying" was not in bad faith.  The fact that persons are being prosecuted in the E. Barrett Prettyman courthouse for what the Select Committee did does not help with the public's confidence in our institutions.

The deletion, loss, or mishandling of this information occurred with full-awareness by the Select Committee that prosecutions were underway, some convictions already on appeal, and the evidence that the Select Committee was collecting was a parallel criminal investigation and a public trial of guilt or innocence.  The deletion of this information would qualify as obstruction of justice or contempt of court (by disrupting the Court, not so much by a direct order).  Note that initially the Select Committee rebuffed requests from the DoJ, which could have provided organized indexing, inventories, and data organization.

Neither the Congress nor the DoJ can now minimize the severity of this spoliation of evidence, where the Select Committee already determined and promised to release the information that it subsequently deleted. The Select Committee by its Chairman Bennie Thompson decided and publicly announced that it would be releasing the information publicly.

> The Jan. 6 select committee has formalized a path to share witness transcripts and evidence with the Justice Department, its chair Rep. Bennie Thompson (D-Miss.) told POLITICO Thursday.
>
> "We've put a template together for sharing information, sharing it with Justice. My understanding is, there's general agreement on it," Thompson said.
>
> Agreement on evidence-sharing would mark a significant milestone as the DOJ inquiry into efforts by Donald Trump and others to overturn the 2020 election enters a more public-facing phase. Federal investigators have sought to access the congressional committee's 1,000-plus witness interview transcripts since April, but the select panel has resisted as its probe continued to generate extraordinary new evidence and witness testimony.
>
> Now, though, as DOJ delves even more deeply into the former president's inner circle and the select committee's most significant round of public hearings has concluded, there appears to be greater urgency for prosecutors to obtain evidence the select committee has gathered.
>
>         * * *

Thompson had previously floated the prospect of sharing evidence with DOJ "in camera" — which would require department investigators to visit the select committee offices and review transcripts without keeping them.

But Thompson said Thursday that the new template is unlikely to include in-camera review because it created unworkable complexities. Instead, he said, DOJ would have to provide details about the information it's interested in and the select committee will supply it.

He also expressed an awareness of some tricky calculus for DOJ once it begins obtaining select committee materials. ***Prosecutors are obligated by law to share evidence with defendants that may bear on their cases, a process known as discovery.***

***"There's a concern — and I'm not a lawyer — if you give them something and there's something in there that impacts a case they're looking at, they have to let the other side know," Thompson noted.***

Kyle Cheney," Jan. 6 committee has a formal path to share investigative material with DOJ, its chair says, Politico Magazine, July 28, 2022, *(emphases added),* [https://www.politico.com/news/2022/07/28/doj-jan-6-panel-evidence-sharing-00048457](https://www.politico.com/news/2022/07/28/doj-jan-6-panel-evidence-sharing-00048457)

## VI. WHY THE MISPLACED OR DELETED INFORMATION IS EXCULPATORY AND MUST BE DISCLOSED

Defendant, by counsel, is not certain if the records have been forever deleted or are misplaced, disorganized, or otherwise unavailable.  However, it makes little difference.  The Defendant will still not have the benefit of these records according to his *Brady v. Maryland* rights, *The Jencks Act* concerning prior statements by witnesses, or *Giglio.*

However, as Select Committee Chair Bennie Thompson publicly announced, the Department of Justice must share the information – now missing – with Defendants' attorneys in disclosure.  The information collected by the Select Committee consists of around 1,000

interviews, mostly in private depositions, with witnesses of events on January 6, 2021.[2]

Defendant is entitled to know about and to call witnesses in his favor, as guaranteed under the

Sixth Amendment to the U.S. Constitution.  We know that the vast majority of these witnesses

would be exculpatory and probative of the January 6 Defendants' innocence or guilt for less than

what is charged.  The Select Committee's public meetings were partisan political campaign

commercials like those of a political action committee (PAC) encouraging election of the

Democrats who were in charge of security of the Capitol complex on January 6, 2021.  However,

the vast majority of the deposed witnesses were never disclosed by the partisan campaign project

of the Select Committee, obviously because those witnesses would likely debunk the partisan

narrative.  Instead, the Committee chose to delete deposition videos and transcripts.  Obviously,

those witnesses who would be consistent with the Defendant's guilt were not deleted.

