UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. **1:21-cr-00191-JEB-1** |
| RYAN ZINK | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT ZINK'S RULE 29 & 33 MOTION TO SET ASIDE VERDICT, AND FOR NEW TRIAL

COMES NOW defendant Ryan Zink ("Zink"), by and through counsel, with this Motion to set aside the jury's verdict, and for a New Trial, pursuant to Rules 29 and 33.

Federal Rule of Criminal Procedure 33 provides that "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment." Section (b)(1) provides that "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty."

In Zink's case there is both (1) insufficient evidence to sustain the jury's verdict, and (2) newly discovered evidence in the aftermath of the trial which totally undermine, falsify, and invalidate the jury's verdict.

1.  The evidence was insufficient to sustain the jury's verdict with regard to each and every count.

At Zink's trial, the evidence showed that Zink (1) made various statements about the events of January 6, including several Facebook livestream reports to his Facebook followers, and (2) walked at a normal pace onto Capitol Grounds, accompanied by thousands of others, unobstructed by any fencing, security, or police officers—in circumstances where crowd jubilance and tacit approval of authorities was evident.

Although evidence showed that there had been fencing and police lines in various places earlier in the day, there was no evidence whatsoever that Zink ever went past a standing barrier, police officer, or police line.

Moreover, Zink's many statements and remarks cannot be construed to fall outside protected speech, political advocacy and petitioning for redress of grievances.

**A. The evidence was insufficient to sustain Zink's conviction for obstructing an official proceeding of Congress.**

Most significantly, the evidence was clear that no one inside the U.S. Capitol on January 6 could have heard or been affected by anything Zink said.  Zink occasionally chanted and joined in group statements while at a great distance from the Capitol.  Such chanting was entirely within the tradition of First-Amendment-protected political advocacy (e.g., "We want Trump!" "USA!").

A handful of Zink's statements as he walked on Capitol grounds were plainly spoken into his cell phone to a Facebook livestream audience.  It was in these livestreams that Zink spoke words about "bumrushing" the Capitol or "storming" the Capitol.  Nothing in Zink's words constitute criminal activity.

There is binding case law which holds that the Capitol Grounds are a free speech forum. *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972). In *Jeannette Rankin Brigade* a special 3-judge panel of the DC District Court held that the <u>Capitol Grounds are "an area to which access cannot be denied broadly or absolutely."</u> 342 F. Supp. 575, 583-84 (D.D.C. 1972) (emphasis added). The Supreme Court summarily affirmed, making *Jeannette Rankin Brigade* binding precedent. 409 U.S. 972 (1972).

Later, in *Community for Creative Non-Violence v. Kerrigan*, the DC Circuit held that "there is no doubt that the Capitol Grounds are a public forum." 865 F.2d 382, 383, 387 (1989) (upholding "a reasonable time, place or manner restriction," a regulation limiting the length of time during which demonstration "props and

equipment" may remain on the Grounds). Clearly, therefore, the "Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public," and "the primary purpose for which the Capitol was designed--legislating"--is entirely consistent "with the existence of all parades, assemblages, or processions which may take place on the grounds." *Jeannette Rankin Brigade*, 342 F. Supp. at 584.

Indeed, in *Jeannette Rankin Brigade*, the district court observed that "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Id*. *See also, Lederman v. United States*, 291 F.3d 36 (DC Cir. 2002) (striking down a regulation banning leafleting and other "demonstration activities" on the sidewalk at the foot of the House and Senate steps on the East Front of the Capitol). The *Lederman* Court found that sidewalks around the Capitol are a public forum, and that a regulation banning leafleting and other "demonstration activities" at the foot of the House and Senate steps on the east side of the Capitol is unconstitutional.

Note that courts have held that even the *interior* of the Capitol is an appropriate forum for organized prayer sessions and organized walking through the halls.[1]

---

[1] The First Amendment literally says "Congress shall make no law" restricting speech, advocacy, or petitioning. The government's only path around this problem is the notion that the mere presence of the Vice President in the Capitol on Jan. 6 somehow allows for prosecutions of advocates, protestors or petitioners hundreds of yards away, outside, separated by numerous thick marble walls.

But the Supreme Court has never held that the First Amendment can be evaded simply by a Secret Service proclamation that a protected government official lurks nearby.  The government often asserts on Judge Friedman's well-articulated opinion in *Bynum v. U.S. Capitol Police Board*, 93 F. Supp. 2d 50 (D.D.C. 2000), which the government says classified the interior of the Capitol as a nonpublic forum.  In fact, *Bynum* struck down a previous ban on picketing and parading in the Capitol as too broad. See id. (holding groups of visitors have 1st amendment rights to hold nondisruptive prayer sessions in Capitol hallways).

