### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | : **Case No. 1:21-cr-191 (JEB)** |
| | : |
| **RYAN ZINK** | : |
| | : |
| | : |
| **Defendant.** | : |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO
### SET ASIDE VERDICT AND FOR NEW TRIAL

The United States of America hereby opposes Defendant Ryan Zink's (hereinafter, "Zink") motion to set aside the verdict and for a new trial (ECF No. 106). Zink's motion raises two arguments: (1) that there was insufficient evidence to convict Zink of all counts beyond a reasonable doubt; and (2) that photographs he took on January 6 constitute newly discovered evidence and merit a new trial. As explained herein, Zink's claims lack factual and legal support, and accordingly, his motion should be denied.

### I.      Background

On January 6, 2021, Zink participated in the riot that took place at the United States Capitol. On that infamous day, the United States Capitol building was closed to the public for Congressional certification of the results of the 2020 presidential election and because of the Covid 19 pandemic. Trial Transcript Volume I at 125-126.[1] The Vice President of the United States is a person protected by the Secret Service. 18 U.S.C. § 3056(a)(1). On the of January 6th following a presidential election, the United States Constitution and the Electoral Count Act dictate that the Vice President will preside over a joint session of Congress to count the votes of the Electoral

---

[1] The trial transcripts correspond with each day of five days of trial and are labeled Volumes I through V. Hereinafter, each transcript will be referred to by volume as "Tr. I" and so on.

College. U.S. CONST. art. I, § 3, cl. 4; 3 U.S.C. § 15 . On January 6, 2021, Vice President Pence arrived at the Capitol shortly before 1:00 p.m. for this purpose.  *See* Trial Ex. 406. A riot ensued and the Vice President, legislators, and staff had to be evacuated for their safety. *Id*.  Rioters poured into the building and breached the House and Senate chambers. *Id*. The riot interrupted and delayed Congress's certification of the Electoral College vote that determined the outcome of the 2020 presidential election. *Id*. Congress could not reconvene while rioters were present in the Capitol building and grounds.  *See* Tr. I at 182-183.

Because of the presence of Secret Service protectee Vice President Mike Pence, a restricted perimeter was established around the Capitol grounds and was established by "Area Closed" signs, bicycle racks, snow fencing, and uniformed police officers. *See* Trial Ex. 502; Tr. I at 146-148, 151, 157-158.  Zink entered the restricted perimeter on the east front of the Capitol (*see* Tr. III at 208-210; Tr. IV at 24) and remained near the Rotunda Doors (*see* Tr. IV at 18-19, 27-28). The Rotunda Doors were not a public entrance or exit to the Capitol. *See* Tr. I at 180.  Rather, the Rotunda Doors were used for ceremonial purposes such as State funerals.  *Id*. The landing outside of the Rotunda Doors was well within the restricted perimeter.  *Id*. at 182.  While on restricted Capitol grounds, Zink chanted, shouted, and made clear his intent to interrupt or delay the Congressional proceedings.  *See* Trial Exs. 101.1, 102.1, 103.1, 104.1, 105.1, 202.1-202.10.

Consequently, Zink was convicted after a jury trial of three counts arising from the events of January 6:  Count 1 - Obstruction of an Official Proceeding and aiding and abetting in violation of 18 U.S.C. §1512(c)(2); Count II -  Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1); and Count III - Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(2). *See* ECF No. 6 (Indictment); ECF No. 102 (Jury Verdict Form); Minute Entry Sep. 13, 2023.

Before the trial began, the Court denied an 11th hour motion to preclude the United States from introducing Facebook video recordings Zink livestreamed on January 6th on the basis that the recordings were tantamount to "confession statements" pursuant to "corpus delecti rules." *See* ECF No. 84; Tr. I at 3.  The motion in limine admitted that Zink entered and remained in the restricted perimeter around the Capitol on January 6, as follows:

> Zink merely stood and walked in various locations outside the Capitol on January 6.  At most, this evidence might implicate Zink for 'entering or remaining in a restricted area' (if the jury credits the government's assertion that the steps, grounds, terrace of the Capitol were truly posted and restricted.)

ECF No. 84 at 2.

Trial began on September 5, 2023, and concluded on September 13, 2023.  *See* Minute Entries Sep. 5-13, 2023.  The jury heard testimony from Government witnesses: United States Capitol Police (USCP) Lieutenant George McCree, USCP Officers Joshua Barney, Raymond Mooney, and Benjamin Fluke, Secret Service Inspector Lanelle Hawa, Federal Bureau of Investigation Special Agent Michael Brown, and in rebuttal, USCP Lieutenant John Jenkins.  Zink testified and called witnesses: Laura Zink, Stephanie Zink, Alexandra Fields, Jeff Zink, Andrew Pore, and Robert Powell.

