IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT
OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>RYAN ZINK<br><br>           **Defendants.** | Criminal No.: **1: 21-cr-00191-JEB-1**<br><br>DEFENDANTS<br>OBJECTIONS TO<br>PRESENTENCE REPORT |

**DEFENDANT ZINK'S OBJECTIONS TO PRESENTENCE REPORT**

Defendant Ryan Zink ("Defendant" or "Zink"), through undersigned counsel, presents these objections to the Presentence Report (PSR).

**6.** "Pretrial Services Agency of the District of Columbia (PSADC) records indicate the defendant missed one check-in during the week of September 9, 2023. He has otherwise complied with all court-ordered conditions of release." **Objection.  This was obviously during Zink's trial in the same courthouse.  Upon information and belief, agents for Pretrial Services were watching and monitoring the trial and were aware of Zink's trial.  Zink knew that Pretrial Services knew he was on trial—down the hall from the Pretrial Services Office.  Zink did not mis any check-ins, as he understood it was unnecessary during trial.  After all, the agency is called PRE-trial Services and the requirement to check in is a PRE-trial condition; not a trial condition.**

**Objections to 16 to 23**

**16.** "At trial, evidence showed that the defendant, Ryan Zink, was aware of Congress's Joint Session to review and certify the Electoral College ballots on January 6, 2021. He traveled from Arizona to Washington, DC, with his father, Jeff Zink, on January 5, 2021. On the morning of

1

January 6, 2021, he attempted to attend the "Stop the Steal" rally but could not attend because he was carrying a large backpack. Defendant Zink walked to the US Capitol before the rally ended and filmed himself saying, "time to get it done; Stop the Steal." **Context must be added to this paragraph. Nothing in this paragraph indicates Zink used independent means to do anything other than intend to persuade policymakers to 'stop the steal,' which is 1st Amendment-protected political advocacy.**

17. "Mr. Zink revealed his intent to obstruct the Congressional proceedings and keep Donald Trump in office, not only by his words and actions captured in his own videos but social media messages and posts. For example, on December 5, 2020, he posted, "kiss your freedom goodbye if Biden wins."" **Zink's remark does no such thing. Nothing in such a remark suggests any "intent to obstruct the proceedings and keep Donald Trump in office." Zink merely expressed dark predictions about the state of freedom if Biden wins. This is not a crime.**

"On the morning of January 6, 2021, he posted, "Stop the Steal." After the riot, on January 7, 2021, he texted a friend, "it's official the election was stolen, I stayed up all night, they rejected 100% of the evidence nothing was done."" **Again, this was Zink's political assessment; and was not a crime.**

"The same day, he commented on Facebook, "they are trying to charge us with sedition they will have to kill me im [sic] not coming quietly."" "On January 8, 2021, he posted, "I'm afraid the time for rioting is over better clean those guns and invest in some level 4 armor." **Zink's remark was entirely conditional and hyperbolic. Under the true threats doctrine of the First Amendment, the remark was protected political speech. The true threats doctrine requires, at a minimum, that a threat be communicated under**

2

circumstances indicating a serious intent to harm and causing fear and social disruption. *See Virginia v. Black*, 538 U.S. 343 (2003); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).

**18.** At trial, defendant Zink testified that he did not know what Congress was doing and that he had no intent to disrupt the certification because he was "media." However, he filmed himself talking about the Congressional proceedings including details about an objection to the state of Arizona's electoral vote near the time the objection was actually occurring inside the Capitol. And late on January 6, 2021, he posted and sent messages indicating that Congress was "pushed out of session" and the "job was accomplished."

**There are elements of this paragraph that are inaccurate. Zink's testimony was that he didn't regard himself as extremely political and that his awareness of the precise proceedings on Jan. 6 was not detailed. He did film himself remarking with favor regarding Arizona's objection to the vote count—which was consistent with Zink's political advocacy (and his dual role as reporter of information).**

**19.** The defendant knew there was a restricted perimeter around the Capitol grounds. He took a selfie-style video on the west front that showed an "Area Closed" sign in the background, and another on the east front with bike rack barriers and uniformed officers guarding the restricted perimeter in the background. And an open-source video shows him standing up against a bike rack barrier on the east front with a view of numerous officers manning the bike rack barrier. Video evidence also showed that defendant Zink had a line of sight to rioters physically assaulting police officers as the officers tried to hold on to the barriers and hold back the mob during the east front breach. The riotous mob overwhelmed the police, violently ripped apart the bike racks, and pushed through the police line.

