**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-191(JEB)** |
| **RYAN ZINK,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ryan Zink to 24 months of incarceration, one year of supervised release, $500 in restitution, the mandatory $50 special assessment, and a fine of $12,179.

## I.   Introduction

The defendant, Ryan Zink, a thirty-five year old, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Zink, then a self-employed pressure washer from Texas, and a self-proclaimed social media influencer, joined the storming of the U.S. Capitol on the East Front. Zink was at the front of the crowd along police bike rack barricades when rioters ripped the barriers apart, overcame the police line, and flooded onto the East Plaza. Zink ran with the mob toward the Capitol and livestreamed his thoughts and actions to Facebook. Zink understood the constitutional significance of January 6, and intended to disrupt Congress' certification of the 2020 election. And as he ran through restricted Capitol grounds he angrily yelled: "we knocked down the gate," "we're storming the Capitol," "We want Trump," and we're about to "bum rush this shit!" Zink went directly to the Central East steps, where police had retreated to keep rioters away from the Capitol building. There, Zink continued to livestream the riot and urged his Facebook followers to get to their state Capitols−in other words−he urged like-minded individuals to act throughout the country.

After rioters broke the police lines on the Central East steps, Zink went up the to the Portico outside the Rotunda Doors and remained there as rioters battled against dramatically out-numbered police officers to enter the doors. He remained as rioters attacked police with pepper spray, smashed the glass in the Rotunda doors, and eventually pushed through police defending the doors. He climbed up on a pillar across from the Rotunda Door and witnessed the violence occurring against police inside the Capitol.  He remained even after police deployed a flash bang munition at rioters to repel them from the Rotunda Doors, and after he knew that someone had been shot inside the Capitol Building.

Zink has never expressed remorse for his involvement in the riot. To the contrary, Zink was proud of his conduct and expressed a willingness to engage in violence in the aftermath of

January 6. The day after the riot, Zink angrily commented on Facebook that, "they are trying to charge us with sedition they will have to kill me im [sic] not coming quietly." The next day, on January 8, Zink ominously messaged another Facebook user, "I'm afraid the time for rioting is over better clean those guns and invest in some level 4 armor." Moreover, Zink obstructed justice by giving false testimony under oath at trial. And he continues to falsely portray himself as a victim and spread misinformation on social media, on a personalized GiveSendGo page, and through online interviews. He launched a campaign for election to Congress in the 19th Congressional District in Texas in February of 2024—after his jury trial conviction for obstruction of Congress—with a "January 6" platform plank extolling the free speech rights of "1400 political prisoners myself included." He used his Congressional campaign to portray himself as a political prisoner whose Constitutional rights had been violated by his prosecution at candidate forums and in interviews and on social media. His lack of remorse, portrayal of the January 6 prosecutions as politically motivated, and of denials of his guilt continue in an ongoing torrent.

The government recommends a sentence of  24 months of incarceration, above what is called for by the Sentencing Guidelines, to comply with the purposes of sentencing.  See 18 U.S.C. § 3553(a); *see United States v. Hostetter*, 210CR0392-RCL, ECF 507, at 4-5 (cleaned up) ("[*United States v.] Fischer[*, 144 S. Ct. 2177 (2024)], does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [the defendant's] serious conduct on January 6th, 2021, in its entirety. To reduce [the defendant's] sentence . . . would require this Court to take a drastically different view of [his] conduct.").  A 24-month sentence reflects the gravity of Zink's conduct, his false testimony, his continued refusal to accept responsibility, and his concomitant risk of recidivism. Accordingly, for the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence Zink to 24 months of incarceration one

year of supervised release, $500 in restitution, the mandatory $25 special assessment for each

misdemeanor conviction, and a fine of $12,179.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the facts presented at trial, specifically the testimony

provided by U.S. Capitol Police Officers who described the attack on the United States Capitol by

hundreds of rioters on January 6, 2021, in an effort to disrupt the peaceful transfer of power after

the November 3, 2020, presidential election. Additionally, the facts are summarized in the

Statement of Facts attached to the Complaint. *See* ECF No.1-1.

### B.    Zink's Role in the January 6, 2021, Attack on the Capitol

Zink participated in the January 6 attack on the Capitol. He documented his crimes through

a series of videos he posted to Facebook, and he was captured on open-source video and

surveillance footage from outside of the Capitol.

