**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Complainant** | : | |
| | : | |
| **v.** | : | **Criminal Case No.** |
| | : | **1:21-cr-00191 (JEB)** |
| **RYAN ZINK,** | : | |
| | : | |
| **Defendant.** | : | |

**DEFENDANT RYAN SCOTT ZINK's SENTENCING MEMORANDUM**
**AND OBJECTION TO PRESENTENCE INVESTIGATION REPORT**

COMES NOW, Defendant, Ryan Scott Zink ("Zink"), by and through undersigned

counsel, and hereby submits to the Court his Sentencing Memorandum as follows:

## I.  INTRODUCTION AND OVERVIEW

The Court has scheduled a sentencing hearing on September 20, 2024, at 11:00 AM.

A PRESENTENCE INVESTIGATION REPORT ("PSIR") was prepared and filed on

November 13, 2023.  A revised PSIR was filed with the Court on September 13, 2024, at ECF

Doc. # 131, that is one week before the sentencing hearing scheduled for September 20, 2024.

The revised PSIR was prepared by Ms. Crystal S. Lustig, Supervisory United States Probation

Officer.  (202) 565-1425  crystal_lustig@dcp.uscourts.gov.

It should be noted that Zink, by counsel, finds themselves having to respond to the

Revised PSIR _on the same Friday_ that the Revised PSIR was filed and provided.  This is not

pragmatically possible and counsel submits Defendant Zink's Memorandum as quickly as

possible after midnight in the morning of Saturday, September 14, 2024.  Receiving the Revised

PSIR on September 13, 2024, counsel is pressed to file a response within one week of

sentencing.

The revised PSIR reflects and reports that Defendant Zink is being sentenced for two

Counts upon which he was convicted:[1]

### Offense:

> **Count 2**: Entering and Remaining in a Restricted Building or
> Grounds
> 18 USC § 1752(a)(1)
> Maximum possible punishment:  Up to 1 year imprisonment and/or up to a
> maximum $100,000 fine

> **Count 3**: Disorderly and Disruptive Conduct in a Restricted
> Building or Grounds
> 18 USC § 1752(a)(2)
> Maximum possible punishment:  Up to 1 year imprisonment and/or up to a
> maximum $100,000 fine

The original Statement of Facts justifying Defendant Zink's arrest at ECF. Doc. # 1-1 on

February 20, 2021, clearly demonstrates that Defendant Zink committed no crime other than

(perhaps) entering or remaining in a (dubiously) restricted grounds or building.

In keeping with usual legal analysis, accounts closer in time to the events at issue should

be afforded great credibility.  Of course it is possible for new evidence to be uncovered, but this

should normally be clear.  Where the original understanding changed should be transparent with

an understanding of how new evidence altered the original view of events.

But the Statement of Facts from February 20, 2021, dramatically demonstrates that Zink

---

[1]     It is well understood but sometimes lost in the complexity of discussions that of course
each Count upon which a Defendant is charged requires independent and separate analyses, even
though there may be overlap or similarity.  Counts under which a Defendant was charged but not
convicted should form no part of this or any other analysis.  Discussions about criminal charges
are of course intended to focus on the specific Count being discussed, one at a time.  Our
jurisprudence requires that every Defendant is presumed innocent _for all purposes_ unless proven
guilty beyond a reasonable doubt.  It would violate Zink's constitutional rights to consider an
accusation that has not been proven for any purpose, including sentencing.  It is also understood
that advocates are required to make sure questions are clearly presented for the Court's analysis.

did not commit any act of violence or any disorderly or disruptive conduct.  He is accused of "***guilty viewing***."   Zink saw other people commit crimes, which Zink did not himself commit.

For example, "Towards the end of the segment, ZINK turned the video to capture an unknown subject breaching one of the windows at the U.S. Capitol. Screenshots of these videos can be found in Figure (10) and (11)."

So an "***unknown subject***" breached a window and Zink videotaped it.  The PSIR summarizes this as criminal conduct by Zink.

The U.S.A.O. would hope that the Court falsely conclude that recording evidence of what other people were doing – the good, the bad, and the ugly – is somehow a crime.  The U.S.A.O. has repeatedly tried to argue that there is some duty to depart if people see a crime.  No such duty exists, just as there is no "Good Samaritan" obligation in U.S. law.  It is not a crime to watch someone else commit a crime.  Yet that is all the arrest Statement of Facts offers.

Of course, again, in these proceedings the question is how to sentence Defendant Zink for Count 2 and Count 3 but the seriousness of the conduct is an important issue.

Defendant Zink was arrested on February 4, 2021, in the Northern District of Texas and held without bond. His initial appearance in the US District Court for the District of Columbia on March 16, 2021, and Zink was released on his personal recognizance.

## II. SUMMARY OF PSIR'S RECOMMENDATIONS AND RESPONSES BY THE DEFENDANT

The PSIR groups Counts 2 and 3, thus assigning the higher of the two base offense levels.

The PSIR assigns 10 base offense level points under Count 3 under 18 U.S.C. 1752(a)(2), pursuant to USSG §2A2.4.  Counsel would disagree but for the lack of any better-fitting category in the Guidelines.  As a result, as explained below, the Defendant would argue for a reduction

because otherwise the Government is creating massive disfavored disparities in sentencing between demonstrators based on the partisan politics of the demonstrators.

Notably, the Government is attempting to sentence Zink for what other people did. Based on the near universal efforts to impose collective guilt in violation of Due Process, counsel assumes that this is not at the initiative of Pre-trial services.

The PSIR notes no criminal history and assigns a 2 point reduction for

> 41. **Chapter Four Adjustment:** The defendant meets the criteria at USSG §§4C1.1(a)(1)-(10). Therefore, the defendant is a Zero-Point Offender, and the offense level is reduced by two levels. USSG §§4C1.1(a) and (b).