     The Select Committee's Chair publicly acknowledged that Defendants would have a right

to review the information collected, yet then deleted the information anyway.  This sequence of

events evidences a consciousness of guilt or wrongdoing by the Select Committee in hiding the

truth that would help the Defendant's case.

     Many of the Defendants' attorneys also helped witnesses appear before the Select

Committee.  As those in the John Pierce Law Firm know, such as then attorney for Stewart

Rhodes Jonathon Moseley, the Select Committee took entire day or days of behind-closed-door

---

[2]     Astonishingly, the USAO is trying to argue over a Protective Order with regard to former
President Donald Trump that Trump would attempt to litigate his case in public.  The Select
Committee was a public, partisan, political show trial reminiscent of the infamous Roland
Freisler, complete with screaming, crying, outrage, etc.  The purpose and effect of the Select
Committee was to try all January 6 Defendants and now Trump in public.  The Judiciary and
other agencies of the Government face a crisis of public confidence because – to the surprise of
those in Washington, D.C. – the American people are not stupid.  The Select Committee *was* the
trial of these Defendants, leaving this District Court nothing but the sentencing resulting from the
feverish lynch mob that the Committee created.

testimony but then publicly released only a couple minutes carefully selected to give a misleading and accusatory false impression.[3]

The ability to cross-examine or impeach the Government's witnesses is now impaired by the destruction or mishandling of the evidence, again a violation of the Sixth Amendment.

The Government will be unable to fulfill its duties under The Jencks Act or *Giglio* much less *Brady v. Maryland.*   The Government cannot provide Defendants' counsel with past statements made by the Government witness when the Select Committee has destroyed the transcripts.

Other information collected by the Select Committee would similarly improve the Defendant's ability to impeach witnesses against him, or set the context or circumstances for the events in question.

For example, the USCP is still resisting disclosure of records showing what caused the Joint Session of Congress to begin a recess and evacuation at about 2:00 PM to 2:13 PM on January 6, 2021.  The refusal of the USCP to release these documents must lead us to the inference that if the documents were released it would prove the Defendant here innocent.  With no reliable, as-it-happened evidence of the reasons for the Joint Session to recess, the Government cannot prove obstruction of the congressional hearing.

Christina Bobb, now a Trump attorney, reports publicly that the Cannon House Office Building was the only Capitol building to be locked down other than the Capitol, and for a longer time period.[4]  Cannon of course is closest to where pipe bombs were discovered near the RNC.

---

[3]     Our now staff member describes the staff attorneys for the Select Committee he dealt with as being professional, respectful, well-organized, and detailed and allowing the witness to talk freely and tell his story at length.  This leaves unexplained how the records got to be as now Chairman Barry Loudermilk describes that were handed to him.  Something may have happened.

[4]     Christina Bobb, <u>Stealing Your Vote</u>, Jan. 24, 2023, Skyhorse Publishing, ISBN:  1510776699.

Did the USCP react to the pipe bombs or to this Defendant?  The Defendant is entitled to those records because if the *cause* of the recess *was not him*, then he is innocent of those charges.  If the decision-making focused on the pipe bombs, then Defendant Zink is innocent of obstructing the Joint Session of Congress under 18 U.S.C. 1512(c)(2).

The Select Committee was supposed to be investigating the circumstances of the protests gone wrong and the disruption to Congress, including the six (6) demonstration permits issued by the USCP in December for rallies on the Capitol Grounds on January 6, 2021.  Now, however, it appears that those records have been destroyed or lost by Congress.  Therefore, the Government cannot establish that any Defendant disrupted Congress where the Congress (USCP) fervently, desperately resists disclosing the documentation of who, what, when, why and even where any actions caused the disruption of the Joint Session of Congress or delayed its resumption.