Judge Friedman himself wrote that his conclusion to categorize the inside of the Capitol as a 'nonpublic forum' was "somewhat surprising." Id. at 56 ("Which brings the Court to what may seem a somewhat surprising conclusion that the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes").  And despite the *Bynum* Court's pronouncement that the inside of the Capitol is a nonpublic forum for protesting, the Court held that some, limited expression, prayer and petitioning is nonetheless permitted inside the Capitol:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking . . . or other expressive conduct. . . ." Traffic Regulations for the Capitol Grounds § 158. Because the regulation's proscriptions are not limited to the legitimate purposes set forth in the statute, it is an unreasonable and therefore an unconstitutional restriction on speech. *See Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc*., 482 U.S. 569, 575 (1987) (general prohibition of First Amendment activity in airport cannot be justified even if airport is nonpublic forum "because no conceivable government interest would justify such an absolute prohibition of speech"). For these reasons, and those discussed in Section II B of this Opinion, the regulation is both unreasonable and unconstitutionally overbroad.

*Bynum*, at 57.

Judge Friedman also found that the "picketing and parading" ban violated due process because it was vague:  "While there certainly are types of expressive acts that rise to the level of a demonstration, any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." Id.

> The regulation as written allows a police officer to restrict any sort of expressive conduct when, in the eyes of the particular officer, it might attract onlookers -- without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs. The determination of what conduct is prohibited by such a regulation therefore necessarily will vary depending on the subjective judgment of the particular officer regarding what conduct in his or her judgment has a "propensity to attract a crowd of onlookers." Such a regulation does not provide any standard at all. Rather, it "confers on the police a virtually unrestrained power to arrest and charge persons with a violation" and "the opportunity for abuse . . . is self-evident." [citations omitted].
> The virtually standardless, broad discretion given to the Capitol Police by this regulation also causes it to be unconstitutionally vague.

Bynum, at 58-59.

There was no evidence at trial showing Zink damaging any property, confronting any officers, breaking through any police lines, upending any barricades, or even yelling at an officer.

**Nothing in Zink's conduct obstructed an official proceeding of Congress.**

Compare Zink's conduct, or the entire Jan. 6 episode, to episodes of political rioting in D.C. history.  During the May Day Riots of 1971, thousands of demonstrators attacked the City's infrastructure with "the avowed purpose" to "close down the government". 165 U.S.App.D.C. at 36, 506 F.2d at 97. Protestors published a "May Day Tactical Manual" which (on page 3) stated that the "objective (of the demonstrations) was to close down all Federal government sections of Washington, D.C., by blocking traffic arteries during the early morning rush hours of May 3 and 4."

"The Manual identifies and describes in detail, with a photograph of each, and a marked street map, twenty-three "target areas" where traffic could be disrupted."  Key points were selected for obstruction . . .. Most Federal employees live in the Maryland and Virginia suburbs and use these arteries daily in commuting to their offices. If the demonstrators' program had become effective, the result would have been a massive blockage of the operation of the Government. The climax of this anti-war effort was set for Wednesday, May 5, 1971. The outline called for all the people who had not been arrested on May 3 or 4 to *move*

*to the Capitol building to lay a nonviolent siege demanding that Congress ratify the Peoples' Peace Treaty and to remain there until the Treaty was ratified or all were arrested*. The Manual made it quite clear that the singular objective of this effort was to close down the federal government.

All of this is documented in *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977).  Note that the large "First Amendment" sign and plaque in the hallway on the 1st floor of the Prettyman Courthouse memorializes this case.  In comparison, the four hours of rioting on January 6, 2021 pale in comparison. And nothing in Zink's conduct on January 6 remotely obstructed anything inside the Capitol building.

Of all the First Amendment cases ever decided by the Supreme Court, the case of *Adderley v. State of Fla*., 385 U.S. 39, 48 (1966) may provide the clearest path for analysis.  In *Adderly*, the Court upheld the trespassing arrest of 13 college students who entered the grounds of the Leon County, Florida jail to protest prior arrests and city segregation policies.  The students blocked a driveway to the jail entrance not normally used by the public and refused to disperse after being ordered by sheriff.  Significantly, the majority opinion authored by Justice Black indicated that the same facts *would lead to First Amendment protection from a trespass conviction* <u>if the facility had been a capitol with a history of political protest and speech advocacy</u>.