## II.    Legal Principles

Federal Rule of Criminal Procedure 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." When considering such a motion, the Court must "consider[] th[e] evidence in the light most favorable to the government" and uphold a guilty verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002). Put another way, the Court must determine whether "a reasonable juror must necessarily have had a reasonable

doubt as to the defendants' guilt." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). The post-trial standard for a new trial on sufficiency is "highly deferential" to the jury verdict. *See United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016). "[W]e *must* accept the jury's verdict if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Id.* (internal punctuation omitted and emphasis added). The Court "must view the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Id.*

Federal Rule of Criminal Procedure 33(a), in turn, provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Trial courts enjoy broad discretion in ruling on a motion for a new trial." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014). Accordingly, the D.C. Circuit counsels that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *Id.* (citation and internal quotation marks omitted).

"To obtain a new trial because of newly discovered evidence (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal." *Thompson v. United States*, 188 F.2d 652, 653 (C.C. 1951). "Under our usual Rule 33 standard, a defendant is not entitled to a retrial on the basis of newly discovered evidence unless he can show that **"a new trial would *probably* produce an acquittal."** *United States v. Williams*, 233 F.3d 592, 593 (D.C. Cir. 2000) *(quoting Thompson)* (emphasis added by *Williams* Court). Generally, a hearing on a motion for new trial to consider newly discovered evidence is not required, absent a claim of witness intimidation where

a determination of credibility could be required.  *See Lyons v. United States*, 833A.2d 481, (D.C. 2003).

It should go without saying that a Rule 33 motion for a new trial based on newly discovered evidence would require "that the evidence truly be newly discovered[.]"  *United States v. Gloster*, 185 F.3d 910, 914 (D.C.Cir.1999).  A defendant's "new assessment" of evidence adduced at trial, or "speculation" about testimony heard at trial does not constitute "newly discovered evidence." *United States v. Davis*, 612 F. Supp. 2d 48, 52 (D.D.C. 2009), aff'd, 377 F. App'x 19 (D.C. Cir. 2010) (citing *Gloster*, 185 F.3d at 915 (noting that defendant had a "full opportunity to question [the witness] before trial and to include whatever information he wanted in the written statement admitted into evidence" and that the omitted details were not newly discovered because "they [were] simply newly proffered, having been intentionally withheld as a result of the defense's tactical calculations")).

## III.    Analysis

It is unclear what relief Zink is seeking in his post-trial motion captioned, "Defendant Zink's Rule 29 & 33 Motion to Set Aside Verdict, And For New Trial." *See* ECF No. 106, caption. In the caption Zink identifies his motion as one pursuant to Rule 29 of the Federal Rules of Criminal Procedure which sets out the requirements for a motion for judgment of acquittal, but the body of the motion says that he is seeking to "to set aside the verdict." *See Id*. at 1. In his motion to "set aside the verdict," he makes a sweeping claim that the evidence was insufficient to sustain the jury's verdict on all counts, but then focuses primarily on Count I for obstruction of an official proceeding. *Id*. at 2-9.  Thus, the United States will interpret his insufficiency argument as a request for judgment of acquittal.

Zink's request for a new trial appears to be under both Rules 29 and 33, but this is equally unclear.   His motion for new trial appears to be based on his claim that he "newly" discovered

that "the government withheld evidence" and not on *new* evidence. *Id*. at 10. He implies also that the "newly discovered" evidence consists of pictures he took on January 6. *Id*. at 11. However, he does not identify any photograph(s) as new evidence. He states that photographs from the Canon camera that were supposedly withheld were used by the prosecution as exhibits at trial in a way that undermined his defense, but also that photographs from the Canon camera would have corroborated his defense. See ECF No, 106 at 10-13. Zink did not offer the Court a legal standard for review for any of any of his claims, nor request a hearing on his motion pursuant to Rule 33. The United States will first address the arguments in Zink's motion to "set aside the verdict" before turning to his request for a new trial.

### A.      Count I – Obstruction of an Official Proceeding

There was overwhelming evidence of Zink's guilt for obstruction of an official proceeding in Count I. The elements of obstruction of an official proceeding are, (1) the defendant attempted to or did obstruct or impede an official proceeding; (2) the defendant intended to obstruct or impede the official proceeding; (3) the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the proceeding; and (4) the defendant acted corruptly. 18 U.S.C. § 1512(c)(2); See *United States v. Mostofsky*, 579 F. Supp. 3d 9, 27 (D.D.C. 2021).