**Zink and his father both testified that they understood from circumstances on the east side that protestors were negotiating with police to get closer to the Capitol building. Zink even heard a lead officer say over a megaphone that the police were considering opening the plaza for the crowd to go forward. Thus, when the barriers were moved aside, Zink understood the crowd had been granted the right to a ceremonial "bumrush" of the plaza. It was a chaotic moment with lots of yelling and waving to come forward—including by an officer.**

20. After defendant Zink watched the violent breach, he marched across the plaza near the Senate skylight and filmed himself as he shouted, "we knocked down the gates," "we're storming the Capitol," and "you can't stop us." He repeatedly shouted, "STOP THE STEAL," and "WE WANT TRUMP" and declaring his intent to "bum rush this shit!"

**Zink did not see a violent breach. He did walk, along with his father across the plaza, following the crowd. Zink chanted political slogans along with the crowd; but his remarks about "storming the Capitol" and "bumrushing this shit" were for his Facebook livestream audience. Zink was acting as something of a hybrid protestor/campaign staffer for his congressional-candidate father, and reporter to his audience.**

21. After the breach of the police line and barricades at the east front perimeter, defendant Zink continued to film as police raced to the building and formed a line on the first landing of the East Front steps. Defendant Zink stood near the bottom of the East Front stairs as rioters breached the police line on the first landing and pushed the officers back to the top of the East Front steps. The defendant then climbed the stairs to the landing outside of the Columbus doors. He yelled some supportive comments as other rioters threatened the police officers, but then stayed on the landing and filmed rioters as they tried to breach the Columbus Doors. He did not leave the

landing when he saw rioters and police officers spraying each other with chemical agents. He did not leave the landing when police officers fired a flashbang to try and keep rioters out of the Columbus doors. He did not leave the landing after learning that someone had been shot inside the Capitol.

**Disgracefully, the Probation Office left out the most important facts.  Zink was seen and heard shouting at destructive demonstrators the "Leave [the officers] alone! They're doing their jobs!"  This one-sided depiction of events reveals the bias of the Probation Office's PSR.  Zink's law abiding intent was revealed in these moments, when Zink <u>separated himself</u> from violent mob members and zealously protected officers.**

22. The defendant then climbed atop a pillar after the Columbus doors were breached so that he could see inside the Columbus Doors. He testified at trial that he decided to leave only after he saw that rioters were viciously beating police officers inside the building.

**Zink could have easily gone inside the Capitol along with the streaming crowd.  But Zink forsook the movement into the building, and separated himself and his father from the crowd, turning against the movement of the crowd to walk in a direction away from the crowd and the Capitol building. Zink did the most difficult thing under the circumstances; he turned away from the crowd and rejected the urge to enter the building.**

23. The jury rejected the defendant's defense at trial that he was at the Capitol for innocent reasons that he was trying to entertain and inform his Facebook followers of events at the Capitol or was documenting the events for use in his father's congressional campaign. The jury also rejected defendant Zink's contention that he and his father were "waved in" to the restricted perimeter by a particular police officer. The officer they identified in a Tik Tok video testified that the only waving he did was to officers who were trapped behind the advancing mob when

police retreated to protect the Capitol building. Video evidence showed that the officer was indeed waving to other officers. The defendant livestreamed statements at the time of the breach, including, "we knocked down the gates," "we're storming the Capitol," and "you can't stop us."