### *Zink's Approach to the Capitol*

As early as November 3, 2020, four days before election day 2020, Zink was sending

Facebook messages about the election:

| Time | 2020-11-03 14:30:53 UTC |
| --- | --- |
| Message | Say prayers  Go vote Clean guns Lock and load Say prayers  Make bug out bag  Say prayers  Be aware of your surroundings  Hold fast |

*Image 1: Zink Facebook Message from November 3, 2020 (government trial exhibit 202.9)*

A month after the election, on December 5, 2020, Zink still claimed that his preferred Presidential

candidate could stay in office by predicting grave harm "if Biden wins" the election.  He sent the

below Facebook message to a friend:

**Time** 2020-12-05 10:25:52 UTC
**Message** Check the sources if you don't believe it open your eyes and kiss your freedom goodbye if Biden wins. Lick and load as Biden would say. Lock and load if your with me can I get a yeeyee

*Image 2: Zink Facebook Message from December 5, 2020 (government trial exhibit 202.1)*

On December 19, 2020, the date of the former president's tweet calling protestors to D.C., and promoting it with the language, "Be there, will be wild!" Zink sent a message claiming that the Pentagon had halted contact with the incoming president and signed it with the hashtag "#fuckbiden":

**Time** 2020-12-19 09:05:40 UTC
**Message** Hmmm the pentagon has haunted all contact with the Biden administration 🤔🤔 but I thought he was the office of the president elect spokesperson you. Can you SMELL what the TRUMP is cooking now sleepy joe. Wake up everyone here's your wake up call boom boom boom. Shots fired #fuckzuck #fuckcnn #fuckbiden delete me idc

*Image 3: Zink Facebook Message from December 19, 2020 (government trial exhibit 202.2)*

Then on January 5, 2021, Zink traveled from Arizona, where he had been visiting his parents, to Maryland with his father. In the early morning hours of January 6, 2021, Zink and his father took the Metro into Washington, D.C.to attend the "Stop the Steal" rally. Zink was turned away from the rally at the magnetometers because he was carrying a large backpack. He and his father made their way to the U.S. Capitol where Zink stood at the restricted perimeter and filmed himself narrating events.  His selfie-style video captured an "AREA CLOSED" sign affixed to snow fencing behind him.



*Image 4: Zink near West Front with area closed sign circled (government trial exhibit 101.1b)*

Zink then walked along the restricted perimeter from the West Front to the East Front of the Capitol Building.  On the afternoon of January 6, a crowd gathered on the East Front, outside the perimeter, including Zink.  Zink and his father stood at the restricted perimeter again, this time formed by bike racks guarded by police officers. Zink stood at the bike rack barricades, and livestreamed video of himself. As he talked about a challenge to the Arizona electoral vote count, Zink's own video demonstrated both his knowledge of the restricted perimeter and the official government business being conducted in the U.S. Capitol on January 6th.



*Image 5: Zink at East Front barricade (still from government trial exhibit 102.1)*

### Zink's Conduct on Capitol Grounds

As the mob at the East Front grew, Zink stood right up against a bike rack barrier on the

East Front as shown in the following image:



*Image 6: Zink standing at the bike rack barriers on the East Front (zoomed in still from open-source video, government trial exhibit 111)*

From Zink's front-of-the-pack vantage point, he had a view of numerous officers manning the bike rack barricades. At about 1:58 p.m., the first breach on the East Front occurred as individuals in the northeast corner began to tear apart the barricades and flood into the East Plaza. Shortly thereafter, the riotous mob overwhelmed the police near the center of the East Plaza, tearing apart barriers close to where Zink was positioned, and then all along the perimeter.



*Image 7: Screenshot from Capitol Security Video government trial exhibit 107*

As shown in the following image, Zink photographed rioters assaulting police officers as the officers tried to hold on to the bike rack barriers and hold back the mob during the East Front breach:



*Image 8: Photo from Zink's cellphone of the viewfinder of his camera (government trial exhibit 201.1)[2]*

After Zink witnessed and photographed the violent breach, he ran into the East Plaza near the Senate skylight.

---

[2] Zink photographed events on January 6th with a Digital Camera and an iPhone. Several of the photographs from the digital camera SD card taken on January 6th could only be extracted in thumbnail form, but pictures Zink took of the viewfinder of the camera with his iPhone camera were recovered.



*Image 9: Screenshot from Defendant Zink's Trial Exhibit 28 at the 24 second mark showing Zink (circled in red) running into the East Plaza*

Zink pressed forward through the East Plaza with the mob.  As Zink moved toward the Capitol building he livestreamed another video and shouted into the camera, "we knocked down the gates," "we're storming the Capitol," and "you can't stop us!"



*Image 10: Zink marching across the East Plaza (still from government trial exhibit 103.1)*

The police established a line at the first landing of the Central East steps and then at the top of the steps, but both positions were soon overrun. Zink positioned himself at the base of the steps. As he faced the police line and chanted, "We Want Trump!" over and over.



*Image 11: Zink filming the police line that had formed on the Central East steps (screenshot from government trial exhibit 103.1)*

Additionally, Zink livestreamed a chant of "USA" and urged his Facebook followers to "get to their [state] capitols." He then repeatedly chanted, "Stop the steal!," rioters' shorthand for stopping the electoral vote count, while he pumped his fist in the air.



*Image 12: Zink pumping fist and chanting (screenshot from government trial exhibit 103.1)*

Zink then turned the camera on himself and declared "we're about to bum rush this shit!"