In a disturbing new trend, probably _not_ originating with Pretrial Services, the PSIR assigns a +2 point increase based on Obstruction of Justice in taking the stand to testify.  As explained below, counsel objects and argues that this adjustment – as applied promiscuously at least in January 6 cases if not as a growing trend on other cases as well – is contrary to the Guidelines and indeed unconstitutional.  The adjustment, as applied, imposes an irrebuttable presumption of guilt for the crime of perjury where the Government is unable to validly charge Defendant with perjury.  Rather than face the burden of proof of innocence until proven guilty on a straight-up charge of perjury, the Government is now routinely sneaking in through the backyard window to impose the penalty for a crime they cannot prove or charge.

Specifically, the new trend is that if a jury convicted a Defendant, and if the Defendant testified, then the jury must have concluded that the Defendant was lying.  This is nonsensical. We have no way of knowing what the jury concluded, particularly when many charged crimes are unfortunately a collection of alternative scenarios.  All we know is that the jury convicted. We do not know why.  No irrebuttable presumption on a direct charge of perjury could withstand constitutional challenge and neither should a round-about manner of obtaining the same result.

Moreover, obstruction of justice either literally or conceptually in the Guidelines occurs when an accused's mendacity prevents the discovery of evidence or witnesses that the Government might have otherwise obtained.  A mere disagreement among witnesses – one recalling that the traffic light was red while the other recalling that the traffic light was green – is not obstruction of justice.  Indeed, resolving disputes of facts is the very purpose of courts, judges, courthouses, and juries.  Disputed facts keeps a lot of people employed.

As a result, **the PSIR concludes that a Total Offense Level of 10 applies.**

Because Defendant's counsel challenges the over-use and the manner of use of the false testimony "Obstruction of Justice" adjustment, Defendant contends that **the Total Offense Level should be 8 points not 10**.

Moreover, on the grounds of avoiding disparities between Left-wing protestors against whom charges are routinely dropped or are sentenced to $50 fines only, Defendant requests a downward departure to match the treatment of the same offense conduct by offenders in demonstrations unrelated to January 6, 2021, events.

The PSIR also appears to reflect that Zink cooperated with an extensive interview of his biography and personal details, except that he answered financial issues by question and answer rather than by a specific form.

Finally, although the PSIR reports only $12,179 of a desired goal of $100,000 being raised for legal defense fees and expenses on GiveSendGo, it is a persistent problem that the amounts raised on such donation platforms confusingly suggests that money is sitting on hand available.  All parties should understand with these new tools that the reports of amounts raised – ever – do not mean that any money is still on hand unspent.  The amount of $12,179 is obviously a small amount compared to the typical cost of criminal defense attorneys.  But one can easily

mistake such websites as suggesting that funds are sitting there.

In his interview with Pre-trial Services reflected in the PSIR, Zink appears to imply that he has segregated a second bank account to keep all such donations separate from his personal finances and pay legal bills. GiveSendGo downloads funds into a linked bank account.

**The PSIR concludes that Zone B of the U.S. Sentencing Guidelines table applies with an imprisonment range of 6 months to 12 months.**

> [91 …..  The term of sentencing] may be satisfied by (1) a sentence of imprisonment; (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in USSG §5C1.1(e), provided that at least one month is satisfied by imprisonment; or (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in USSG §5C1.1(e). USSG §5C1.1(c).
>
> 91a. The defendant received an adjustment under USSG §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table. Therefore, a sentence other than a sentence of imprisonment, in accordance with USSG §5C1.1(b) or (c)(3) is generally appropriate. USSG §5C1.1, comment. (n.10).
>
> * * *
>
> 95. Counts 2 and 3: The Court may impose a term of supervised release of not more than one year. 18 USC § 3583(b)(3).
>
> * * *
>
> 98. Counts 2 and 3: Since the offense is a Class A Misdemeanor, the guideline range for a term of supervised release is one year. USSG §5D1.2(a)(3).
>
> 99. If a sentence of imprisonment of one year or less is imposed, a term of supervised release is optional. USSG §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute. USSG §5D1.1(a).

The PSIR suggests conditions of supervision upon release or probation, including a draft

of a charge to the Defendant addressed to the Defendant.  Counsel for the Defendant – based

more on experiences with potential (questions) or actual confusion suggests these modifications:

> 8. You must not communicate or interact with someone you know is currently
> or from time to time engaged in ongoing criminal activity. If you know
> someone has been convicted of a felony, you must not knowingly communicate
> or interact with that person without notifying the probation officer.  If asked
> to possibly testify or provide assistance to a person charged but not convicted of a
> felony you must notify the probation officer and you must insist that you should
> be contacted by that person's attorney.

> 9. If you are arrested or questioned by a law enforcement officer, other than for
> a parking ticket or traffic ticket you must notify the probation officer within 72
> hours.  Interaction that is not merely about a ticket but  about a potential
> criminal charge or accident you must report.  If you are unable to reach the
> probation officer such as over a long holiday weekend you must attempt to do
> so such as by leaving a message recording.

> Counsel disagrees with the way paragraph 11 is conceived and written, though
> understands the intent.  Requiring a Defendant to inform someone to whom he
> poses a risk sounds like it could generate conflict.

> Footnote 2 is on a subject that frequently generates confusion, in that convicted
> Defendants frequently do not live alone due to finances and it is generally
> helpful that they have family or friends to help them transition.  It has never
> been clear how the Second Amendment rights of other people can be upheld
> while restricting the Defendant's ownership of a gun.