## VII.  SECRET SERVICE COMMUNICATIONS ALSO DESTROYED

In like fashion, several months after Donald Trump left office and Joe Biden was sworn in as President, the Secret Service destroyed text messages and other communications from events on or about January 6, 2021.   See, letter, attached as **Exhibit 1**.  News coverage tried to imply that this loss of key information occurred under the Trump Administration, when it was in fact the Biden Administration.

> The US Secret Service erased text messages from January 5 and 6, 2021, shortly after they were requested by oversight officials investigating the agency's response to the US Capitol riot, according to a letter given to the House select committee investigating the insurrection and first obtained by CNN.
>
> The letter, which was originally sent to the House and Senate Homeland Security Committees by the Department of Homeland

Security Inspector General, says the messages were erased from the
system as part of a device-replacement program after the watchdog asked
the agency for records related to its electronic communications.

"First, the Department notified us that many US Secret Service text
messages from January 5 and 6, 2021, were erased as part of a device-
replacement program. The USSS erased those text messages after OIG
requested records of electronic communications from the USSS, as part
of our evaluation of events at the Capitol on January 6," the letter from
DHS IG Joseph Cuffari stated.

Jamie Gangel, Zachary Cohen and Ryan Nobles, "**Secret Service erased text messages from
January 5 and 6, 2021 – after oversight officials asked for them, watchdog says**," CNN, July
15, 2022, https://www.cnn.com/2022/07/14/politics/secret-service-text-messages-
erased/index.html

The explanation that while upgrading equipment, the Secret Service with the aid of the

fabled White House Communications Agency and the computer sleuths at the Department of

Homeland Security charged with defending the country against computer hacking and computer

espionage failed to keep copies of the information on phones and personal devices during the

upgrade defies belief.  Of all the impossible fairy tales we are asked to believe this may be the

least credible.  Amateurs know to create back-up copies of data before changing hardware.

## VIII.  GOVERNMENT'S POSITIONS REVEAL WIDESPREAD VIOLATIONS OF *BRADY V. MARYLAND* AND DISCLOSURE

Initially, we should read and consider this and many dozens of other disputes as

establishing that the U.S. Attorney's Office (USAO)'s for the District of Columbia and

investigative agencies like the Federal Bureau of Investigation (FBI) and U.S. Capitol Police

(USCP) are violating their constitutional, statutory, and rules-based obligations under *Brady v.

Maryland* and progeny and the Federal Rules of Criminal Procedure.

This problem is not limited to the instant motion, but is a candid revelation that the entire

handling of all January 6 related cases has been constitutionally inadequate.  It is likely that all

January 6 cases, even those concluded, are subject to being vacated on appeal.

Because line prosecutors do not have the resources alone to review all of the candidate material, whatever instructions have been given to paralegals and other professionals at the U.S. Department of Justice's "Capitol Siege Unit" processing center will either lead to correct or disastrously erroneous results.  The understanding of the requirements will dictate the instructions given to staff and the instructions will dictate the results.  If the instructions given to reviewing personnel are bad, the entire process is bad, because they will not notice and flag for higher-level review the materials that are candidates for disclosure.  The USAO's Oppositions indicate an erroneous understanding of the U.S. Government's obligations.

## IX.   ALL GOVERNMENT OFFICES, AGENCIES, OFFICERS, AND PERSONNEL MUST BE INCLUDED FOR CANDIDATE DISCLOSURES

But the USAO persists in rejecting the authority of this Circuit and the U.S. Supreme Court that candidate information and documents that may require disclosure are not limited to the files sitting on an assigned prosecutor's desk but include an obligation for "the whole of government" to the extent that any agency or part of the U.S. Government or State or local Government was part of the investigation or part of the underlying events.

Binding precedent clarifies that parts of the government with no relevance to the case at hand are not within the scope.  Yet any part of government that was involved in the underlying events or participated in the investigation of them or which the agency or the prosecutor has reason to suspect might have relevant information is subject to the obligation for disclosure.