The dissenting opinion in *Adderley v. State of Fla*., authored by Justice Douglas and joined by Brennan and Fortus, found that the student protestors' trespassing arrests <u>should be overturned on First Amendment grounds</u>. 385 U.S. 39, 48 (1966) (Douglas, J., dissenting). "We do violence to the First Amendment when we permit this 'petition for redress of grievances' to be turned into a trespass action," wrote the dissenters. *Id*. at 52.

The parallels between the *Adderly* case and January 6 could not be more compelling.  In fact, there was evidence in the *Adderly* case that workers in the jail were obstructed and afraid to leave the jail facility during the protest. And in some ways, the disruption of the Leon County jail by the *Adderly* protestors was less supported by the law than the protests of January 6.[2]  Even so, three Supreme Court justices pronounced that the student protestors' conduct was First Amendment protected. "In the first place the jailhouse grounds were not marked with 'NO TRESPASSING!' signs," wrote Douglas, *id*. at 52, and "[o]nly the sheriff's fiat [ordering trespassers to disperse" transformed lawful conduct into an unlawful trespass." *Id*.

Three members of the Supreme Court held in 1966 that protestors who entered the grounds of a jail—which (unlike Capitol Grounds) had never been a

---

[2] **"The fact that no one gave a formal speech, that no elaborate handbills were distributed, and that the group was not laden with signs would seem to be immaterial" to the question of First Amendment protection, wrote the dissent.  Justice Douglas wrote that the First Amendment protected the *Adderly* protestors nonetheless. Id. at 51.**

forum for free speech—blocked traffic, prevented a worker from leaving, and defied orders from a sheriff to disperse were <u>fully protected</u> by the First Amendment.  *And* <u>*every member of the Supreme Court*</u> held that the First Amendment would have protected the protestors from a trespassing conviction under the same facts *if the facility had been a capitol rather than a jail.*[3]

Justice Douglas cited numerous Supreme Court cases standing for the proposition that the 'custodian' of public property cannot arbitrarily decide "when public places shall be used for the communication of ideas," e.g., Hague v. C.I.O. 307 U.S. 496 (1939); Schneider v. State of New Jersey, 308 U.S. 147, 163—164; Cantwell v. State of Connecticut, 310 U.S. 296; Largent v. State of Texas, 318 U.S. 418; Niemotko v. State of Maryland, 340 U.S. 268; Shuttlesworth v. City of Birmingham, 382 U.S. 87. "For to place such discretion in any public official, be he the 'custodian' of the public property or the local police commissioner (cf. *Kunz*

---

[3] The Court compared the jail protest with the protest upheld in *Edwards v. South Carolina*, 372 U.S., at 235, 83 S.Ct., at 683 (1963). In *Edwards*, the Supreme Court overturned convictions of protestors at a state capitol who refused commands to disperse.

> In *Edwards*, the demonstrators went to the South Carolina State Capital grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. The demonstrators at the South Carolina Capital went in through a public driveway and as they entered they were told by state officials there that they had a right as citizens to go through the State House grounds as long as they were peaceful. Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff.

Adderly at 41.
> The dissent even gently mocked the majority's proffered distinction between jail grounds and legislative grounds. "Would the case be any different if, as is common, the demonstration took place outside a building which housed both the jail and the legislative body? I think not." *Id*. at 53 (Douglas, J. dissenting).

*v. People of State of New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280), is to

place those who assert their First Amendment rights at his mercy." Id. at 54. "It

gives him the awesome power to decide whose ideas may be expressed and who

shall be denied a place to air their claims and petition their government." Id.

## NEWLY DISCOVERED EVIDENCE REGARDING HUNDREDS OF WITHHELD PHOTOGRAPHS  AND VIDEOS

Additionally, Zink's defense has obtained newly discovered information that

the government withheld most of the evidence—including plainly exculpatory

evidence—from the defense.  After the government's case in chief, Zink's counsel

discovered that it had been deprived of most of the evidence in this case.

Trial began on September 5; the government presented its case in chief and

rested by the end of Wednesday, September 6.  The defense's third witness,

Stephanie Zink, testified that Ryan had gone to D.C. on January 6 to take pictures

for his father's political campaign.  On cross-examination, prosecutors mocked and

discredited Stephanie Zink, asking her why the Zink campaign hadn't used any of

Ryan's Canon camera pictures on Jeff Zink's political website.  Stephanie Zink,

the campaign director, replied that the campaign hadn't uploaded the pictures

because the government had seized the camera and its pictures.