Zink argues that the evidence was insufficient to convict him of obstruction of an official proceeding on the theory that that the Capitol is a free speech forum and that, consequently, his presence and statements at the Capitol were protected by the First Amendment. See ECF No. 106 at 3-5. The cases he cites are inapposite to the circumstances present on January 6, 2021—closure of the Capitol building and grounds to the public due to the Covid 19 pandemic, the Congressional proceeding to certify the election, and the presence of a Secret Service protectee. Moreover, Zink was not prosecuted for his speech or other protected activity on January 6. A long list of cases

rejects the First Amendment challenge in the January 6th context.  *See e.g., United States v. GrossJankowski*, No. 21-123, 2023 WL 130817, at *7 (D.D.C. Jan. 9, 2023) (surveying cases). "Section 1512(c)(2) targets only 'corrupt' acts of obstructing, influencing, or impeding an official proceeding. Therefore, it does not 'proscribe lawful or constitutionally protected speech.'"  *Id*., quoting, *Caldwell*, slip op. at 48, —— F. Supp. 3d at —— (quoting *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996)).

An individual who obstructs or impedes a Congressional proceeding by engaging in other independently unlawful conduct acts corruptly.  *See United States v. Mostofsky*, 579 F. Supp. 3d 9, 26 (D.D.C. 2021).  Here, Zink showed his corrupt intent by, among other things independent of his clear-cut statements of intent, the unlawful actions of entering or remaining in restricted ground in violation of 18 U.S.C. § 1752(a)(1), and disorderly conduct within restricted grounds in violation of 18 U.S.C. 1752(a)(2).

Often (though not always[2]), acting corruptly involves acting with the intent to secure an unlawful advantage or benefit either for oneself or another person.  *See United States v. Fischer*, 64 F.4[th] 329, 340 (D.C. Cir. 2023) (opinion of Pan, J.); *id.* at 352 (Walker, J., concurring); *United States v. Weyer, No. 22-cr-40 (JEB) (Transcript of bench trial, June 6, 2023, at 57)*.  Zink revealed this additional aspect of his corrupt intent to obstruct the Congressional proceedings and keep Donald Trump in office, in his words and actions as documented in videos he took on January 6, and in social media postings before and after.

---

[2] *See United States v. Robertson*, No. 22-3062, 2023 WL 6932346 (D.C. Oct. 20, 2023) (rejecting Robertson's claim that "corruptly" should exclude seeking a benefit to former President Trump because the benefit was "too remote").

A summary of the evidence—which at this stage the Court must consider in the light most favorable to the government—demonstrating that a rational juror could have found Zink's intent to obstruct the Congressional proceedings on January 6 beyond a reasonable doubt, follows.

### 1. Social Media Postings Before January 6

Zink posted on Facebook about his dissatisfaction with the results of the 2020 election on election day 2020, as follows: "Say prayers Go vote Clean guns…Make bug out bag…" *See* Trial Ex. 202.9. On December 5, 2020, he posted, "kiss your freedom goodbye if Biden wins." *See* Trial Ex. 202.1.

### 2. Conduct and Statements on January 6

Zink traveled from Arizona to Washington, D.C. with his father, Jeff Zink on January 5th. *See* Tr. III at 48-49. On the morning of January 6, 2021, Zink posted to social media, "Stop the Steal." Trial Ex. 202.10. He attempted to go to the "Stop the Steal" rally, and then filmed himself walking to the Capitol before the rally ended and saying, "Congress is in session," "pay attention to what is going on today with Congress," "Stop the Steal," "time to get this stuff done," "MAGA, go Trump, Trump 2020." *See* Trial Ex. 101.1. On his approach to the Capitol, Zink filmed himself in front of "Area Closed" signs, snow fencing, bike rack barricades, and police lines. *See* Trial Exs. 101.1, 101.1a, 101.1b,111.1, 111.2. Zink stood right up against a bike rack barrier on the east front of the Capitol manned by police before the breach of the east front. *See* Trial Exs. 111.1, 111.2. From his vantage point he could see rioters violently breach those barriers. *See* Trial Exs. 107, 110, 201.1. On the east front of the Capitol grounds, even after some of the bike rack barriers were broken down, many sections remained standing. *See* Trial Ex. 107. Additionally, immediately after the bike rack barriers on the east front were breached, Zink livestreamed video to Facebook of himself saying, " "We knocked down the gates. We're storming the Capitol. You can't stop us. We broke through. They're not holding us out." *See* Trial Ex. 103.1.

As Zink participated in the riot on restricted Capitol Grounds, he livestreamed videos and stated his intent to impede or interrupt the Congressional proceedings, chanting and shouting the following:

- "USA USA USA!  You can't stop us.  You can't stop us.  This is our land. We want Trump! We Want Trump! We want Trump! We want Trump!"  *Id*.