**Again, the Probation Office is revealed as biased, favoring the prosecution, and one-sided in its analysis.  There were competing video segments in evidence at trial—including video evidence taken from multiple perspectives—which indicated the officer's waving could be *reasonably interpreted* as waving for members of the crowd to move forward.  The officer in question DID NOT put up any hand signals indicating protestors should stay put, and DID NOT make any attempts or even gestures trying to stop or slow demonstrators who were visibly streaming toward the building all around the officer.**

**OBJECTION TO 25.** "This offense involved a large crowd of individuals who gathered outside the US Capitol, some of whom ultimately forced entry inside the building. Those individuals' actions included, but are not limited to, breaking windows, damaging property, and assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. According to information received from the government, as of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol are assessed at $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

**One cannot be responsible for restitution of damages simply because an offense "involved a large crowd of individuals who . . . . [broke[ windows, [damaged] property, or [assaulted] members of law enforcement. . ."**

**OBJECTION TO 36.** "Specific Offense Characteristics: The offense resulted in substantial interference with the administration of justice, specifically, the proceeding before Congress (to

wit: Congress's certification of the Electoral College vote); therefore, three levels are added. USSG §2J1.2(b)(2). +3"

**First, the addition of 3 points for "substantial interference with the administration of justice" is improper double counting.  Zink's offense of "obstructing an official proceeding" already takes full account for all "interference with the administration of justice."**

**Additionally, the counting of electoral ballots is not "the administration of justice." The "administration of justice" plainly refers to fact-finding or investigation of criminal or civil justice in courts or court-like settings.**

**Third, the case law does not show any prior cases where a defendant is hit with enhancement for "substantial interference with the administration of justice" based on mere participation in political demonstrations.  The case law regarding this enhancement involve defendants who concealed evidence, evaded discovery, misled investigators or otherwise deceived fact-finders or investigators.**

**Fourth, there was testimony in Zink's trial (including confessions by government witnesses) that nothing Zink said, yelled, gestured, or did outside could have had any effect on proceedings going on inside the building.**

**OBJECTION TO 39. Adjustment for Obstruction of Justice**: The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct (to wit: the jury rejected defendant Zink's testimony at trial, specifically, that he was at the Capitol for innocent reasons that he was trying to entertain and inform his Facebook followers of

events at the Capitol or was documenting the events for use in his father's congressional campaign. The jury also rejected defendant Zink's contention that he and his father were "waved in" to the restricted perimeter by a particular police officer. The officer they identified in a Tik Tok video testified that the only waving he did was to officers who were trapped behind the advancing mob when police retreated to protect the Capitol building); therefore, two levels are added. USSG §3C1.1. +2

**Nothing in the jury's verdict required the jury to "reject" Zink's testimony at trial. The jury could have simply credited the government's testimony and arguments. The addition of this adjustment would chill Zink's and others' right to testify in their own defense. As stated above, video of the "waving" officer on the east plaza could be reasonably interpreted, in good faith, as communicating to protestors that they were allowed to be on the plaza nearer to the Capitol. (The waving officer made no countervailing hand gestures toward protestors of any kind.)**

**Zink's testimony was wide-ranging; and he testified that he was at the Capitol on Jan. 6, 2021 for multiple reasons and purposes. Much had to do with quirks of accident and happenstance, as Zink did not know what else to do under the circumstances. It is undeniably true that Zink did in fact entertain his Facebook audience, did in fact act as a campaign supporter for his father's campaign, and did in fact act as something of a reporter of the events.**

**CONSTITUTIONAL CHALLENGE AND OBJECTION TO "RESTITUTION" IN THIS CASE**

**116.** Statutory Provisions: Pursuant to 18 USC § 3663A, restitution shall be ordered in this case. The defendant has not entered into an agreement to pay restitution; however, the Government may seek restitution. 117. Guideline Provisions: Restitution shall be ordered. USSG §5E1.1.

**Zink objects and challenges the constitutionality of restitution in this case. Zink damaged no property and harmed no one during the events in question. It is a due process and 6th amendment violation to require any "restitution" in this case.**

| | |
|---|---|
| Dated: November 29, 2023 | Respectfully Submitted, |

*/s/ John M. Pierce*
John M. Pierce
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: jpierce@johnpiercelaw.com

## CERTIFICATE OF SERVICE

I, John M. Pierce, hereby certify that on this day, November 29, 2023, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.

/s/ John M. Pierce
John M. Pierce