*Image 13: Zink declared his intent to "bum rush this shit" at the bottom of the Central East steps(screenshot from government trial exhibit 103.1)*

At about 2:06 p.m., rioters pushed through the police line and flooded up the steps and on to the Portico outside the Rotunda Doors. Zink joined the mob there. He yelled a few supportive comments as other rioters threatened police officers, but remained with the mob on the Portico in

spite of rioters' increasingly violent threats and subsequent attacks against police. He remained on the crowded Portico as rioters assaulted police officers defending the Rotunda Doors.  Zink remained as police and rioters deployed chemical sprays and rioters smashed the glass in the Rotunda Doors. Zink was not dissuaded even after police detonated a "flashbang" munition to drive the mob back from the Rotunda Doors. He did not leave the Portico even after he learned that someone had been shot inside the Capitol.

At about 2:25 p.m., a rioter already inside the Capitol opened the Rotunda Door from the inside. Rioters rushed through and fought officers to keep the doors open, pushing and pulling officers out of the way, and trying to jam their bodies in the doorframe. Officers succeeded in closing the doors at approximately 2:28 p.m., after one officer hurled himself through the doors and turned his back to the crowd, pushing them back just enough to allow space for the doors to close.

While officers stood guard at the Rotunda Doors, and then barricaded the doors with benches, tensions remained high. Rioters outside continued yelling and chanting and skirmishing with officers, trying to breach the doors again. At about 2:37 p.m., rioters from the Rotunda moved towards the doors in an effort to open them, while police officers rushed to guard the doors from the inside. At about 2:39 p.m., the rioters pushed forward, crushing the police, and forcing the doors open again.  Zink livestreamed another video to Facebook showing the struggle to get in the Rotunda Doors.



*Image 14: Zink filming the Rotunda Doors (Screenshot from government trial exhibit 105.1)*

Zink climbed on a pillar after the Rotunda Doors were breached so that he could see inside and take more pictures.



*Image 15: Open-Source video screenshot of Zink standing on pillar outside of the Rotunda Doors (Zink circled in red)*

Zink claimed at trial that he left only after he saw that rioters were viciously beating police officers inside the Capitol building. By his own admission, he stayed on the Portico for at least 45 minutes, or until about 2:45 p.m. Even before he saw rioters beating police officers inside the building, he had to have witnessed the violence toward the police on the Portico as rioters fought to get in the Rotunda Doors.

### Zink's Spread of Misinformation Online Post-Arrest

After his arrest, but prior to his trial, Zink spread misinformation about his conduct on January 6, 2021. In March of 2023, Zink gave an online interview on the "Mel K" show with his attorney, John Pierce, advertising a GiveSendGo page created for Zink.



*Image 16: Screenshot of Mel K Show interview of Ryan Zink, March 2023*

In the Mel K interview, Zink explained his knowledge of the electoral proceedings, falsely claimed that he was waved into the Capitol by a police officer, that the Capitol was not guarded

by police on the East side during the riot, and claimed that Nancy Pelosi, then Speaker of the

House of Representatives, was invited to come outside of the Capitol by rioters, as follows:

> "…we were going to witness history happen where the vote was turned back over to the states.  And this is, you know, one of the things that he was adamant about, and he was like, this would be something to be there to go and see. Well, then everything starts to play out, you know, the way that it does.  Arizona objects, we see some pushing and shoving originally that had come out.  And we started covering this.  Well, then the police started waving us through the barricade.  And I have my location of where I was standing, and there's a very special video of a police officer who's standing by this green, light -- it's like a generator with lights it's like a rental that comes out. And he waves people through the barricades. Well we're standing right there. We see this whole thing. So we start makin our way up and at this point everything is opened up. Now it's come out that one side of the Capitol is not even completely 'ya know it's not even guarded. There's no one over there. Nancy Pelosi rejected multiple, you know, offers to come out."

Sentencing Exhibit 1, March of 2023, Mel K Interview.

Zink participated in an interview on July 24, 2023 with the online host Emerald Robinson,

on her show: The Absolute Truth with Emerald Robinson with the chyron, "J6 FOOTAGE

SHOWS CAPITOL POLICE WAVING RALLY-GOERS IN":



*Image 17: Screenshot of Zink's July 24, 2023, The Truth with Emerald Robinson interview*

In this interview, more than six months after the riot, Zink claimed that there was no insurrection on January 6, and that his conduct of joining the riot was not the true cause of Congress being pushed out of session, saying as follows:

> …they're trying to claim that this was an insurrection, that we were there to overthrow the government or prevent Joe Biden from taking office and…

> … in all of these cases because there are many that have gone before me and there is an actual reason that Congress was dismissed from session and that reason needs to be stated now…you cannot put a blanket over this.  There is a direct cause.  Not everybody there that was speaking is a terrorist. And we have to know the reason of why things happened because in for me I am not the reason that Congress was obstructed and pushed out of session.