The PSIR asserts that restitution is not merely available but mandatory under 18 USC §

3663A.  Defendant's counsel rejects this.  Nothing in 18 USC § 3663A applies.  Nothing in any

other law applies.  The only argument for restitution depends upon the false idea that Defendant

Zink is responsible for what other people did.  No aspect of Zink's offense (the term of art in the

statute) relates to any losses to anyone.  Furthermore, no court has ever imposed restitution

requirements on the tens of thousands, surely hundreds of thousands, of Left-wing protestors

who burned down buildings, killed or injured many hundreds of police and others, and disrupted

entire cities from 2014 to 2020.  The U.S. Sentencing Act of 1984 was enacted in part due to

widespread public anger at obvious disparities among similar crimes, with the public drumbeat

highlighted on television news shows and many other outlets.  A fine would be less objectionable than endorsing a new Orwellian era of people being punished for the actions of other people.

## III.   GOVERNING LAW REQUIRES CAREFUL EXAMINATION AND RESOLUTION OF FACTUAL DISPUTES

Sometimes sentencing depends upon specific facts which have not been established and/or disputed, even outside the trial or even though the trial or a plea deal are concluded.

The Court may not speculate or guess as to the facts underlying sentencing decisions in any respect.  As movie star Tom Hanks teaches us in the movie "A League of Their Own," "***There is no crying in baseball***."  Similarly, "There is no guessing in court."  Speculation, imagination, creativity, or guessing may be valuable in certain areas of human activities, but they have no place in the law.  Just as we do not want "creative accounting" neither do we tolerate creativity in arguing the facts in a criminal proceeding.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 - Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[2]

> Commentary
>
> Although lengthy sentencing hearings seldom should be necessary, ***disputes about sentencing factors must be resolved with care***.  When a dispute exists about any factor important to the sentencing determination, ***the court must ensure that the parties have an adequate opportunity to present relevant information***.  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  See, e.g., United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991).  ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***.  See, e.g., United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United

---

[2]     https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6

> States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because
> district court did not hold evidentiary hearing to address defendants'
> objections to drug quantity determination or make requisite findings of
> fact regarding drug quantity); see also, United States v. Fatico, 603 F.2d
> 1053, 1057 n.9 (2d Cir. 1979), cert. denied, 444 U.S. 1073 (1980).  The
> sentencing court must determine the appropriate procedure in light of the
> nature of the dispute, its relevance to the sentencing determination, and
> applicable case law.
>
> In determining the relevant facts, sentencing judges are not restricted to
> information that would be admissible at trial.  See 18 U.S.C. § §
> 3661; see also United States v. Watts, 519 U.S. 148, 154 (1997) (holding
> that lower evidentiary standard at sentencing permits sentencing court's
> consideration of acquitted conduct); Witte v. United States, 515 U.S.
> 389, 399-401 (1995) (noting that sentencing courts have traditionally
> considered wide range of information without the procedural protections
> of a criminal trial, including information concerning criminal conduct
> that may be the subject of a subsequent prosecution); Nichols v. United
> States, 511 U.S. 738, 747-48 (1994) (noting that district courts have
> traditionally considered defendant's prior criminal conduct even when
> the conduct did not result in a conviction).  Any information may be
> considered, so long as it has sufficient indicia of reliability to support its
> probable accuracy.  Watts, 519 U.S. at 157; Nichols, 511 U.S. at
> 748; United States v. Zuleta-Alvarez, 922 F.2d 33 (1st Cir. 1990), cert.
> denied, 500 U.S. 927 (1991); United States v. Beaulieu, 893 F.2d 1177
> (10th Cir.), cert. denied, 497 U.S. 1038 (1990).  Reliable hearsay
> evidence may be considered.  United States v. Petty, 982 F.2d 1365 (9th
> Cir. 1993), cert. denied, 510 U.S. 1040 (1994); United States v.
> Sciarrino, 884 F.2d 95 (3d Cir.), cert. denied, 493 U.S. 997 (1989).  Out-
> of-court declarations by an unidentified informant may be considered
> where there is good cause for the non-disclosure of the informant's
> identity and there is sufficient corroboration by other means.  United
> States v. Rogers, 1 F.3d 341 (5th Cir. 1993); see also United States v.
> Young, 981 F.2d 180 (5th Cir.), cert. denied, 508 U.S. 980
> (1993); United States v. Fatico, 579 F.2d 707, 713 (2d Cir. 1978), cert.
> denied, 444 U.S. 1073 (1980).  Unreliable allegations shall not be
> considered.  United States v. Ortiz, 993 F.2d 204 (10th Cir. 1993).

*Id. (Bolded and italicized emphases added).*

The Department of Justice imagines what various Defendants mean or intend, and invites

us along for their day dream.  The Government tells us what we are thinking, what we mean,

what we intend.  But that is not the law.  If the Court is going to entertain these assertions, the

Court must examine the truth or falsehood of those assertions, even to the extent of an evidentiary hearing if necessary.

Defendant, by counsel, however, asserts that the Court can bow to simplicity by disregarding disputed facts or factors and proceed to sentencing on what is clear and undisputed. If the Court is going to consider a factual assertion or circumstance that is disputed, a searching inquiry is mandatory, even up to an evidentiary hearing post-trial. But counsel supposes that if the Court simply takes disputed factual assertions off the table, then the requirement is moot.

## IV.    SO WHAT WAS PROVEN TRUE AT TRIAL?

The attempted presumption – in place of actual evidence – that facts are true based on a Defendant's conviction is neither consistent with Due Process nor supported logically.

The Government's Presentence Investigative Reports have consistently made the mistake of assuming that the most expansive outer limit of what prosecutors alleged must be taken as proven true merely because a Defendant was found guilty. This is somewhat understandable because the Probation Officers are presented with the very extensive allegations of prosecutors, but face a giant task sorting through which of those assertions were actually proven and which were not proven.

Here, the PSIR telegraphs and admits on Page 4 *(emphasis added):*

> **The Offense Conduct**
>
> **7. The information contained in this section was taken from the Criminal Complaint (ECF, doc. 1), the Government's Opposition to Defendant's Motion to Set Aside Verdict and For New Trial (ECF, doc. 108), and other _information as provided by the government._**

Thus, the PSIR telegraphs that its recommendations are merely the Government's position, not what is true. The PSIR has calculated its recommendation based on "information as

provided by the government" not what the evidence showed at trial.