Here the U.S. Congress and its statutory police force the USCP claim to be victims of the crimes charges relating to January 6, 2021.  In their posture as victims as well as the primary (first, if smaller than the FBI) investigative agency, all documents and information known to the

USCP and FBI are subject to disclosure regardless of whether in the prosecutor's hands.

    1. Was the recording in the possession of the government?[5]

      The government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.

      "[T]he duty of disclosure affects not only the prosecutor, ***but `the government as a whole, including its investigative agencies,'*** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied *Brady* and *Jencks* requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations[6]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

      The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222,

---

[5]    Clearly referring to all levels of government.

[6]    This doesn't fully explain that the prosecution arose out of "WMATA regulations" concerning a threatening showdown on a bus against a bus driver.  WMATA security responded to the threatening situation but then turned the investigation over to the D.C. MPD.

966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

                            * * *

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

                            * * *

**The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.**

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).*

* * * When WMATA is seeking to enforce its regulations or to protect its employees and involves its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.

**When the statement being sought by the defense as *Jencks* material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee, *cf. United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we conclude that production, upon request, is required.** See *United States v. Deutsch*, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

*Wilson v. United States*, 568 A.2d 817 (D.C. 1990) (paragraph break added for emphasis and

bold emphases added).

## X.   CONFIDENTIAL HUMAN SOURCES ARE NECESSARY, EXCULPATORY WITNESSES TO DEFENDANT'S INNOCENCE

It appears, including from the witnesses that were called publicly and the snippets played on video, that the Select Committee would have focused first and at highest priority out of the roughly 1,000 witness interviews on informants, Federal assets, Confidential Human Sources, and others most likely to have relevant testimony.  The fact that the Select Committee interviewed witnesses likely to be adverse to the Defendant, but they had no information of the Defendant's guilt is exculpatory.

Suppose a person is accused of shooting off a gun in a restaurant filled with 90 people, yet no one saw it or heard any gunshot.  Suppose only the Defendant's ex-wife in a bitter divorce proceeding claims what no one else saw.   The fact that out of 90 patrons in the restaurant, none of them saw the accused do it nor heard any gunshot would be exculpatory.

Even a fact witness that something *did not happen* could be "exculpatory:"

> The failure of a witness to see or hear a particular event may have weight as to the non-occurrence of the event. 4 Jones on Evidence § 986. However, the burden is upon the party who asserts the negative evidence to prove that the witness was in a position to have observed the questioned event had it occurred as alleged. 1 Jones on Evidence § 208.

*United States v. Eisenberg*, 469 F.2d 156 (8th Cir. 1972)

Here, most of the charged offenses concern whether or not there was a plan or conspiracy or intent such as to disrupt a Joint Session of Congress which had already been disrupted before Defendant arrived at the Capitol.  Depending on such planning or intent, with regard to some Defendants, there might be no crime.  That is, certain events without the necessary intent would not violate the statute. Or if an FBI "case agent" or "hearsay agent" who wasn't there and doesn't

know the Defendant testifies to the "hearsay agent's" interpretation of videos that the FBI agent did not witness in real life or record, the fact that actual witnesses who were actually there and actually saw and heard what happened would testify in conflict with the FBI "hearsay agent" would be exculpatory.

Here, the Government's Confidential Human Sources were tasked with monitoring many planning to come to Washington, D.C., on January 4-6, 2021.  Yet none of them reported back to their handlers any conspiracy or plan to obstruct the official proceeding of the Joint Session of Congress.  These are not informants who might have come forward with unexpected tips.  These are agents of the U.S. Government at some level of formality who were specifically tasked with finding out if anything criminal was being planned.  Their answer:  No. [7]

In both the Proud Boys' trial and the Oath Keepers' trial, every witness called by either the Government or the Defendants, including those who had pled guilty on promise of testifying for the Government, insisted that no plan existed to go the U.S. Capitol other than to attend the six (6) permitted demonstrations, nor to attack the Capitol, nor to enter the Capitol, nor to take over the Capitol, nor to stop the Joint Session of Congress.  Every witness insisted that demonstrators wanted the Joint Session of Congress to be held and to run its course so that objections from questioned States could be heard and resolved (they hoped) in Donald Trump's favor.  Disrupting the Joint Session of Congress would be the worst possible outcome for Trump's supporters.[8]

Therefore, the fact that various agencies of the U.S. Government explicitly tasked their

---

[7]     Of course large crowds were known and expected, and warnings went out of likely ANTIFA violence within government channels.