Note that Ryan was arrested—and the Canon camera seized—on Feb. 4,

2021—*just four weeks after January 6*.  Two and one-half years later, the

government provided some 24 pictures from the camera to the defense in

discovery. And defense counsel, for obvious reasons, was under the impression that the 24 pictures constituted the entirety of the camera photos.

It was after the government's cross-examination of Stephanie Zink that defense counsel realized there were large amounts of missing photos.

At around 10 pm on Sunday night, Sept. 12—after a three-day break in the trial and after defense counsel had gone to bed the night before restart of trial—the government emailed a set of exhibits it intended to use on cross-examination of Ryan Zink the following morning. Among these pictures were new pictures which the defense had never seen before—taken from the Canon camera. At least one photo was a picture of cops at the barricade line to the left of Zink on January 6 which partially rebutted and discredited Zink's trial testimony.

This was after Ryan Zink had taken the witness stand in his own defense on Thursday. Ryan's direct examination continued the following Monday morning.

(Note that Zink's trial strategy and defense would have been different had the government timely disclosed these pictures. In fact, Zink may have decided not to take the witness stand at all.)

So it was that Zink's counsel Roots sent an email to prosecutors at 8:40 a.m. on Monday morning prior to trial, Sept. 11. "We will be objecting to several of these newly provided exhibits. . . . Additionally, we have not been provided with all of Ryan's photos from the Canon camera in DOJ's possession."

Zink's counsel did object to the introduction of the newly-proved photos, but the Court overruled the objection.

Upon further review with Mr. Zink himself, defense counsel realized that many hundreds of photographs and videos taken by Zink on January 6 have been improperly withheld by the prosecution. The number of withheld video and image files number in the hundreds and may total *more than a thousand*.  This constitutes by far the bulk of the evidence in this case. And the defense never saw it.

**This missing evidence is plainly exculpatory.**

Again during closing arguments, prosecutors mocked and belittled Zink's testimony that he had been a journalist and campaign photographer/videographer for his father on Jan. 6.  Prosecutors told the jury that Zink *was a liar* and that Zink's purpose in Washington, D.C. on January 6 had nothing to do with Jeff Zink's campaign. At one point, the prosecution even told the jury that none of Ryan Zink's pictures had been pictures of Jeff Zink.  This was damning to Zink, and almost certainly caused the jury to convict Zink. *While the government withheld the very camera images Zink could use to rebut the prosecution.*

Attached to this motion are sworn declarations by Stephanie Zink and Jeff Zink, who briefly saw the pictures taken by Ryan on the Canon camera prior to the camera's seizure by FBI on Feb. 4, 2021.  Both Stephanie and Jeff Zink attest under penalties of perjury that the Canon camera files contained campaign pictures

of Jeff Zink and Jeff Zink's surroundings which would have been suitable for Jeff Zink's congressional campaign.

These images would have directly supported Zink's defense and rebutted and disproven the prosecution's case.

Thus it is plain that these withheld images are exculpatory. <u>Zink is entitled to a new trial on this basis alone</u>. The government misled the jury throughout the trial by disparaging, denigrating, insulting and mocking Zink's defense—while knowingly possessing and withholding evidence which would have supported Zink's defense and rebutted the prosecution.

Additionally, at the close of trial after the jury went out to deliberate, Emily Lambert of Zink's legal team approached the prosecution table and asked if they would be willing to provide the missing photos if Ms. Lambert provided a flash drive.  The prosecutors told Ms. Lambert <u>they had destroyed the photos</u>. See the attached declaration of Emily Lambert.

When Ms. Lambert followed up with an email to the prosecutors to memorialize the conversation, the prosecutors did not respond. See attachments.

CONCLUSION

For all the reasons described herein, defendant Zink is entitled to a new trial.

Dated: October 3, 2023                                    Respectfully Submitted,

                                                          */s/ John M. Pierce*
                                                          John M. Pierce
                                                          21550 Oxnard Street
                                                          3rd Floor, PMB #172
                                                          Woodland Hills, CA 91367
                                                          Tel: (213) 400-0725
                                                          Email: jpierce@johnpiercelaw.com

14

**CERTIFICATE OF SERVICE**

I, John M. Pierce, hereby certify that on this day, October 3, 2023, I caused a copy of the

foregoing document to be served on all counsel through the Court's CM/ECF case filing system.


<u>/s/ John M. Pierce</u>
John M. Pierce