- "We stormed the Capitol.  There's thousands of us here, they can't stop us all.  And everybody else is coming too."  *Id*.

- "We are at the steps of the Capitol.  Call your congressman.  Call anyone that you can.  Get to your Capitols.  Get to your Capitols.  It's time.  This is bullshit." *Id*.

- "This is our country.  This is it.  The steps of the Capitol.  Stop the steal! Stop the steal! Stop the steal!"

- "They cannot stop us.  This is our country.  This is our building.  This is ours."  *Id*.

- "You all wanted to know how it's going? We are about to bum rush this shit."  *Id*.

- "You wanted to see what it's become.  We're in the doors.  They shot flashbangs at us.  Do they hear us?  Do they hear us now?" Trial Ex. 104.1

And late on January 6, he posted the following explicit statement of his intent on Facebook: "Broke down the doors pushed Congress out of session" and concluded, "we accomplished the job."  Trial. Ex. 202.4.

### 3.  Social Media Posts After January 6

On January 7, 2021, Zink commented on Facebook, "they are trying to charge us with sedition they will have to kill me im [sic] not coming quietly."  Trial Ex. 202.7. On January 8, 2021, he posted, "I'm afraid the time for rioting is over better clean those guns and invest in some level 4 armor." Trial Ex. 202.8.

4.        **In Fact, Impeding or Disrupting**

Zink also argues that his conduct did not in fact impede Congress because people inside the Capitol could not have heard his words about "bum rushing" or "storming" the Capitol or chanting "We want Trump!" *See* ECF No. 106 at 3.   However,  Zink's conduct cannot be considered in a vacuum because he was part of a mob of thousands.  In *United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022), for example, Judge Kollar-Kotelly found that "[e]ven the mere presence in an unlawful mob or riot is disruptive insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants."  *Id*. at 8. "Even the presence of <u>one</u> unauthorized person in the Capitol," however, can be "reason to suspend" — and to extend the suspension of — "Congressional proceedings." *Id*. at 9.   In this case, USCP Lieutenant McCree testified that it was not safe for Congress to resume their work until all rioters were cleared from the Capitol building and grounds.  Tr. I at 182-183. Zink entered the United States Capitol grounds as part of a riot as Congress was in session to certify the presidential election with the Vice President present. Thus, his actions must be viewed in that frame.

Moreover, Zink was not merely present; he actively participated in the riot.  He chanted, shook his fist, went past police lines to the top of the Rotunda steps as part of a crowd of thousands of people rushing the Capitol building.  See Trial Exs. 103.1, 104.1, 105.1. Zink's video recorded statements on January 6 as he walked through the restricted area proved that he knew that his conduct was unlawful, e.g., "we broke down the gates," and "we're storming the Capitol," and "you can't stop us."  *See* Trial Ex. 103.1.

Video evidence also showed that Zink had a line of sight to rioters physically assaulting police officers as the officers tried to hold on to the barriers and hold back the mob during the east front breach.  *See* Trial Exs. 107, 112.  From his vantage point, Zink saw that the riotous mob

overwhelmed the police, violently ripped apart the bike racks, and pushed through the police line. *See* Tr. Exs. 112, 201.1.   Video evidence showed that although some bike rack barriers were forcibly removed by rioters, many remained that Zink had to walk by.   *See* Tr. Ex. 107.

After the breach of the police line and barricades at the east front perimeter, Zink continued to film as police raced to the building and formed a line on the first landing of the East Front stairs. *See*, Tr. Vol. III at 137.   Zink stood near the bottom of the East Front stairs as rioters breached the police line on the first landing and pushed the officers back to the top of the East Front stairs.   *See* Trial Ex. 103.1.   Zink testified that he could see a police line that formed near the top of the East Front stairs.   *See* Tr. Vol IV at 129-131, 134-135.   Before Zink climbed the stairs to the landing outside of the Columbus doors he yelled, "You all want to know how it's going? We are about to bum-rush this shit."   *See* Tr. Vol. IV at 135; Trial Ex. 104. Zink remained on the landing and filmed rioters as they tried to breach the Columbus Doors.   *See* Trial Ex. 105.1.   He did not leave the landing when he saw police officers had been sprayed with chemical agents.   *See* Tr. Vol. IV at 41.   He did not leave the landing when police officers fired a flashbang to try and keep rioters out of the Columbus Doors.   *See* Tr. Vol. IV at 139.   He did not leave the landing as rioters breached the Columbus Doors.   *Id*. at 140.   Instead, Zink climbed on a pillar after the Columbus doors were breached so that he could see inside the Columbus Doors. *Id*. at 144. He testified that he decided to leave only after he saw that rioters were beating police officers inside the building.   *Id*.