Sentencing exhibit 2, clips from July 24, 2023, the Truth with Emerald Robinson interview.

### Zink's False Statements Under Oath at Trial

Zink made multiple materially false statements to deny or minimize culpability, mischaracterize his criminal conduct as altruistic, and avoid conviction for his crimes, under oath at trial including the following:

1) Zink testified that a police officer waved he and other rioters into Capitol grounds.  *Tr. Vol 3* at 206:19-22; 207:4-8.[3]

   a. The following trial evidence showed that Zink's statements about being waved in were materially false:

      i. Zink recorded himself immediately after going through the barricades saying: "we broke down the gates," "we're storming the Capitol," and "we're about to bum rush this shit!" Government Trial Exhibit 103.1.

      ii. On January 7, Zink referred to the events of January 6 as a "rioting" in a social media message saying, "the time for rioting is over better clean those guns and invest in some level 4 armor." (Government Trial Exhibit 202.8).

---

[3] References to "Tr." are to the jury trial transcript which consists of 5 volumes corresponding to each day of trial.

iii. Zink showed his consciousness of guilt in a social media message on January 8, saying, "they are trying to charge us with sedition they will have to kill me im not coming quietly." Government Trial Exhibit 202.7.

iv. The police officer who Zink identified as waving him in testified that rioters near the area where Zink was standing were, "pushing and shoving" and "ripping" heavy barricades apart and taking them into the crowd." *Tr. Vol 4* at 191:14-25, 192:1-10. He testified unequivocally that he did not wave rioters in. *Tr. Vol 4* at 192:22-25, 193:1-23, 194:5-23.

v. Zink took a photograph of the violent breach of the barriers and police line from where he was standing. Government Trial Exhibit 201.1.

b. Zink's false testimony that he was waved in by a police officer was material as it showed Zink's knowing unlawful entry on restricted grounds.

2) Zink testified under oath at trial that "there were no barricades there after we had taken a step back to have the conversation" about whether to enter the grounds. *Tr. Vol 3* at 210:14-25, 211:1-5.

a. The following trial evidence showed that Zink's statement that there were no barricades was materially false:

i. Zink took a photograph of the violent breach of the barriers and police line from where he was standing. Government Trial Exhibit 201.1.

ii. Video evidence introduced by Zink showed him running past barriers. Defendant's Trial Exhibit 28.

iii. An overview of the scene captured by CCV roof cameras showed numerous barriers still in place after the breach. Government Trial Exhibit 107.

b. Zink's false testimony about the barricades being absent was material because it showed his knowingly entered and remained on restricted grounds.

3) Zink testified under oath at trial that he did not know what Congress was doing and that he had no intent to disrupt the certification because he was "media." *Tr. Vol 4* at 181:16-24.

a. The following trial evidence showed these statements were materially false:

i. Zink filmed himself on January 6 talking about the Congressional proceedings including detail about an objection to the state of Arizona's electoral vote near the time the objection was actually occurring inside the Capitol. Government Trial Exhibit 102.1.

18

ii. Late on January 6, Zink sent social media messages indicating that Congress was "pushed out of session" and the "job was accomplished." Government Trial Exhibit 202.4.

iii. On January 8, 2021, Zink sent a social media message that said, "everyone should have been here we needed more people it should have been a bigger message." Government Trial Exhibit 202.8.

b. Zink's false testimony about his ignorance of the proceedings was material to the element of knowingly engaging in disorderly conduct on Capitol grounds that impeded or disrupted the orderly conduct of Government business or official functions.

4) Zink testified under oath that he was not political and that he voted but didn't "follow one side or the other" in the presidential election. *Tr. Vol. 3* at 167:11-14; 178:23-25. He also said that he didn't enjoy "covering" politics because people have differences "that should be accepted." *Id*. at 168:2-5.

a. The following trial evidence showed that these statements were materially false:

i. Zink posted on election day 2020, "Say prayers Go vote Clean guns…Make bug out bag…" Government Trial Exhibit 202.9.

ii. On December 5, 2020, Zink posted on Facebook, "kiss your freedom goodbye if Biden wins." Government Trial Exhibit 202.1.

iii. On December 19, 2020, the day the former president called for protestors to come to D.C., promoting it with the language, "Be there, will be wild!" Zink sent a social media message saying that the Pentagon had [halted] contact with the Biden administration, referring to Trump "cooking" something up, and ending it with "#fuckbiden."

iv. On the morning of January 6, Zink posted to Facebook, "Stop the Steal." Government Trial Exhibit 202.3.

v. Zink chanted in his selfie-style videos on Capitol grounds, "Stop the Steal" and "We want Trump!" Government Trial Exhibit 103.1.

b. Zink's false testimony was material because Zink was trying to negate the evidence of his knowingly engaging in disorderly conduct on Capitol grounds that impeded or disrupted the orderly conduct of Government business or official functions.