Counsel argues the opposite is true:  That only the bare minimum of elements necessary to a conviction can be assumed to be true.  Where a fact-finder could convict on the least extensive set of facts, only those minimal facts can be taken as having been proven.  The Court may consider that more than the minimum was in fact established – always beyond a reasonable doubt for any purpose – by the actual evidence at trial.  But this must be approached with great caution especially where there is so many dubious assumptions and confused ideas.

For example, the PSIR states that:

> 23. The jury rejected the defendant's defense at trial that he was at the Capitol for innocent reasons-- that he was trying to entertain and inform his Facebook followers of events at the Capitol or was documenting the events for use in his father's congressional campaign. The jury also rejected defendant Zink's contention that he and his father were "waved in" to the restricted perimeter by a particular police officer. ***

But of course we have no idea what the jury accepted or rejected.  Without a special verdict, without polling the jury, we will never know what the jury rejected.  We only know that the jury convicted on presumably the barest minimum of elements required.  While the jury _might have_ also believed other things, we do not _know_ that beyond the realm of speculation.

For example, although the PSIR improperly refers to the Count under 18 U.S.C. 1512(c)(2), that statute includes "influences" or "interferes with."  The jury could have found that Defendant Zink like hundreds of others intended to exercise their First Amendment rights to "influence" an official proceeding on January 6.

We have no idea and will never know if the jury believed that Zink "influenced" the Joint Session of Congress or attempted to by exercising his right to Petition the Government for Redress of Grievances or "interfered with" the Joint Session.

Yet the Government persists in its mind-reading obsession.  Not only will the

Government happily tell you what you were thinking and what you intended, but the

Government will also read the minds of the jury and tell us what the jury was thinking.

## V. VICTIM IMPACT CLAIMS

The Government by the PSIR recommendation once again attempts to sentence not

Defendant Zink but the crowd, which is impermissible.  In Paragraph 25, the PSIR asserts:

> 25. This offense involved a large crowd of individuals who gathered
> outside the US Capitol, some of whom ultimately forced entry inside the
> building. Those individuals' actions included, but are not limited to,
> breaking windows, damaging property, and assaulting members of law
> enforcement, as others in the crowd encouraged and assisted those acts. *
> * *

So the PSIR recites the "victim impact" from the actions of *other people*.  It hardly needs

to explained that this is unconstitutional.  Defendant Zink cannot be sentenced for what other

people did.  And yet all 1500 January 6 cases are a mud bath of collective guilt.

Meanwhile, Paragraph 25 goes on to claim with incredible vagueness:

> * * * According to information received from the government, as of July
> 7, 2023, the approximate losses suffered as a result of the siege at the
> United States Capitol are assessed at $2,923,080.05. That amount
> reflects, among other things, damage to the United States Capitol
> building and grounds and certain costs borne by the United States
> Capitol Police.

Thus, the Government by the PSIR admits that the absurd estimate of $2,923, 080.05 (the

number keeps changing years after the fact) includes unspecified claims some of which may be

eligible for restitution and other are clearly not.  In reality, the Government has fervently resisted

identifying its unsupported claim.  Even in civil lawsuits for restitution, the Government has

never identified its supposed losses.  Here, we must blame the Architect of the Capitol and the

U.S. Capitol Police, not either the U.S.A.O. prosecutors nor Pre-Trial Services.  No court nor

Defendant has ever been told what these costs consist of.  Do they qualify?

13

In the case of *United States v Nordean, et al.*, 1:21-cr-00075, the undersigned counsel elicited the admission by an official of the Architect of the Capitol that the one side of a very large window that the Government accused Dominic Pezzola of breaking cost only $750 to replace. Since only very few windows throughout the entire 750 foot building were broken and a few doors were damaged, the estimate of $2,923,080.05 is clearly false. That would be 3,897 very large windows. How does the Government claim this number? We don't know. They won't tell us. It has never been proven. A careful look at the photographs by someone who knows what the Capitol normally looks like shows that the Government is counting *trash removal* – not actual damage to the building.

18 U.S. Code § 3663 allows for an order that a Defendant pay restitution of "losses" "from the offense."

> **18 U.S. Code § 3663 - Order of restitution** (in relevant part):
>
> **(a)**
>> * * *
>> **(B)**
>> **(i)**The court, in determining whether to order restitution under this section, shall consider—
>>> **(1)** the amount of the loss sustained by each victim *as a result of the offense*; and
>>> * * *

Therefore, the maximum penalty for restitution is limited only to (a) the results of "the offense" committed by the Defendant, not to what other people did or other things that happened, (b) which constitutes a "loss," (c) to each victim – that is an identifiable victim.

## VI.   FAILURE TO UNDERSTAND HOW PEOPLE TALK

Even though the PSIR includes improper allegations of matters not relevant to Counts 2 and 3, it is also erroneous in failing to understand how humans talk. Throughout all January 6 prosecutions the Government suffers from an inability to decipher how people talk.

Zink acting as a reporter – which the Government's own evidence showed, using his video recordings in the form of reporting – described what was happening. Never did Zink either do anything illegal nor say that he had done anything illegal. Unmistakably when describing what other people were doing, the use of "we" does not mean that Zink personally participated in any illegal conduct. It is hard to explain any other way but to hope that the Government will spend more time with real people discovering how people talk.

Knowing that Zink was not suggesting that he personally did anything when reporting on what "we" did – that is, what our side did – the Government nevertheless tries to put on evidence that they knew did not support the conclusions being suggested. But this has become a universal practice of today's DOJ. All of this is of course protected by the First Amendment.