[8]     Dominick Mastrangelo, "**Trump adviser Navarro: Rioters on Jan. 6 hurt plan to challenge election result**," THE HILL, Jan. 5, 2022, https://thehill.com/homenews/588312-navarro-rioters-on-jan-6-hurt-plan-to-challenge-election-result

agents (of whatever type) to look for trouble leading up to January 6, and no such reports were provided to their handlers, becomes Sherlock Holmes' famous "The Dog That Didn't Bark."

The non-reports of these CHS's are exculpatory evidence that Defendant Ryan Zink is not guilty of most of the charges brought against him.  The fact that those assigned to watch pro-Trump demonstrators did not report on any plans to attack the Capitol is directly material.

Anything that, if omitted, may hinder the Defendant's preparation for or presentation of his defense case is subject to *Brady* disclosure.

> [U]nder the *Strickland* formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*United States v. Bagley*, 473 U.S. 667, 684, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Many of the prosecutions of January 6 related events – not all, but many – are of the nature of questioning whether or not a crime actually occurred with regard to a particular Defendant.  This again is not a conclusion that can be guessed at or leaped to in advance of the information.  First comes the information.  Then comes the analysis.  Then comes the conclusion.  A desired, predetermined conclusion is not an excuse to evade the information.

The information collected by the Select Committee could determine whether any crime occurred at all (of course considering each Count charged separately and individually) or if defenses apply or if the evidence is too mixed to satisfy beyond a reasonable doubt.

We cannot know before we look.[9]

---

[9]     The DOJ could say "We did look, and in our unbiased, even-handed opinion there is nothing there helpful to the Defendant," subject of course to severe consequences if later

For example, try driving through Manhattan at rush hour.  Police officers will demandingly gesture to drivers to disregard the red lights and rush through the city as the police officer's direction by stern, severe hand gestures.  The decisions of some Judges in January 6 Defendants is wrong.  Yes, police officers ***can*** transform otherwise unlawful conduct into lawful conduct.  That happens every work day in Manhattan's streets at rush hour.  Or suppose the President's motorcade is barreling through Washington, D.C., and police sternly gesture for drivers to clear the road by turning illegally or running through red lights to exit the area.  Or suppose this Judge now instructed counsel to come back to (private) chambers to discuss an element of the case confidentially.  The invitation (even instruction) of the Judge for counsel to enter private offices would transform what would otherwise be unlawful to lawful.  On the other hand, if someone were found in the Judge's office wandering around without being invited, that would be some species of trespass, at the least.

It is an absolute fact of American law that authorized officers can transform otherwise unlawful conduct into lawful conduct by authorizing it.  To suggest otherwise is untenable.  Indeed, 18 U.S.C. 1752(a)(1) explicitly includes the qualifier "without lawful authority to do so."  How, then, does this lawful authority occur?  On the face of that statute, it is clear that officers can authorize entry.[10]  Indeed, officers could allow – even demand – that pedestrians make way for an ambulance by getting away from the road and up onto otherwise-restricted grounds.

---

revelations show differently.  But here, they didn't look.  The Committee deprived not only the Defendants but the prosecutors of this information in most cases.

[10]     Sometimes seemingly-intractable disputes develop because the question is phrased inaccurately.  The controversy is not about whether officers can give permission but what constitutes sufficiently-clear permission to support or justify a Defendant's actions?  The real dispute is about whether an officer's explicit or implicit approval is sufficiently unambiguous.  Those objecting to the idea that demonstrators could be authorized to enter an otherwise restricted area are really objecting to scenarios where they see officer's expressions or actions as ambiguous, indistinct, or unclear.