Finally, Zink contends that the "circumstances" outside the Capitol evinced "tacit approval" from police to enter the restricted perimeter.   See ECF No. 106 at 2.   Although the motion does not make clear what the "tacit approval" consisted of, the defense contended at trial that a police officer waved them into the restricted grounds. See, e.g., Tr. III at 37, 117, 123. Video evidence and testimony from Lieutenant John Jenkins established that he waved his arm in an area where Zink was standing, but that he was actually waving to officers who were trapped behind the

advancing mob when police retreated to protect the Capitol building.  *See* Trial Ex. 110; 120; Trial Tr. Vol IV at 193:4-23 to 194:5-23. Any rational juror would have rejected the testimony that a police officer authorized Zink to enter the restricted perimeter, considering that from Zink's position leaning against a bike rack barrier, he could see the violent breaches of the bike racks.  In addition, the defense was inconsistent with Zink's own livestreamed statements at the time of the breach, including, "we knocked down the gates," "we're storming the Capitol," and "you can't stop us."

Examining the evidence in the light most favorable to the government, and deferring to the jury's determination of credibility, Zink's claim that the evidence of obstruction of an official proceeding is insufficient must fail.  A rational juror could clearly have found that Zink acted as part of a mob to obstruct, impede, and interfere with the orderly conduct of government business beyond a reasonable doubt.  His corrupt intent to secure an unlawful benefit that his preferred candidate would remain President of the United States was proved beyond a reasonable doubt. There is no First Amendment right to storm and "bum rush" the United States Capitol with the purpose of disrupting the peaceful transfer of power.

**B.     Zink's Conviction of Counts II and II**

The jury found Zink guilty of Count II of the Indictment charging Zink with entering and remaining in restricted grounds in violation of 18 U.S.C. § 1752(a)(1) and Count III charging Zink with disorderly and disruptive conduct in a restricted building or grounds a violation of 18 U.S.C. § 1752(a)(2).  The charge in Count II requires only that a defendant "knowingly enter or remain in any restricted building or grounds without lawful authority to do so." 18 U.S.C.§ 1752(a)(1). "[S]omeone can violate the statute by knowingly 'entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *United States v Griffin*, No. 21-0092, 2021

WL 2778557 at *3, 549 F. Supp. 3d 49, 54 (D.D.C. July 2, 2021) (quoting *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019).

The fact that Zink entered restricted Capitol grounds is not in dispute.  See ECF Nos. 84 and 106.  Zink admits in his motion to set aside the verdict that he "walked at a normal pace onto Capitol Grounds, accompanied by thousands of others." ECF 106 at 2. Zink also admits that there "had been fencing and police lines in various places earlier in the day." *Id*.

The same evidence reviewed herein with respect to Count I also established that Zink knowingly entered restricted Capitol grounds on January 6th. Trial evidence showed bike rack barriers and dozens of police officers first manning the barriers and then retreating to defend the Capitol closer to the building.  *See, e.g.,* Trial Ex. 107. In arguing that the government did not meet its burden, Zink asserts that there was no evidence of signs or postings on the east front as Zink entered. This argument ignores Zink's contemporaneous statements as he walked into the grounds that the barriers were "knocked down."  And, even though some barriers were knocked down−as Zink watched−many remained standing that he had to walk by. *Id*. The statute's requirement that a person not enter a cordoned off or otherwise restricted area does not disappear simply because some barriers were breached.

Moreover, Zink's argument ignores the other portion of the statute, which criminalizes knowingly remaining in a restricted area once a person becomes aware of his unauthorized entry. 18 U.S.C. § 1752(a)(1).  When police used extreme crowd control measures of spraying rioters with chemicals and firing flashbang munitions at them it is more than clear that "remaining" is unauthorized.  As officer Benjamin Fluke testified, "there would be no other reason why we would be using our munitions than to deter the crowd."  Tr. 5 at 21.  Zink admitted that he remained on the landing outside the Rotunda Doors, well within the restricted perimeter, for at least 45 minutes. *See* Tr. IV at 18-19.

Finally, Zink acted knowingly.  A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. *See* Tr. V at 30, 36 (Jury Instructions); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). Zink's selfie-style livestreamed video on the west front showed an "Area Closed" sign in the background (Trial Ex. 101.1.a) and another livestreamed video on the east front showed bike rack barriers and uniformed officers guarding the restricted perimeter in the background (Trial Ex. 111.1, 111.2). An open-source video showed Zink standing up against a bike rack barrier on the east front with numerous police officers in full view manning the bike rack barrier.  *See* Trial Ex. 111.  Thus, there was ample evidence that Zink knew that his conduct was unlawful, including his own statements, his view of the breaches of police lines, and his knowledge that police used chemical sprays and a flashbang munition to deter rioters.