*Zink's Social Media After Trial*

Following the guilty verdict at trial, Zink showed continued lack of remorse and continued to spread misinformation to his followers on the social media platform "X" using the handle "Ryan Zink @eyetowardheaven." with a "BRING OUR J6ERS HOME" frame around his picture to showcase his view that persons serving time for crimes on January 6 are akin to hostages rather than persons who were afforded all of the protections of the Constitution and lawfully convicted in the American criminal justice system.



*Image 18: Zink's "X" Profile*

He later changed his handle, to "Ryan Zink for Congress TX 19: @Ryan Z4Congress,  but not his "frame."  As of August 30, 2024, he had 4,755 followers.



*Image 19:  Zink's updated "X" Profile*

Zink reposted a tweet from "The Absolute Truth with @Emerald Robinson" on September 14, 2023, the day of the guilty verdict in his trial, bringing attention to his July 24, 2023, interview with Ms. Robinson. Zink's "repost" amplified misinformation from his interview with Emerald Robinson that, "[e]very January 6th defendant has had their constitutional rights violated," and specifically that his trial represented a rush to judgment by the jury.



*Image 20: Repost of Zink on "X" on September 14, 2023*

On October 8, 2023, the day after Hamas terrorists attacked Israel, Zink attempted to minimize the January 6th attack against the Capitol by comparing it to the Hamas attack, as follows:



*Image 21: Tweet by Zink on "X" on October 8, 2023*

Zink has spread disinformation about the fairness of his trial a number of times. On November 6, 2023, Zink reposted another tweet on "X", this time attacking the credibility of government witnesses, generally, and with Zink adding his own comment attacking the credibility

of a witness at his trial. This was not mere benign mention of the special agent who worked on his

case. Zink falsely claimed that his trial was unfair while simultaneously releasing the name of a

special agent.



*Image 22: Tweet by Zink on "X" on November 6, 2023*

On November 9, Zink retweeted more misinformation that portrayed January 6 defendants

as victims, and again attacked the FBI:



*Image 23: Tweet by Zink on "X" on November 9, 2023*

On November 21, 2023, Zink attacked the DOJ, the "jury pool", and the FBI, as government extremists:



*Image 24: Tweet by Zink on "X" on November 9, 2023*

Beginning on November 17, 2023, Zink posted tweets and retweets multiple times, focusing on release of Capitol video footage, the death of Roseanne Boyland at the Capitol, and alleged police misconduct at the Capitol. He promoted a call-in appearance that he made on the Laura Loomer show to speak as a "political prisoner" along with numerous other Capitol riot defendants. On November 20, he retweeted an interview with Ivan Raiklin, a guest on the Absolute Truth with Emerald Robinson, with the title, "@IvanRaiklin joins @Emerald Robinson to discuss how we can continue exposing the fedsurrection."

In early 2024, Zink launched a run for Congress in the 19th Congressional District in Texas on a platform that included treating convicted January 6th rioters as political prisoners."[4]

---

[4] Zink was defeated in a Republican primary for the Congressional seat on March 5, 2024.





I will always defend the right to free speech. The Biden administration has made over 1400 people political prisoners myself included. After seeing the lies, contempt, corruption, and hate towards people who simply wanted to address their grievances and being followers of a political opponent. I will advocate for full release of all footage. Submit and investigate all known inquiries sent to my office

Share this post:   

*Image 25: screenshot from Zink's Congressional run*

In support of his run for Congress, Zink spoke at forums and gave interviews saying that he was "inspired" to run by the events of January 6, and claiming in a "Big Country Politics" videotaped interview that, "[f]or the last 1,111 days, I've been a political prisoner of the Biden administration due to the January 6 proceedings, where you just don't stand a chance in Washington, DC, if you are a Republican." And again on July 27, 2024, he falsely claimed to have been a journalist on January 6, falsely claimed that the FBI kidnapped him, and compared the January 6 riot to a Palestinian protest as follows:



*Image 26: Tweet by Zink on "X" on October 8, 2023*

On March 10, 2024, Zink spread disinformation and showed a continuing lack of insight into his own conduct or remorse by reposting a tweet referring to rioters as political prisoners and criticizing federal judges in January 6 cases.