## VII.   COLUMBUS DOORS WERE NEVER BREACHED

It may be a minor point but it leads to a larger understanding, where the PSIR recites:

> 22. The defendant then climbed atop a pillar after the Columbus doors were breached so that he could see inside the Columbus Doors. He testified at trial that he decided to leave only after he saw that rioters were viciously beating police officers inside the building.

Actually, the Columbus Doors at the top of the Center East stairs were never closed and were never breached. The massive 10 ton, 17 feet high Columbus Doors are solid bronze and decorated with elaborate scenes forged in the bronze. Immediately behind the Columbus Doors are a second set of doors, known as the East Rotunda Doors, which are much less sturdy doors with 6 windows set in the two sides of the doors. It is easy to confuse these doors and other places in the Capitol which are labeled with unfortunately fanciful names of insider significance. But it becomes important to ask why the Columbus Doors were never closed. Had the U.S. Capitol Police activated the code-controlled and motorized Columbus Doors and shut the

entrance to the Rotunda, no one could have touched the second inner set of the East Rotunda Doors.  No one could have entered the Capitol from Center East.  Yet the USCP never closed those 17 feet high 10 ton bronze doors.  As a result, faced with wide-open massive doors any signal that visitors were not welcome into the Capitol as on any other day was lost.

The second set of inner doors were never breached.  Windows were cracked but did not break.  The doors were opened only when a demonstrator came from another location and opened them from the inside.

Meanwhile, Defendant Zink wanting to look into the Rotunda from the outside of the building to see what was going on is evidence of innocence and innocent intent.  Why the Government relies on this is unclear.  If someone were planning to disrupt they would forge inside.  Someone trying to observe and report would do as Zink is alleged to have done.

## VIII.   CREATING SENTENCING DISPUTES TO BE AVOIDED

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

While the Government, in its Sentencing Memoranda, consistently preaches rhetoric about the need to avoid sentencing disparities, it is the government's own conduct regarding American political protest which has caused the greatest disparities of all: the gaping disparities between "left wing" and "right wing" protestors and rioters.

Throughout, the Government has invented a unique "January 6 Bubble" existing as an alternate universe divorced from the rest of U.S. law.  Inside the Bubble, sentences are drastically and severely inconsistent with the sentences imposed – if any – for identical conduct committed by protestors who are politically favored.  Unmistakably, nearly all January 6

Defendants are being sentenced based purely on partisan politics, not on uniformity of charges.

In this context, the Government tries to enforce its "January 6 Bubble" by preaching that sentences must be consistent _with other January 6 cases_ while wildly inconsistent with the same conduct committed by Left-wing or non-political defendants.  Thus, the Government uses the idea of minimizing disparities to create massive disparities between January 6 cases inside the Bubble and all other cases outside the January 6 Bubble.

Federal sentencing laws are concerned with sentence disparities.  Unequal treatment of similar offenders violates the very essence and foundation of respect for the rule of law.  Indeed, the legitimacy of Congress, the federal courts, and the United States government itself depends on the notion that when Congress enacts laws, such laws must be equally applicable.

Yet since violent riots in 2014 and especially in the past five years, the government has treated left wing rioters—who generally seek more power for government, more intrusive and expansive bureaucracy, higher taxes, and more government regulations of the environment, speech, public health, and near-total control of commercial enterprise and commerce — with kid gloves; while sentencing "right wing" rioters — to severe sentences.

When satire website The Babylon Bee publishes a biting parody "Summer of Blood" of how violent arson, killing cops and others, billions in property damage is celebrated when it is on the political Left but minimally unruly protesting from the Right is savagely attacked, the fabric of respect for the Courts has already unraveled.  Absolutely no one believes that the legal system is fair or consistent.

Thus the very core of the reason for the U.S. Sentencing Reform Act of 1984 has utterly failed.  A court must reference all similar conduct by anyone, Left wing or Right wing, or not motivated by politics, the same.  A court may not reference only other January 6 cases in striving

toward uniformity in sentencing.  To do so causes the very harm that the Act was passed to

prevent.

## IX.  GROUPING OF THE TWO COUNTS REQUIRED FOR SENTENCING

> While the district court provided a detailed explanation of its findings
> and conclusions in its Sentencing Memorandum and Order, it did not
> address the issue of grouping. It is clear, however, that the district court
> did not group and instead treated each offense discretely. This failure to
> group the offenses was a fundamental error by the district court,
> consequently, Lewis' sentence in this case must be set aside and the case
> remanded for resentencing.

*U.S. v. Lewis*, 200 F.3d 1177, 1178 (8th Cir. 1999); *see also*, *U.S. v. Smith*, 267 F.3d 1154, 1163-

1165 (D.C. Cir. 2001).

> I. The District Court Erred in Not Grouping Rafal's Two Counts of
> Conviction

> When a defendant is convicted of multiple counts, the sentencing
> guidelines provide rules for grouping the offenses together "to limit the
> significance of the formal charging decision and to prevent multiple
> punishment for substantially identical offense conduct." U.S.S.G. ch. 3,
> pt. D, introductory cmt.

> Counts must be grouped when they involve "substantially the same
> harm." Id. at § 3D1.2. One way that counts can involve substantially the
> same harm is "[w]hen one of the counts embodies conduct that is treated
> as a specific offense characteristic in, or other adjustment to, the
> guideline applicable to another of the counts." Id. at § 3D1.2(c). The
> sentencing guidelines address the situation presented here in an
> application note, stating that "use of a firearm in a bank robbery and
> unlawful possession of that firearm are sufficiently related to warrant
> grouping of counts under this subsection." Id. at § 3D1.2 cmt. n.5; see
> also United States v. Gelzer, 50 F.3d 1133, 1144 (2d Cir. 1995) ("[T]he
> unlawful possession of a firearm is grouped with armed robbery because
> the conduct embodied in possessing a firearm is substantially identical to
> the specific offense characteristic of possessing that firearm during a
> robbery.").