The Government argues that disclosure of confidential human sources is limited: "The Supreme Court's decision in *Roviaro v. United States*, 353 U.S. 53, 59 (1957), has long established that an informer's privilege exists to further and protect the "public interest in effective law enforcement" and permits the government to withhold from disclosure the identify of individuals who "furnish information of violations of law to officers charged with enforcement of that law." *Id.* at 59.

This, however, is not that.

## XI.   OBJECTION TO TIMING IS NOT VALID

The USAO also purports to object that if disclosure is required, that it might not be required yet. That is not a valid objection. In fact, there is no blanket rule that disclosure in the middle of trial is adequate. It depends. The timing must avoid prejudice to the Defendant. The purposes of disclosure include:

- Discovering witnesses that the Defendant might choose to call in his or her defense.

- Locating witnesses that the Defendant's legal strategy would have called for.

- Understanding and analysis of the events that happened to help counsel prepare a defense for a Defendant.

- Preparing for effective cross-examination of the prosecution's witnesses.

Prosecutors are required to produce disclosures early enough to allow Defendant's counsel to make effective use of the information and for the Defendant not to be prejudiced by the late disclosure. On occasion, appellate courts have allowed disclosure just before or during trial *because under those circumstances defense counsel could make use of a prior inconsistent statement of a witness or other information about a witness in impeachment.* However, there is

no rule nor any appellate endorsement of an automatic rule that disclosure is ***always*** timely just

before or during trial.  It depends.  On the contrary, prosecutors are admonished by precedent to

make disclosure in sufficient time to allow defense counsel to make effective use of the

information.  On a case by case basis, this will require disclosure long before trial.

> **D.   Timing of disclosure.** Due process requires that disclosure of
> exculpatory and impeachment evidence material to guilt or innocence be
> made *in sufficient time to permit the defendant to make effective use of
> that information at trial.* See, e.g. *Weatherford v. Bursey*, 429 U.S. 545,
> 559 (1997); *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993). In
> most cases, the disclosures required by the Constitution and this policy
> will be made in advance of trial.
>> **1.   Exculpatory information.** Exculpatory information
>> must be disclosed reasonably promptly after it is
>> discovered.

*See* United States Justice Manual (USJMM) § 9-5.001, https://www.justice.gov/jm/jm-9-5000-
issues-related-trials-and-other-court-proceedings#9-5.002.  *(Emphases added.)*

The DoJ has transformed appellate generosity that *sometimes* disclosure can be timely

just before trial or during trial before a witness testifies into an unwarranted rigid rule that

disclosure is *always* timely if just before a witness testifies.

Recall that the Sixth Amendment to the U.S. Constitution commands on this fundamental
right that:

> In all criminal prosecutions, the accused shall enjoy the right to a
> speedy and public trial, by an impartial jury of the State and district
> wherein the crime shall have been committed; which district shall
> have been previously ascertained by law, and to be informed of the
> nature and cause of the accusation; to be confronted with the
> witnesses against him; ***to have compulsory process for obtaining
> witnesses in his favor;*** and to have the assistance of counsel for his
> defence.

*Id. (emphasis added).*  Therefore, the Government's cavalier disregard for the right of the

Defendant to learn and secure the attendance of witnesses in time to obtain a *subpoena ad*

*testificandum* and to get it served on a witness violates the Sixth Amendment.  Note that the

Constitution specifically requires "compulsory process" not just a vain hope of calling witnesses.

The Constitution is explicit in demanding that an accused must be afforded "compulsory process" for calling witnesses.  This cannot be accomplished by Brady and Rule 16 disclosures made after a trial has already begun, nor even close to the start of a trial.  Furthermore, the last minute disclosures promote a chaotic approach to trials even as counsel is attempting to get ahead of timetables.

Closely associated with the federal rule are several U.S. Supreme Court decisions which hold that a defendant has a right to the testimony of witnesses. *See, United States v. Dennis*, 384 U.S. 855 (1966); *United States v. Proctor & Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model Code Of Prof'l Responsibility Rule 3.8(d).