The following elements establish Zink's guilt of Count III of the Indictment, charging him with a violation of 18 U.S.C. 1752(a)(2): (1) he engaged in disorderly or disruptive conduct; (2) in a restricted building or grounds; (3) with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (4) that such conduct, in fact, impeded or disrupted such business or functions. The same evidence set forth to establish the scope of the restricted grounds as to Count II, also applies to Count III. The government turns to the remaining three elements.

As discussed *supra* with regard to Counts I, a myriad of signs placed Zink on notice that his presence was unlawful. Zink not only watched but joined the riotous mob that overwhelmed the police.  He could see rioters that rioters had violently ripped apart bike rack barriers and pushed through police lines on the east front of the Capitol.  Undeterred, he marched across the plaza near the Senate skylight and filmed himself as he shouted, "we knocked down the gates," "we're storming the Capitol," and "you can't stop us."  Particularly in the presence of a mob on Capitol

grounds, Zink's conduct was capable of disrupting, and in fact disrupted, the orderly business of Congress. Zink's statements made before, during, and after his entry into the restricted Capitol grounds, make clear that Zink's conduct on January 6 was knowing. Yet even without his obvious statements of intent, the jury may have reasonably inferred Zink's knowledge as the natural and probable consequences of his conduct. *United States v. Rivera*, 607 F. Supp. 3d 1, at 7-9; *see also United States v. Griffith*, No. 21-244-2, 2023 WL 3477249, at *6. (May 16, 2023).

### C.    Motion for New Trial Based on Newly Discovered Evidence

As an alternative to acquittal, Zink's motion for new trial appears to be based on his claim that he "newly" discovered that "the government withheld evidence," and not on any actually new evidence discovered after trial.  ECF No.106 at 10.  The evidence purportedly withheld are pictures taken by Zink on January 6 which he speculates would be exculpatory, and which were discussed in court during the trial proceedings.  Under *Thompson*, Zink's motion fails for several reasons: the evidence was not "discovered" after trial; any pictures that did exist would be cumulative to the testimony given at trial that Zink was at the Capitol to take pictures for Jeff Zink's Congressional campaign; and in any event those pictures would not be of a nature to produce an acquittal.  *See Thompson v. United States*, 188 F2d 652, at 653.

Foremost, the allegation that discovery was withheld or that additional pictures exist is false.  As discussed in more detail next, all electronic evidence obtained in the seizure of Zink's Canon camera were provided to Zink in discovery.  Just as fatal, Zink has failed to identify any actual piece of evidence (in the form of a photograph or other piece of data from the SD drive he wrongly claims was withheld) *whatsoever*, let alone any evidence that would have resulted in an acquittal.  And even if photos existed to support Zink's claim that he was photographing his father's campaign, it would make little difference: a defendant's unlawful intent to obstruct an official proceeding is not negated by the simultaneous presence of another lawful purpose for his

conduct.  Even if it were presumed that one purpose for Zink's presence at the Capitol was to take pictures of Jeff Zink for use in his congressional campaign, Zink also had the intent to obstruct the official proceedings in Congress on January 6.  Thus, the motion falls far short of meeting the standard that a serious miscarriage of justice may have occurred.

### 1.   Zink's Claim that the Photographs are "Newly Discovered" is False

The issue of the photographs was previously addressed by this Court during trial as follows: "if your client says he took hundreds of pictures, he knew from the beginning that he had hundreds of pictures. So that is something, if you didn't get them, that you could have raised months ago. So, this idea that you are raising it right near the end of the defense case seems to me…" Tr. IV at 67. The Court then denied an oral  motion for a new trial based on the allegation that photographs constituted newly discovered evidence, stating, "the defense has known for months and months and months that these existed. And if they hadn't been provided., the defense should have asked for them..." *Id*. at 68.

Nonetheless, Zink claims in his motion that "[i]t was after the government's cross-examination of Stephanie Zink that defense counsel realized there were large amounts of missing photos." ECF No. 106 at 10. During Zink's case in chief, Stephanie Zink testified that as Jeff Zink's campaign manager she thought that Ryan Zink's travel to Washington, D.C. could help the campaign generate marketing materials.  *See* Tr. VI at 25. Similarly, in her affidavit attached to the motion for a new trial, Stephanie Zink claims to "personally recall seeing and reviewing pictures and videos that were on the Canon camera <u>after</u> Ryan Zink returned from Washington, D.C., before the camera was seized by the FBI." *See* ECF No. 106-3 (Affidavit of Stephanie Zink at ¶ 3). Additionally, Jeff Zink also claimed that he, "saw and reviewed pictures that were stored on the Canon Camera after Ryan Zink returned from Washington, D.C. on or about January 8,

2021, prior to the camera being seized by the FBI." See ECF No. 106-2 (Affidavit of Jeff Zink, ¶ 2).