*Image 27: Tweet by Zink on "X" on March 10, 2024*

On February 21, 2024, Zink was interviewed on the "Java with Just Jodie" show and said that the first time he saw property damage and violence on January 6, that it was caused by Antifa. He claimed that an individual at the riot was "confirmed" as "Antifa" and that he "was not allowed to use that in my trial either. That was removed from the forum, if you will, uh by the 'ya know the prosecutors and the judge working together to keep that as an element of what was actually there that day." Government Sentencing Exhibit 3, clips from February 2024 interview on Java with Just Jodie. In the same interview, Zink referred to the crowd on the West Front of the Capitol on January 6 as "an overwhelmingly beautiful picture of the American people and the voice that they carry…" *Id.* He went on to make false statements about the FBI agent who investigated the case and who testified at trial, saying that, Zink had a "form" that he could not show the interviewer because it would violate his "gag order." Zink falsely claimed that the FBI agent accused Zink of being responsible for "assaults against multiple agents" and "the death of a federal police officer." Zink explicitly stated in the interview that an FBI agent falsely accused Zink of killing a police officer. Zink then blamed his criminal charges in this case on the agent's statements, on "the corrupt J6 committee" and on an individual congressman for the conduct of the January 6 Select Committee hearings. *Id.* Finally, he again claimed in the interview that the jury who heard his case consisted of "all democrats." *Id.*

On March 25, 2024, Zink went so far as to repost a viral "meme" of a woman who was filmed having a mental health issue on an airplane and projected a narrative of her as a juror in his case to criticize the jury in his case and juries in the District of Columbia, generally:



*Image 28: Tweet by Zink on "X" on March 25, 2024*

## III.    THE CHARGES AND VERDICT

On March 5, 2021, a federal grand jury returned an indictment charging Zink with four

counts, including, Count One - Obstruction of an Official Proceeding and aiding and abetting in

violation of 18 U.S.C. §§ 1512(c)(2) and (2); Count Two - Entering and Remaining in a Restricted

Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); and Count Three - Disorderly and

Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2).[5] On September 13, 2023, Zink was convicted of all three of the offenses following a jury trial. On August 9, 2024, this Court granted the government's unopposed motion to dismiss Count One.

## IV.    STATUTORY PENALTIES

Zink now faces sentencing for Entering and Remaining in a Restricted Building or Grounds (Count Two) and for Disorderly and Disruptive Conduct in a Restricted Building or Grounds (Count Three). He faces up to one year of imprisonment, one year of supervised release, a fine of $100,000 for each of Counts Two and Three. The defendant also faces a restitution order, as discussed below.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The sentencing range calculated in the Presentencing Report by the Probation Office was drafted on November 13, 2023, prior to Count One (obstruction of justice under 18 U.S.C. § 1512(c)(2)) being dismissed. The PSR did not include a Guidelines analysis for each of the counts for which Zink was convicted. *See* PSR ¶¶ 29-43.[6] The Government's calculation of the guidelines is as follows:

---

[5] Zink's indictment included a count of Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104 (e)(2)(D). The Government filed a motion to dismiss this count on August 25, 2023, and the Court granted that motion on August 28, 2023.

[6] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines

**Count Two: 18 U.S.C. § 1752(a)(1)**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | 10 | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Zink entered the restricted area of the Capitol grounds with the intent to obstruct officers during a civil disorder.  The substantive offense is thus Count Three, and the base offense level for that offense should be applied. |
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice |
| Total | 12 | |

**Count Three: 18 U.S.C. § 1752(a)(2)**

| Base offense level | 10 | U.S.S.G. § 2A2.4. |
|---|---|---|
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice |
| Total | 12 | |

Counts Two and Three group under U.S.S.G. § 3D1.2(a) because they each have the same

victim; Congress. Because the counts group, Count Three, which has the higher base offense level,

---

analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 33) that Counts One, Two and Three group—a conclusion with which the government agrees—but did not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

provides the base offense level for the counts in the group. *See* U.S.S.G. § 3D1.4.The highest offense level is 12  (for Count Three); therefore, the combined offense level for this group is 12.

**Two-Level Upward Adjustment for Obstruction of Justice**

Pursuant to U.S.S.G. § 3C1.1 (Obstructing or Impeding the Administration of Justice), the offense level should be increased by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," including by providing "materially false testimony" during trial. U.S.S.G. § 3C1.1, n.4. Zink made multiple materially false statements to deny or minimize culpability, mischaracterize his criminal conduct as altruistic, and avoid responsibility, as set out, above (see, pages 17-19).

Zink's trial testimony was untruthful with respect to several material matters, and he testified untruthfully for the purpose of substantially affecting the outcome of the case. Accordingly, the Chapter 3 adjustment for obstruction of justice applies in the instant case. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (§ 3C1.1 enhancement is properly applied when a defendant testified falsely about a material matter at trial).

**The Two-level Reduction Pursuant to § 4C1.1**

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Here, although Zink did not use violence against police on January 6, 2021, and at one point told other rioters to leave the police alone, his shouted sentiments that he was "storming" and "bum-rushing" the Capitol in the context of joining a mob after he had witnessed the violent breach of a police line was threatening.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 46. Accordingly, based on the government's calculation of Zink's total offense level at 12, the corresponding guidelines range is 10-16 months.

### Upward Departures and Variances

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Zink's Guidelines range would not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards.

Zink was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Zink "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024).

As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86-87.