*United States v. Rafal*, No. 17-4107 (10th Cir. Sep 07, 2018); *U.S.A. v. Young*, 266 F.3d 468,

481-483 (6th Cir. 2001).

> Section 3D1.2 of the Guidelines instructs that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. Separate counts involve "substantially the same harm" when, inter alia, the "counts involve the same victim and the same act or transaction" or the "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Id. § 3D1.2(a)-(b). The commentary reveals that counts are to be grouped together under the guideline when: (1) "they represent essentially a single injury or are part of a single criminal episode or transaction involving the same victim"; or (2) they "are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim ... even if they constitute legally distinct offenses occurring at different times." Id. § 3D1.2 cmt. n. 3 & n. 4.

*U.S. v. Wise*, 447 F.3d 440, 445-446 (5th Cir. 2006)

## X. IN ANALYZING SENTENCING, THE TWO COUNTS ARE THE SAME – AS APPLIED

Although it is true that the Court is sentencing Zink for only two (2) Counts, the Court should approach the sentencing for those two Counts by considering that they are in effect only one (1) Count.

Although the text of 18 USC § 1752(a)(1) compared with 18 USC § 1752(a)(2) are capable of presenting different crimes, in most cases relating to the events of or leading up to January 6, 2021, the Government has not indicted, presented, proven, or argued them as different crimes.  The fact that a prosecution team  *could have potentially* charged two different crimes under these statutes does not mean that *they actually did* as appearing on the record here.

Specifically, Count 2 under 18 USC § 1752(a)(1) is based upon entering and remaining in a restricted area while Count 3 under 18 USC § 1752(a)(2) is based upon disorderly and disruptive conduct.

But this DOJ consistently and persistently argues that mere presence in a restricted area is _**per se**_ "disorderly" or "disruptive."  Therefore Count 2 and Count 3 are actually the same charge.  In the hands of this DOJ, one is disorderly or disruptive merely by showing up.  The prosecution "proved" only that "other people" were disorderly and disruptive – not Zink.

There certainly were people for whom the Government could have and generally did charge the individual actual conduct clearly qualifying as disorderly or disruptive.  If the Government proves conduct which stands on its own as disorderly and disruptive, then the problem does not arise.  Here, however, the element is _derivative_ of "mere presence."  That collapses the two Counts into one, at least for consideration on sentencing.

Yet how many people turn a legal "mere presence" into an illegal "disorderly and disruptive" crowd?  Do 5 people who are merely present meet the standard of "disorderly or disruptive" by their passive presence?  Are 10 people required?  40?  50?  100?  When does legal conduct become illegal conduct?  Does legal conduct become illegal when there are 129 people in attendance? Does legal tip the scales into illegal at 143 people? Does it require 174 people?

## XI.  IMPERMISSIBLE ADJUSTMENT FOR OBSTRUCTION OF JUSTICE

The PSIR repeats the attempt to add an adjustment of two levels under USSG §3C1.1 for obstruction of justice because he testified in his own behalf.  Fundamentally, the adjustment is impermissible, as it attempts to repeat a separate crime:  Perjury.  The Government chose not to (because it could not) charge any January 6 Defendant with perjury.  Yet knowing that it is unable to make such a charge stick, the Government seeks to improperly obtain sentencing without conviction for a crime that it cannot support factually.

The USSG's Application Notes preclude the obstruction enhancement in this case.

Application Note 2 states that "*this provision is not intended to punish a defendant for the exercise of a constitutional right*. . . . the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice" (emphasis added).  Similarly, the DC Circuit, in *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994), read the commentary's admonition, that "*such testimony or statements should be evaluated in a light most favorable to the defendant*," as requiring a standard higher than the usual preponderance standard.  *Id*.  *(emphasis added)*.  This requirement may have reflected the Commission's concern that "in the absence of a heightened standard of proof on perjury, defendants might be leery about testifying in their own defense lest they face a charge of perjury whenever convicted."  *United States v. Dozier*, 162 F.3d 120 (D.C. Cir. 1998).  See *United States v. Dunnigan*, 507 U.S. 87 (1993) and *United States v. Grayson*, 438 U. S. 41, 55 (1978) ("Nothing we say today requires a sentencing judge to enhance, in some wooden or reflex fashion, the sentences of all defendants whose testimony is deemed false.").

## XII.   DISPARATE, NON-UNIFORM SENTENCING BASED ON POLITICS

The goal of the remedial legislation The U.S. Sentencing Act of 1984 is to assure the public and to achieve actual justice by seeking uniformity in punishment for similar crimes.

Instead, in May to June 2020, rioters and insurrectionists attacked the White House from their rallying point at Lafayette Square, **injuring 60 Secret Service agents**,[3] comparable to or worse than January 6, 2021.[4]  At least 155 law enforcement officers were injured by the

---

[3]      Melissa Barnhart, , "Historic St. John's Church near White House torched by rioters," Christian Post, June 1, 2020, accessible at:  https://www.christianpost.com/news/historic-st-johns-episcopal-church-set-on-fire.html

[4]      Jon Lockett,"AT DON'S DOOR 50 Secret Service agents injured in White House riots as

insurrection and attack on the White House May to June 2020,[5] contrasted with around 114 at

the Capitol on June 6, 2021.[6]



"They were battling over the fences," [Attorney General Bill] Barr said. "They were trying to get entry. They were throwing bricks and inflammable liquid at the police. One fifth of the- there have been 750 officers hurt in the last week. One fifth of those have been in Washington, D.C. Most of those have been federal officers at Lafayette Park."

Later in the interview, Barr repeated the claim.