> "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an Defendant," *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Determining usefulness can only be made by an advocate for the defense. *Id.* at 875. The trial judge's function is limited to determining if a case for production has been successful and supervising the process. *Id.*

## XII.   DISCLOSURE OF DOCUMENTS, RECORDS, INFORMATION IS REQUIRED, NOT OFFERING

## OPINIONS

In short the Government is misguided throughout all January 6 prosecutions.  The USAO wants to put the cart before the horse.  Defendants are not seeking the USAO's opinions.

First come the documents and records.  Then opinions result from that analysis.

The USAO consistently has this backwards.  The USAO in every case wants to present their opinions about the case as reasons why the Defendants don't need to see the documents.  If the DOJ says that accused persons are guilty, that should be good enough for us.

Yes, there is a threshold showing that information would be "material" or potentially "exculpatory" (which is a very broad term including locating witnesses, preparing for cross-examination, exploring affirmative defenses, etc.)  And Defendant does need to learn from the Select Committee what information it still has and what information is missing.  But the Government's theory of the case is irrelevant to the Defendant's trial strategy and the value of evidence in the Defendant's favor.

The Defendant is entitled to disclosure.  The Defendant is not obliged to adhere to the prosecutor's opinions about what might or might not be important to the Defendant's counsel's preparation for presenting a defense.  It is not for the prosecutor nor the Court to decide for the Defendant what defense case he is permitted to advance.  That is a constitutional right.

The Government asks the Court to leap to conclusions about what we have not yet seen.

## XIII.  LACK OF DISCLOSURE CAN REQUIRE REVERSAL

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014).

A Defendant must raise at least a colorable claim that the material contains evidence

"favorable to him and material to his claim of innocence." *Id.*

"[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is *'known only to police investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would have been different",' although a 'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

The requirements of *Brady are* very broad. For instance, a "prosecutor must disclose information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial doubt upon the accuracy of any evidence---including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of the evidence. This information must be disclosed regardless of whether it is likely to make the difference between convictions and acquittal of the defendant for a charged crime."

United States Justice Manual USJMM) § 9-5.001.

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence." *Id.* The Defendant is entitled to documents and evidence, to the extent potentially exculpatory*; See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan,  (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

An actual conviction can be overturned on appeal for violation of *Brady* if evidence favorable to the accused for exculpatory or impeachment purposes was suppressed by the government which prejudiced the accused. *Id.*   Favorability to the accused means exculpatory or impeachment value. *Id.* Suppression by the government can be an intentional or inadvertent failure to disclose the evidence. *Id.* at 137.  [11]

Courts in in this jurisdiction disfavor narrow readings by prosecutors as to their obligations under *Brady*.  *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

Under *Brady*, it is relevant that the Defendant explicitly asked for specific information, not passively hoping that the prosecution will notice and think to disclose it:

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made...."  [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or

---

[11]     If the USAO withholds information that is later uncovered by Congress, whistleblowers, the media, FOIA, or other cases, any conviction in this case is vulnerable to being vacated.

to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

"If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.[20] Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

Agurs at 112.

## XIV.  CONCLUSION

The Court should order the relief outlined above in Section II beginning with staying the proceedings and determining what exactly of the investigation into the events of January 6, 2021, has been lost, mishandled, buried, destroyed, or made unavailable by disorganization.  If the Government cannot fulfill its *Brady*, *Jencks*, and *Giglio* obligations, the charges must be dismissed.

August 13, 2023                                    **RESPECTFULLY SUBMITTED,**

John M. Pierce, Esq.
*Counsel for Defendant*

_____*/s/ John Pierce*_____

JOHN PIERCE LAW
21550 Oxnard Street 3rd Floor, PMB #172
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com
(213) 279-7846

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date my law firm is filing the foregoing with the Court by its ECF record-keeping and filing system, which automatically provides a copy to:

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

CARI F. WALSH
Assistant U.S. Attorney

HOLLY F. GROSSHANS
Assistant U.S. Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, NW
Washington, D.C. 20530
Phone: (202) 252-6737
Cari.Walsh@usdoj.gov
Holly.Grosshans@usdoj.gov

Francesco Valentini
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov

_____*/s/ John Pierce*_____
John M. Pierce