Zink claims that these photographs—which Zink's family members knew about immediately after January 6—were improperly withheld by the prosecution.[3] *See* ECF No. 106 at 12. This claim is simply not true. Zink's prior defense counsel, Cynthia Orr, received these files in case specific discovery as documented in a letter dated August 19, 2022, more than a year before trial. *See* Attachment L. That letter specifically indicated that a USB drive including the data extracted from a 32GB SanDisk memory card (S/N # BM1836550822G) from a Canon Rebel SLR camera was included in the discovery materials. *Id.* at 7. Attorney Orr had trouble opening the files included on that drive. After some discussion,[4] on August 23, 2022, the government provided Attorney Orr with another copy of the extraction. *See* Attachment M. According to Attorney Orr, this included "the photos on the camera that were successfully extracted in the original arrest." *See* Attachment I. On February 23, 2023, Attorney Orr's office contacted Zink's current counsel regarding the transfer of Zink's file in her possession to his new defense team via drop box. Attorney Orr's paralegal memorialized the data transfer in an email dated February 28, 2023, and a member of Zink's current defense team, Emily Lambert, confirmed receipt of the drop box link on February 28, 2023. *See* Attachment J.

---

[3] Axiomatically, since Zink himself purportedly took the pictures, he also knew whether he had those pictures before the start of trial.

[4] Attorney Orr explained that the drive that was initially provided to her office could not be accessed and that her office was advised that the data was flawed in some way. Since the data could not be accessed, Zink was offered the opportunity to provide a consent to search the items again. *See* Attachment I (Orr email dated September 14, 2023). Attorney Orr indicated that Zink decided that "he did not want to provide such an authorization for an additional search." *Id.* In the end, as Attorney Orr advised Zink's current counsel, the government re-produced the extracted data on August 23, 2022. (Attorney Orr wrote to current counsel, in September 2023, "[her] office received … the photos on the camera that were successfully extracted in the original arrest.") *Id.*

Attorney Orr confirmed to all parties that she had provided the discovery to new counsel via drop box link. *See* Attachments K and N. Government counsel then sent an email to John Pierce, Zink's current counsel, confirming that he had the case specific discovery from Attorney Orr. *See* Attachment F, email to John Pierce dated July 25, 2023. That email included the original August 19, 2022 discovery letter to Attorney Orr—thereby ensuring that Zink's new defense team was on notice, that the Canon files were produced to him in August 2022. *See* Attachment G.

On August 27, 2023, the subject of these files came up again, when the government provided a subset of the data extracted from the Canon camera that was most relevant to the case. *See* Attachment A (email to John Pierce relating to the August 27, 2023 USAfx production); Attachment B (discovery letter memorializing that production in detail). That subset consisted of 116 thumbnails of photographs that were recovered—but only in thumbnail form—from the Canon SD card; those thumbnails related to Zink's activities on January 6 specifically. This discovery production included an FBI report which explained that, in reviewing the files relevant to January 6 that were found on the Canon camera SD card, "only thumbnails were recovered and not full pictures." S*ee* Attachment C (FBI report dated August 25, 2023). This discovery production also included an FBI report which noted that the evidence evaluated by the FBI included the "Canon Rebel SD Card A Search Warrant Results." *See* Attachment D (attachment to FBI report). Finally, the forensic examination report with the subset of relevant data from Canon Rebel SD Card A was also provided, which  contained the data for the 116 thumbnails recovered that appeared to be responsive to the search warrant. *See* Attachment E. This discovery material thus explained to defense counsel that 116 thumbnails from the Canon camera were seized as evidence, and that full-sized versions of the thumbnails were not recovered from the SD card.

Nonetheless, Zink claims in the motion for new trial that it was after the government's cross examination of Stephanie Zink that the defense counsel realized there were hundreds of

missing photos. See ECF No. 106 at 10-11. Again, this is simply not true. First, the defense had the discovery correspondence discussing the SD card from the Canon camera. Second, Stephanie Zink and Jeff Zink indicated that they knew of photos on the Canon camera, and Ryan Zink purportedly took the photos.