But nothing in Zink's Guidelines calculation reflects these facts. Zink would face the same offense level if his crimes had not endangered the democratic process or interfered with the

peaceful transfer of power.[7] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Put another way, "But the reality is, the behavior you engaged in that day, again, to include an intent to obstruct or interfere with that proceeding, that important constitutional proceeding, the reality is it's pretty dark behavior." *United States v. Sparks*, 21-CR-087-1 TJK, Sent. Tr. at 87. The Guidelines expressly state that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[8] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children

---

[7] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

[8] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

- "The effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who, like the defendant, sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part." *United States v. Languerand*, 21-CR-353-JDB, Sent. Tr., at 33-34.

- "But what a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power. *United States v. Sparks*, 21-CR-87-TJK, Sent. Tr. at 94.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posted a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an

important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id.* at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id.* After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-

RCL, ECF 507, at 4-5 (cleaned up). *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court reflected that January 6 was a day that, "We are reminded of events in Europe today that, if our republic enshrines violence, not the ballot, as an appropriate way to maintain power and govern others, then who are we to complain when other countries follow that example and attempt to impose their will by military might." *United States v. Mostofsky*, 21-CR-138-JEB, Sent. Tr. at 40. And, that on that day the mob was, in essence, the weapon, saying, "And while I completely agree that your actions were not violent, you didn't assault anyone, you didn't destroy anyone, you didn't steal anything, you were part of that mob. And a mob is only a mob if it has numbers. If it is three people or five people or seven or fifty, they don't get anywhere because the Capitol Police is able to resist them." *United States v. Ballenger, et al.*, 21-CR-719-JEB, Sent. Tr. at 54. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Cleveland*, 21-CR-159-ABJ, Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

Other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-87-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[9]

---

[9] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently

In this case, the government submits that an upward variance and/or departure eight months to achieve a sentence of 24 months is warranted.  As discussed below, similarly situated defendants have received similar sentences of around and Zink's actions of inciting the mob and then obstructing justice by lying under oath at his trial, and after his trial attacking witnesses, District of Columbia jurors, and judges, and publicizing an agent's name on social media warrant a significant sentence.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Zink's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Zink angrily joined the mob with the explicit intent of pushing Congress out of session. He incited the crowd as they overwhelmed police by chanting, filming, and crowding onto the Portico during the violent breach of the Rotunda Doors. The nature and

---

discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

circumstances of Zink's offenses were very serious, and fully support the government's recommended sentence of 24 months' incarceration.

### B. The History and Characteristics of the Defendant

Zink is an unemployed 34-year-old who has bounced from job to job. *See* PSR ¶¶ 68-80. Notably, in contrast to his trial testimony that he was a trained media professional working for his father's congressional campaign, his only relevant work experience was as a reporter for "Campus Live" affiliated with Texas Tech University for five to six months between 2018-2019. PSR ¶ 74. He did not report to the PSR writer that he ever worked for his father's congressional campaign.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Zink's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Zink has a criminal history

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

category of I, his obstruction of justice – by giving false testimony under oath – and spread of disinformation online show an utter lack of remorse. Instead, Zink's continued encouragement of other "J6" rioters and disparagement of his trial on social media demonstrates that he sees himself as part of an existential battle against those who disagree with his views. His words and his conduct show that he believes his crimes were justified because they were performed in the name of his political goals. Zink has minimized his conduct on January 6, and has raised money by portraying himself as a victim and a political prisoner. He said on social media <u>after</u> the riot that he wished even more people had been there, and encouraged others to go to their state capitols—while he was in the midst of a riot at the United States Capitol. His statements are indicative of his disdain for the rule of law and failure to accept responsibility for his crimes.

The nature of the instant offense, including Zink's continuing attempts to justify his actions, coupled with his obstruction of justice at trial, lack of remorse, and continued spread of misinformation increases the likelihood that he will not ameliorate his behavior absent a lengthy sentence.

Zink's flippant disregard for any criminal consequences and lack of respect for law enforcement was aptly demonstrated by his statements on Facebook after storming the Capitol Building: "they are trying to charge us with sedition they will have to kill me im not coming quietly." He has additionally exposed an FBI agent's name on social media, criticized the FBI as "terrorists," accused the FBI case agent of lying under oath at his trial and in documents, and claimed that January 6th defendants could not get fair trials. Any sentence he receives must be sufficient to provide specific deterrence from committing future acts of obstruction.