"All I heard was comments about how peaceful the protesters were," he said on June 7. "I didn't hear about the fact that there were 150 law enforcement officers injured, and many taken to the hospital with concussions. So, it wasn't a

---

Donald Trump is taken to 'terror attack' bunker," THE SUN, June 1, 2020, https://www.thesun.co.uk/news/11752998/trump-secure-bunker-friday-george-floyd-protests-white-house/

[5]     "VERIFY:  **Yes, at least 150 local and federal officers were injured during the first week of protests in DC**," WUSA9, June 11, 2020, https://www.wusa9.com/article/news/verify/150-local-federal-officers-injured-during-dc-protests-verify/65-8fdaf04e-df2e-47d0-abd6-a47017a699f8

[6]     Olafimihan Oshin, "GAO says 114 Capitol Police officers reported injuries on Jan. 6," THE HILL, March 7, 2022, https://thehill.com/homenews/state-watch/597258-gao-says-114-capitol-police-officers-reported-injuries-far-more-than/

peaceful protest. We had to get control over Lafayette Park, and we had to do it
as soon as we were able to do that."

WUSA9 News' "Verify Team" contacted law enforcement agencies who responded to
the insurrection at the White House and were told that at least 155 injured officers and agents "so
far" have been identified from the violent attack upon the White House.

The USAO attempts to portray events on January 6, 2021, on Capitol Hill as unique and
threatening.  Yet America's international enemies and friends watched[7] as the U.S. Government
and its worldwide military power were paralyzed by anarchist rioters. [8]  These rioters obstructed
official proceedings at the White House in violation of 18 U.S.C. 1512(c)(2) interfering with and
impeding the world-wide military chain of command of the U.S. Government.[9]

**Not only did the DOJ drop the charges against those few arrested but rioters sued
the District of Columbia and won millions of dollars in settlements of civil suits.** [10]

In January 2017, rioters burned police cars, limousines, stores, and the like professing
their plans to prevent President Donald Trump from assuming the office of the President.

---

[7]      2020 Marissa J. Lang , Antonio Olivo , Rachel Chason and John Woodrow Cox, "**Night
of destruction across D.C. after protesters clash with police outside White House,**" The
Washington Post, June 1, 2020, **https://www.washingtonpost.com/local/dc-braces-for-third-
day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-
b473-04905b1af82b_story.html**

[8]      Shawn McCreesh, "**Protests Near White House Spiral Out of Control Again:
Washington's mayor imposed a curfew and activated the National Guard, but the
demonstrations over the killing of George Floyd turned into a repeat of the previous night**,"
New York Times, May 31, 2020, ("Hundreds of people surged in front of the White House for a
third straight night on Sunday."), https://www.nytimes.com/2020/05/31/us/politics/washington-
dc-george-floyd-protests.html

[9]      Marina Pitofsky, "**Protesters knock down White House security barricades as
tensions mount over Floyd's death**," The Hill, May 30, 2020,
https://thehill.com/homenews/news/500299-protestors-knock-down-white-house-securitys-barricade-as-tensions-
mount-over/

[10]      *See*:  Aila Slisco, "Government Settles Civil Cases With Protesters Injured at Lafayette
Square," NEWSWEEK, April 13, 2022, accessible at:  https://www.newsweek.com/government-
settles-civil-cases-protesters-injured-lafayette-square-1697820

Hundreds were arrested but then released with most charges dropped.



**Washington (CNN)** — Six police officers were injured and 217 protesters arrested Friday after a morning of peaceful protests and coordinated disruptions of Donald Trump's inauguration ceremony *gave way to ugly street clashes in downtown Washington.*

24



## More Than 200 Arrested in D.C. Protests on Inauguration Day

217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital.

Police and demonstrators clash in downtown Washington, D.C. after a limo was set on fire following the inauguration of President Donald Trump on Jan. 20.  Spencer Platt / Getty Images

*At least two DC police officers and one other person were taken to the hospital after run-ins with protesters*, DC Fire Spokesman Vito Maggiolo told CNN. Acting DC Police Chief Peter Newsham said the officers' injuries were considered minor and not life threatening.

Bursts of chaos erupted on 12th and K streets as black-clad "antifascist" protesters *__smashed storefronts and bus stops, hammered out the windows of a limousine and eventually launched rocks at a phalanx of police lined up in an eastbound crosswalk.__* Officers responded by launching smoke and flash-bang devices, which could be heard from blocks away, into the street to disperse the crowds.

Gregory Krieg, "**Police injured, more than 200 arrested at Trump inauguration protests in DC**," CNN, Updated January 21, 2017, accessible at:  https://www.cnn.com/2017/01/19/politics/trump-inauguration-protests-womens-march  *(Emphases added.)*

*Also see* Phil McCausland, Emmanuelle Saliba, Euronews, Erik Ortiz and Corky Siemaszko, **"More Than 200 Arrested in D.C. Protests on Inauguration Day:  217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital,"** NBC News, January 21, 2017, accessible at: https://www.nbcnews.com/storyline/inauguration-2017/washington-faces-more-anti-trump-protests-after-day-rage-n709946



But then: "**GOVERNMENT DROPS CHARGES AGAINST ALL INAUGURATION PROTESTERS**," <u>NBC News</u>, July 6, 2018,  accessible at:  <u>https://www.nbcnews.com/news/us-news/government-drops-charges-against-all-inauguration-protesters-n889531</u>

In 2011, rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[11]  Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.

In 2023, State legislatures in Florida, Montana, Tennessee were physically disrupted by protestors of Republican legislation, but the DoJ took no action to defend official proceedings.