Additionally, in their motion the defense states a mistaken belief that the prosecution used photographs from the Canon camera at trial which the defense had never seen before. ECF No. 106 at 11. Again, this is not true. The photographs and videos used at trial by the prosecution were all extracted from Zink's iPhone. The confusion may come from the fact that two photographs the prosecution used were pictures manually taken of the viewfinder on the Canon Camera, taken with the iPhone camera. *See* Trial Exs. 201.1 and 201.2. These iPhone photographs were provided to Zink in the full extraction of the iPhone, which was transferred by Attorney Orr to Zink's current defense counsel in February of 2023. The iPhone photographs were again produced to current defense counsel in the scoped version of Zink's digital devices in the USAfx link shared with defense counsel on August 27, 2023 and detailed in the discovery letter. *See* Attachment B.

### 2. Zink's Claim that Photographs Are Exculpatory is Incorrect

Zink claimed at trial that he was at the Capitol in the role of a social media staffer for Jeff Zink's congressional campaign and claims in his motion that he took hundreds of pictures in that capacity. ECF No. 106 at 12. However, there is no reason to believe that photographs from Zink's Cannon camera would be exculpatory rather than serve as additional evidence of Zink's crimes. Zink used his iPhone camera to take a picture of the viewfinder on his Canon camera that showed rioters pushing against police. Trial Ex. 201.1. Another iPhone photo of the Canon camera viewfinder showed rioters running across the east front plaza immediately after the breach of police lines. Trial Ex. 201.2. Any further speculation Zink might make about what evidence the Canon

camera might contain is just that—speculation, unsupported by any actual evidence, "newly discovered" or otherwise.

Additionally, videos taken by Zink with his iPhone were consistent with the iPhone photographs that showed the riot and not campaign material. In the iPhone videos, Zink did not film Jeff Zink speaking about his candidacy. Even as Jeff Zink was giving an interview to the Epoch Times near Capitol grounds, Ryan Zink trained his iPhone camera on himself and talked about the Congressional proceedings, including details about an objection to the state of Arizona's electoral vote. Trial Ex. 102.1.

Zink alternately testified at trial that he was trying to be a Facebook influencer, and entertainer for his own purposes, and not a social media staff person for Jeff Zink's congressional campaign, as follows:

> Q: So at this point you have gone through the gates, you have used the language we broke through, they are not holding us out as you are walking to the Capitol building, isn't that correct?
> A: Yes, that's correct.
> Q: That's not just words you are using for your Facebook viewers. You are actually telling them exactly what you are doing, isn't that correct?
> A: No. I never knocked down any gates. The storming, I'm creating an environment. I am amping things up. I am not angry. I'm not doing -- I am walking at a slow pace next to my father.
> Q: Are you saying that your Facebook viewers wouldn't have been interested if you said, hey, the police just let us through the line and now we are going to walk over to the Capitol? Your viewers would not have been interested in that, right?
> A: Not for, like, the bland side. But my thinking at the time, which, you know, I have admitted I wish that I had made a different choice in the way that I presented, was that people would not stay engaged with my content if I didn't appear, you know, like a little rambunctious, if you will, but…
>
> Tr. IV at 128:9 to 129:4.

Thus, the jury saw and heard Zink's Facebook livestreamed videos and rejected Zink's defense that he was at the Capitol for an innocent reason of being a media staffer or a Facebook influencer and entertainer. There is no reason to believe, in the context of all the evidence, that any

photographs taken by Zink on January 6 would have overcome the otherwise overwhelming proof of his purpose and intent on January 6th.

Finally, the defense claims that, "[a]t one point, the prosecution even told the jury that <u>none</u> of Ryan Zink's pictures had been pictures of Jeff Zink. This was damning to Zink, and almost certainly caused the jury to convict Zink." ECF 106 at 12. However, the closing argument actually referred to videos, as follows: "He did not take one video of his father that you have seen to this day. You have not seen any videos of his father."  Tr. V at 84:17-20. The closing argument was not a reference to the camera images that the defense has claimed were withheld by the prosecution. Inasmuch as Ryan Zink's corrupt intent was established by overwhelming evidence, his argument that he had additional innocent purposes is without merit.


## **CONCLUSION**

For these reasons, the United States requests that the Court deny Zink's renewed motion to set aside the verdict and motion for new trial.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

*/s/ Cari F. Walsh*
CARI F. WALSH
Assistant U.S. Attorney
MO Bar No. 37867

HOLLY F. GROSSHANS
Assistant U.S. Attorney
D.C. Bar No. 90000361

United States Attorney's Office
for the District of Columbia

601 D Street, NW
Washington, D.C. 20530
Phone: (202) 252-6737
Cari.Walsh@usdoj.gov
Holly.Grosshans@usdoj.gov