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel*

*Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Sandra S. Weyer,* No. 1:22-CR-00040 (JEB), the defendant was convicted at trial of violating 18 U.S.C. 1512(c)(2) and committing four misdemeanors, whereas Zink has been convicted of two. This Court sentenced Weyer to 14 months' incarceration and 12 months supervised release, with $2,000 in restitution, but granted her motion for release pending appeal while *Fisher* was pending at the Supreme Court. The disturbing intent to obstruct the peaceful transfer of power may still be considered even though the 1512 conviction has been dismissed. *See United States v. Sparks*, 21-CR-087-1 TJK, Sent. Tr. 8/27/2024 at 95 ("Now, that the government dismissed the count charging the defendant with violations of 18 United States Code, Section 1512 (c)(2) of the Supreme Court's ruling in *Fischer* does not mean that I cannot

---

violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

consider at sentencing the evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining   whether the Section 231(a)(3) conviction and the resulting guideline range fully accounts for the criminal conduct."). Like Weyer, Zink entered on the East Front within minutes after the violent breach of police lines and barricades. Weyer pushed past police officers and was inside the Capitol for 10 minutes, whereas Zink didn't go inside. Like Weyer, however, Zink spent about an hour on the Central East Steps. Like Weyer, Zink was responding to social media followers in real time, encouraging them to undertake similar illegal conduct in their local state capitols. Like Zink, Weyer expressed no remorse for her actions after January 6; instead, she continued to brag about her role in the insurrection. Unlike Zink, Weyer did not obstruct justice by taking the stand in her trial – to attempt to mislead the jury under oath.  Unlike Zink, Weyer was a 60-year-old mother of two. Zink's need for specific deterrence is heightened due to his obstruction of justice at trial.

In *United States v. Andrew Johnson*, No. 1:22-CR-414 (JEB), the defendant pleaded guilty to four misdemeanors, including violations of 18 U.S.C. § 1752(a)(1) and (a)(2). Unlike Zink, Johnson was not found to have had a corrupt intent to obstruct the Congressional proceeding essential to the peaceful transfer of power, which, as this court has previously said, "enshrines violence, not the ballot, as an appropriate way to maintain power and govern others." And, unlike Zink, Johnson did enter the Capitol through a broken window. However, he is like Zink in that he prolifically spread false information about January 6 on social media after the riot, such as boasting of being a proud "J6er." Like Zink, he has shown neither meaningful candor nor remorse and violated the terms of his release by posting case agents' names on social media. Johnson has called for a repeat of January 6 if the former president is not reelected, whereas Zink went so far as to run for Congress, inspired to make sure that January 6 prosecutions never happen again. Unlike

Zink, Johnson possessed a weapon and had a criminal history category of II.  He received a sentence of 12 months:

In *United States v. William Calhoun*, No. 21-CR-116 (DLF), the defendant, a practicing lawyer, was convicted after a jury trial of violating 18 U.S.C. 1512(c)(2) and committing four misdemeanors.  Calhoun wrote online about "storming" the Capitol, like Zink, who live-streamed social media videos at the Capitol declaring that he was "storming" it.  Calhoun anticipated arming himself before the election.  Zink made similar comments on social media about the need to "lock and load" and after the riot said that he was "not coming quietly" in anticipation of being arrested. Calhoun specifically stated that he wanted to stop the Congressional certification. Similarly, Zink declared that he wanted to "Stop the Steal!" during the riot, and claimed to have pushed Congress out of session after the riot. Calhoun, like Zink, committed an obstruction of justice by testifying falsely under oath at trial. Calhoun continued to evade remorse after trial. As Judge Friedrich put it, "[a]nd simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, Sent. Tr. at 85. Calhoun received a sentence of 18 months

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Zink was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

47

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Zink to pay $500 in restitution for his convictions on Counts Two and Three. This amount fairly reflects Zink's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) subject him/her to a statutory maximum fine of $100,000 per count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Zink created a GiveSendGo page to collect contributions after January 6th and has collected $12,179 by falsely claiming that he was a "Congressional Media Campaign Staffer," that he was "waved through the barricades by police," and that he "lost his business, was forced to move," and "now can no longer finish school," because of his arrest.  The site states that "the funds will be

used to pay for legal expenses and to help the family offset the cost of legal expenses, incarceration, and other expenses associated with the case."



*Image 34: Zink's "Help Save Ryan" GiveSendGo fundraising web page*
(fund raising total as of September 13, 2024).

In truth, Zink last attended college in 2012, and withdrew because he "didn't like it." PSR ¶ 66.

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). With an offense level of 12, the guidelines fine range here is $5,500 to $55,000 per count. U.S.S.G. § 5E1.2(c). Zink did not fully cooperate with the Probation Office in its preparation of the PSR in that he refused to provide collateral contacts and sign releases of information for his educational and work records and failed to return a completed Net Worth Statement or other documentation for his finances. PSR ¶¶ 62, 68, and 83. Zink should not be able to use his own notoriety gained

in the commission of his crimes to "capitalize" on his participation in the Capitol breach in this way. Accordingly, implementation of a fine is appropriate.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months' incarceration, an upward variance or departure from the government's calculated Sentencing Guidelines range; one year of supervised release; $500 in restitution; the mandatory $50 special assessment, and a fine of $12,179.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      /s/ Cari F. Walsh
Cari Franke Walsh
Assistant United States Attorney
MO Bar No. 37867
601 D Street NW
District of Columbia, DC 20530
(816) 728-5776
Cari.walsh@usdoj.gov