In September 2018, opponents of Judge Brett Kavanaugh's nomination to the U.S. Supreme Court openly and publicly organized and advertised their plans to obstruct an official proceeding in violation of 18 U.S.C. 1512(c)(2) by shutting down the U.S. Senate Judiciary

---

[11]      "Thousands storm Capitol as GOP takes action," <u>Wisconsin State Journal</u>, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at:  <u>https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html</u>

Committee's hearings and confirmation of Kavanaugh to become a Supreme Court Justice. Where the Department of Justice merely suspects and speculates about January 6 Defendants, anti-Kavanugh rioters openly admitted it.  Protestors celebrated on line occupying and taking over the Hart Senate Office Building.  The 2018 demonstrators proudly admitted their conspiracy to obstruct congressional proceedings:

> "It's sort of a coordinated dance, **but the performers are an organized group of protesters** and a dozen or so uniformed Capitol Police officers. And the stage is this week's Senate confirmation hearings for Supreme Court nominee Brett Kavanaugh." One by one, the protesters, many wearing T-shirts reading 'I am what's at stake,' interrupt the proceedings by shouting slogans like 'You're making a mockery of democracy!' or 'Senators: Do your jobs and stop this hearing!' The police then warn that further disruption will result in arrests. Minutes later, the person shouts again and is hustled out a side door…**the protesters are part of a nationwide campaign to disrupt the confirmation process**."

*Id. (Emphasis added).*

**The few of those Left-wing insurrectionists arrested [12] were released on a $35 to $50 bail after 5 hours which became their sole punishment in most cases after their cases were dropped.** [13] *See,* https://twitter.com/womensmarch/status/1047935356673437697 (hear the extreme noise of the alarms and crowd disrupting the Hart Building in the video).  See

https://www.facebook.com/watch/?v=2314502548791821

During that riot, Sen. Schumer led a crowd at the closed doors of the U.S. Supreme Court at which rioters banged on the doors of the U.S. Supreme Court.  Sen. Chuck Schumer openly threatened Justices of the U.S. Supreme Court,

---

[12]    Emily Birnbaum, "Over 200 protesters arrested during Kavanaugh hearings," The Hill, September 6, 2018, accessible at:  https://thehill.com/homenews/senate/405500-212-protesters-total-arrested-during-kavanaugh-hearings;

[13]    Ashraf Khalil, "Protesters continue to interrupt Kavanaugh hearings," Associated Press, 09/06/2018, accessible at:  https://apnews.com/article/3f4ddaec0ee946fe817329b065af3408; accessed Nov 6, 2021; *emphasis added.*

"'I want to tell you Gorsuch, I want to tell you Kavanaugh - you have released the whirlwind, and you will pay the price. You won't know what hit you if you go forward with these awful decisions,'

Schumer told the cheering crowd.

"In 2012, birthday-suit-clad protesters rushed House Speaker John Boehner's office when

Seven naked protesters swarmed the office of Speaker John Boehner (R-OH) on Tuesday for

some 20 minutes of loud chanting against cuts to AIDS funding.   *After police showed up and*

*repeatedly threatened to arrest the protesters for indecent exposure, they eventually put on*

*their clothes and walked out of the Speaker's office.*"[14] *(Emphases added.)*

Twice as many law enforcement officers were injured in just one location in the street

riots in June 2020, as on January 6, 2021:[15]

> More than 350 NYPD officers were injured <u>over the course of nearly two full weeks of citywide protests over the death of George Floyd</u> in Minneapolis, NYPD First Deputy Commissioner Ben Tucker told the city council this week.
>
> Several officers have been hospitalized for a range of injuries from being hit by a car to being hit in the head with a fire extinguisher during an arrest. One officer was hit over the head with a brick so forcefully it cracked the cop's riot helmet. In another case, an NYPD sergeant was hit on the head by a glass bottle someone threw near Fifth Avenue and 15th Street. That officer needed 10 stitches to close the gaping laceration on his head.

## XIII.  THE GOVERNMENT'S CONSPIRACY THEORIES

Unfortunately, there are no greater conspiracy theorists than the U.S. Government and its

---

[14]     Sahil Kapur, "Nude Protesters Arrested After Storming Speaker Boehner's Office, <u>Talking Points Memo</u>, TPM, November 27, 2012,  https://talkingpointsmemo.com/dc/nude-protesters-arrested-after-storming-speaker-boehner-s-office
[15]     Tom Winter and Jonathan Dienst, "Nearly 400 NYPD Cops Hurt During NYC's Two Weeks of Protest Over George Floyd's Death," NBC News Channel 4 New York, June 10, 2020, <u>https://www.nbcnewyork.com/news/local/nearly-400-nypd-officers-hurt-during-nycs-two-weeks-of-protest-over-george-floyds-death/2455285/</u>

prosecutors.  Having decided that they "know" what other people are thinking and other people's intent, this DOJ has argued for three years that every one of the 10,000 demonstrators on Capitol Hill on January 6, 2021, as estimated by the U.S.C.P, were members of a single collective hive mind.  Everyone did exactly the same thing.  Everyone thought the same thoughts.  Everyone had the same goals and intentions.

Yet this DOJ almost exclusively attempts to prosecute a "crowd" or convict Defendants for the actions of other people. Nearly half of every January 6 related trial is about "context" -- meaning events, testimony, or videos that have nothing to do with the Defendant at bar.  The jury is shown for purely emotional purposes videos in which the Defendant does not appear.  The Government argues it needs to show "context" which is nothing other than attempting to convict a Defendant of what other people did.

Here, the only evidence of Defendant Zink's supposed bad intentions is the DOJ's insistence that it does not need any evidence.


September 14, 2024                         **RESPECTFULLY SUBMITED,**
                                          Roger Roots, Esq.
                                          *Counsel for Defendant*

                                          */s/ Roger Roots*

                                          Roger Roots
                                          10 Dorrance Street
                                          Suite 700 #649
                                          Providence, RI 02903
                                          775-764-9347
                                          rroots@johnpiercelaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date my law firm is filing the foregoing with the Court by its ECF record-keeping and filing system, which automatically provides a copy to all counsel of record:


_/s/ Roger Roots_

Roger Roots