UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-cr-191 (JEB) |
| : | |
| RYAN ZINK, : | |
| : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO LIFT THE PROTECTIVE ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, opposes the Defendant's Motion to Lift the Protective Order (ECF No. 152). The significant national security and privacy rights for hundreds of witnesses and victims in this matter significantly outweigh any perceived necessity to seek a modification of a protective order to which the defendant agreed at the inception of this matter, and which he cannot now challenge after the conclusion of his case. The defendant has been pardoned, there is no need for further discovery, and the defendant does not have any First Amendment right to the discovery provided to him. The protective order continues to operate to protect information that is vital to national security and significantly affects the privacy rights of victims and witnesses, even after the conclusion of the investigation and prosecution. The defendant's motion should be denied.

**I.   BACKGROUND**

The defendant was charged with various offenses related to the crimes that occurred at the United States Capitol on January 6, 2021. ECF No. 6. On April 19, 2021, the government filed an unopposed Motion for a Protective Order in this case, which the court granted. ECF Nos. 18, 19. On September 13, 2023, following a jury trial, the defendant was convicted of 18 U.S.C. § 1512(c)(2), obstruction of an official proceeding, and two misdemeanors. ECF No. 102. The parties filed a consent motion to dismiss Count One. ECF No. 129. On September 20, 2024, this

Court sentenced the defendant to three months incarceration and twelve months of supervised release on the two remaining counts. ECF No. 141 (Judgment and Conviction); Dkt Minute Entry 09/20/2024. The defendant filed a Notice of Appeal. ECF No. 143.

On January 21, 2025, in light of the Executive Order dated January 20, 2025, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, the defendant was pardoned for his actions on January 6, 2021, and his remaining sentence was terminated. Although the government moved to vacate the defendant's conviction and remand the matter to the District Court for further proceedings as it has in other matters that were on appeal at the time of the Executive Order, the defendant opposed the vacatur. *United States v. Zink*, 24-3121 (D.C. Circuit), ECF No. 9 (March 10, 2025). The Clerk of Court recently entered an order suspending the briefing schedule set in the court's order dated January 31, 2025. ECF No. 10 (March 26, 2025).

Following the termination of the defendant's sentence, the defendant moved to lift the protective order that he previously consented to, citing a First Amendment right to court records. *See* ECF No. 152 at 2. There is no constitutional right to discovery in general, let alone any First Amendment right to obtain unfettered access to a discovery database consisting of terabytes of information, containing the personal identifying information of hundreds of individuals, including victims, witnesses, and informants, in addition to sensitive information pertaining to national security. The defendant has no inherent First Amendment interest in the discovery database and fails to address, even if he had standing to raise such a claim, how the court should weigh access to terabytes of discovery in a criminal matter against the inherent risks posed by the dissemination of sensitive and highly sensitive materials of such information as it relates to national security, and the privacy interests of hundreds of third parties. The defendant's motion should be denied.

## II.  ARGUMENT

### A. Background Regarding Protective Order

Under the Federal Rules of Criminal Procedure, a court "may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief" relating to discovery by entering a protective order. Fed. R. Crim. P. 16(d)(1). "The burden of showing 'good cause' is on the party seeking the order[.]" *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015) (citations and alterations omitted). Once a showing of good cause has been made, the court has relatively unconstrained discretion to fashion an appropriate protective order. *See United States v. O'Keefe*, No. 06-CR-0249, 2007 WL 1239204, at *2 (D.D.C. Apr. 27, 2007) (describing the court's discretion as "vast"); *Cordova*, 806 F.3d at 1090 ("[A] 'trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect.'" (quoting *Alderman v. United States*, 394 U.S. 165, 185 (1969)).

In determining whether to issue a protective order, courts also take into account "the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security.'" *Cordova*, 806 F.3d at 1090 (citations and alterations omitted). "Considering the type of crime charged helps assess the possible threats to the safety and privacy of the victim. Defendants accused of securities fraud or shoplifting, for instance, may not pose as great a danger to victims as those charged with crimes of violence." *United States v. Dixon*, 355 F. Supp. 3d 1, 4 (D.D.C. 2019). "A long record of convictions for violent crimes may suggest a substantial danger to the safety of others. Similarly, a history of failures to follow court orders may justify a more restrictive protective order." *Id.*

During the pendency of this case, as in other criminal cases associated with the events of January 6, 2021, at the United States Capitol, the Court entered a protective order governing discovery, which outlined procedures and limitations regarding how materials designated "Sensitive" and "Highly Sensitive" would be handled. ECF No. 19. In particular, materials designated either "Sensitive" or "Highly Sensitive" could not be disseminated beyond the legal defense team and individual defendants were not permitted to possess "Highly Sensitive" materials and could only view them under the supervision of a member of the legal defense team. The government has produced a significant amount of material to the defendant in this matter, as it did with most of the prosecutions related to January 6, much of which was designated as "Sensitive," including grand jury materials and records containing personal identifying information of individuals other than the defendant. The government has not removed any designations from these materials.

As part of the January 6, 2021, investigations, the government disclosed "global discovery" and "case-specific" discovery to hundreds of individual defendants and their counsel. The Federal Public Defender for the District of Columbia (FPD) acted as the discovery liaison for counsel in all Capitol Siege cases. In connection with that role, FPD administered evidence.com and Relativity databases for the purpose of receiving global discovery productions and making them accessible to defense counsel. The government could not access or view what occurred in the defense databases.

Global discovery consisted of voluminous video footage, including radio runs and United States Capitol Police and Secret Service surveillance video; and case-specific materials from other defendants' investigations, such as the results of searches of digital devices and the Stored Communications Act accounts and subject interviews. The protective order entered into by the

parties in this case, and hundreds of other cases, indicated that the materials disclosed to the defendant which may be designated as "sensitive" or "highly sensitive" included the following categories of information:

    a. Personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure, as well as telephone numbers, email addresses, driver's license numbers, and similar unique identifying information;

    b. Information regarding the government's confidential sources;

    c. Information that may jeopardize witness security;

    d. Contact information for, photographs of, and private conversations with individuals that do not appear to be related to the criminal conduct in this case;

    e. Medical or mental health records;

    f. Sources and methods law-enforcement officials have used, and will continue to use, to investigate other criminal conduct related to the publicly filed charges;

    g. Surveillance camera footage from the U.S. Capitol Police's extensive system of cameras on U.S. Capitol grounds;[1]

    h. Repair estimates from the Architect of the Capitol;

    i. Materials designated as "security information" pursuant 2 U.S.C. §1979; and

    j. Tax returns or tax information.

In addition to the above categories of information, the database also included medical records of officers who were assaulted, prisoner processing paperwork of defendants, documents pertaining to multi-agency security planning in advance of January 6, 2021, email communications

---

[1] This did not include footage from body worn cameras from other police departments that responded on January 6, 2021, the vast amount of which the United States did not designate as Sensitive or Highly Sensitive. (Body worn camera footage was marked Sensitive or Highly Sensitive only if it contained material described in a separate provision or for a similar reason not anticipated by this Order.)

involving members of Congress and Congressional staffers, and work product consisting of analytical and mapping information created by the government and provided to defense teams solely to assist defense teams in identifying video files that may be relevant in specific cases.

Pursuant to the protective order, and other such protective orders entered into as part of the January 6, 2021, prosecution, no sensitive or highly sensitive materials, or the information contained therein, could be disclosed to any person other than the defendant, their legal defense team, or the person about whom the sensitive or highly sensitive information pertained, without agreement of the United States or authorization from the Court. The parties had to include any material referenced from sensitive and highly sensitive materials in filings under seal. Further limitations were placed on access to highly sensitive materials, including the fact that the defendant could only view such materials with defense counsel or support staff, unless transmitted in such a manner as to prohibit downloading such material. The order did not apply to any materials that later became part of the public record or were later disclosed in public trials or hearings, or materials that the defendant obtained outside of the discovery process. The order made clear that the terms were in effect even after the conclusion of the case.

The government routinely updated the global production lists and sent letters to all defense counsel of record with the overview of what was being produced in the new global production, as well as what had been produced in previous global productions. The last global production letter for Capitol Siege matters prior to the Executive Order regarding the pardons was sent to defense counsel on October 15, 2024. As of October 15, 2024, over 8 million files (over roughly 12 terabytes of information) had been provided to the defense Relativity workspace. Those files included the results of the searches of over 800 digital devices and over 400 Stored Communications Act accounts, over 50,000 FBI 302s and over 31,000 related attachments, over

500 digital recordings of subject interviews, and over 210,000 redacted or anonymous tips. Over 32,000 files including body-worn and hand-held camera footage from five law enforcement agencies and surveillance-camera footage from three law enforcement agencies were shared to the defense evidence.com repository. Those files amounted to over nine terabytes of information and would take more than a year to view continuously.

### B. There is No Right Outweighing Maintaining the Agreed-Upon Protective Order in this Matter Which Countervails the Government's Interest in Maintaining It

#### 1. Defendant Has No First Amendment Right to Discovery

The Supreme Court has made clear that "[t]here is no general constitutional right to discovery in a criminal case." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (citation omitted). His attorney had access to the discovery materials for the purposes they were given, and those purposes were fulfilled in defending Mr. Zink in the prosecution of this matter. *See United States v. Bisong*, 645 F.3d 384, 396-97 (D.C. Cir. 2011) (detained pro se defendant's contention that the district court denied him an opportunity to review discovery and prepare his pro se defense failed where district court ensured standby counsel had access to the discovery materials and was getting defendant the records he requested prior to trial).

Discovery is now over. Rule 16 provides only for a right of *inspection* during the discovery process; not an ongoing right to maintain the materials that were held in a repository for all defense counsel. And, as permitted by Rule 16 and as set forth above, the defendant agreed to the terms of the protective order for receiving access to the materials. The defendant was never entitled to most of the materials under Rule 16. As the government repeatedly stated during the provision of global and case-specific discovery in these matters, the government provided the defendants much broader access than that to which they were entitled in order that the defendants could determine

7

what evidence they believed was exculpatory and the government could be similarly cognizant of the defendant's rights under the Speedy Trial Act.

### 2. The National Security Interests and Privacy Interests of Third Parties Far Outweigh Any Perceived Right to the Discovery

In this case, there is overwhelming good cause to keep the protective order, which covers voluminous materials and broad-reaching evidence related to other defendants, victims, and witnesses, in addition to the defendant here, in place. Maintaining the protective order will protect the United States' legitimate interests and interests of victims and witnesses that continue beyond the pendency of this particular case. The events at the Capitol on January 6 involve highly sensitive information regarding Secret Service protocols on protectees; maps and locations of Capitol surveillance cameras, information regarding witnesses and victims, including medical records and financial records; personal information from individual defendants' digital devices, including photographs and contact information for persons unrelated to this investigation, as well as identifying information from those individuals. The database includes hundreds of thousands of tips the government received after January 6, memoranda of interviews with officers who were victims of assaults, reports identifying by name the officers who used force on the date of the riot, extensive radio communications from multiple police departments, case materials related to hundreds of other subjects—including uncharged individuals—personally identifiable information for defendants, witnesses, and victims, and attorney work product produced and provided to assist the defense in understanding the voluminous evidence in these cases.

None of the cases cited by the defendant are remotely analogous to the situation here. Specifically, those cases largely pertain to a mandamus that was filed by a member of the media seeking public or media access to under seal filings or courtroom hearings; a situation far different from seeking unfettered public access to a database containing terabytes of information beyond

this one defendant's matter, by a defendant who agreed to the protective order he is now challenging after the conclusion of his criminal proceeding (and who has no constitutional entitlement to this information). None of the cases cited by the defendant discuss the effect of protective orders on voluminous discovery in matters which are post-conviction, and several support the concept that the press and media do not have an unrestricted right of access to filings and hearings. *See, e.g., Richmond Newspapers v. Virginia.* 448 U.S. 555, 573 (1980) (finding that a criminal trial must be open to the public in the absence of an overriding interest articulated in findings); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368 (1979) (in a case brought by a newspaper owner to prohibit enforcement of two trial court orders excluding the public and press from a pretrial suppression hearing for a murder prosecution, the Supreme Court held that members of the public have no constitutional right to attend criminal trials and that any First and Fourteenth Amendment right of press to attend a criminal trial was not violated by orders excluding members of the public and press from pretrial suppression hearing); *Globe Newspaper Co. v. Superior Court for Norfolk Company*, 457 U.S. 596 (1982) (holding that to justify the exclusion of the press and public from criminal trials, the state must show that the closure is necessitated by a compelling governmental interest and is narrowly tailored to serve that interest); *Press Enterprise v. Superior Court*, 478 U.S. 1, 9 (1986) (mandamus matter in which Superior Court held that proceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest); *Associated Press v. District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983) (mandamus issue in which Ninth Circuit held that courtroom closure order violated public's First Amendment right of access to criminal proceedings); *In re Globe Newspaper*, 920 F.2d 88 (1st Cir. 1990) (mandamus matter in which First Circuit permitted disclosure of names and addresses of the jurors to newspaper following

conclusion of a criminal trial in absence of particularized findings reasonably justifying nondisclosure); *In re Providence Journal Company, Inc.*, 293 F.3d 1, 10 (1st Cir. 2002) (affirming in a mandamus matter the media's right to access in criminal proceedings); *Siedle v. Putman Investments, Inc.*, 147 F.3d 7, 10 (1st Cir. 1998) (civil breach of contract matter in which First Circuit reversed the district court order unsealing the record and noted that the public does not have an unfettered right in proceedings but that countervailing interests can "overwhelm the usual presumption and defeat access."); *In re Knoxville News-Sentinel Co.*, 723 F.2d 470 (6th Cir. 1983) (newspapers intervened in lawsuit between bank and FDIC to challenge removal of certain exhibits from public record).

    The defendant in this case agreed to this protective order, and the Court already determined that there was sufficient cause for it, and thus agreed to enter it at the inception of this litigation. The defendant has not cited to any authority to support a claim that the public, through him, is entitled to terabytes of data that extend far beyond the defendant's individual case. The defendant himself is not prejudiced by the continued effect of the protective order in this matter, and understood in entering into this order that it would continue to operate beyond the conclusion of the matter.

    Nonetheless, even if this were a matter in which the protective order were being considered *ab initio*, the government would meet the appropriate standard for why it continues to be necessary here. In determining whether good cause for a protective order exists, "courts have considered whether: (1) disclosure of the materials in question would pose a hazard to others; (2) the defendant would be prejudiced by a protective order; and (3) the public interest in disclosure outweighs the possible harm." *United States v. Dixon*, 355 F. Supp. 3d at 4 (D.D.C. 2019) (citing Fed. R. Crim. P. 16(a)(1)(A)-(G)); *see also Cordova*, 806 F.3d at 1090 ("[a]mong the

considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security."). Other courts in this district have recognized the national security interest in maintaining the protective order over these materials. In response to a motion to modify the protective order filed in *United States v. Pope*, 21-CR-128 (RCL), the government submitted a declaration from Thomas A. DiBiase, the General Counsel of the U.S. Capitol Police (USCP). *See United States v. Pope. 21-CR-128,* DiBiase Decl., Ex. A to Gov't's Opp'n, ECF No. 71-1. Mr. DiBiase, quoting language the USCP has included in motions for protective orders in criminal cases in D.C. Superior Court, explained that "the purpose of the [Capitol surveillance] cameras is to assist in the maintenance of national security by detecting threats to U.S. Congressmen, their staff, and constituents, deterring and preventing terrorism, and providing for the safety and security of the Capitol Building and Grounds." *Id.* ¶¶ 8–9. He further explained that the USCP has "significant concerns with the release of any of its footage to defendants in the Capitol attack cases unless there are safeguards in place to prevent its copying and dissemination." *Id.* ¶ 14. This was based on the USCP's awareness that participants in the January 6 riot made efforts to "gather information regarding the interior of the U.S. Capitol, including references to the tunnels below the Grounds and maps of the building's layout." *Id.* He explained the USCP's concern that "unfettered access to hours of extremely sensitive information" would result in "vulnerabilities and security weaknesses of the U.S. Capitol being collected, exposed and passed on to those who might wish to attack the Capitol again." *Id.* On this basis, and in line with the approach taken by other courts in this District, *see, e.g.*, Min. Order, *United States v. Clark*, No. 22-cr-409 (Feb. 8, 2023) (denying *pro se* January 6 defendant "unrestricted access to the online discovery databases"); Order at 3–4, *United States v. White*, No. 21-cr-563 (Oct. 17, 2022) (appointing

11

standby counsel to facilitate *pro se* January 6 defendant's access to discovery consistent with the protective order), Judge Contreras similarly found that good cause existed for the protective order's requirement that the defendant in that case have supervised, view-only access to Highly Sensitive CCTV footage. *Pope*, ECF 103, *see also United States v. Concord Mgmt. & Consulting*, 404 F. Supp. 3d 67, 73 (D.D.C. 2019) ("It is well established that protective orders are appropriate where the disclosure of discovery could jeopardize the national security of the United States ....").

Lifting a protective order in this case creates a dangerous opportunity and could potentially place sensitive information in the possession of those who would use it to harm the national security, in addition to allowing terabytes of information including individual defendants', witnesses', and victims' personal identifying information to be released to the public. The government has thus demonstrated that release of these materials could cause a significant hazard to others, and there is no prejudice to the defendant from continuing the protective order here. *Dixon*, 355 F. Supp. 3d at 4. The defendant has cited no authority or rationale to release this volume of material, protected by these orders in hundreds of similar cases, in such a wholesale fashion, where this material is no longer necessary to his defense and could cause such damage to the national security and rights of third parties, including witnesses and victims.

It is important to note that the protective order explicitly exempts materials that are, or later become, part of the public court record, or that the defense obtains by means other than discovery. The defendant's argument that the government should make its discovery databases available to the public fails to address the vast amount of information that has already been made public through the government's investigations and prosecutions of these cases. The enormous public record detailing the attack on the Capitol is extensive and includes the terabytes of videos that were used as exhibits in trials and sentencing hearings.

### III.    CONCLUSION

The events of January 6, and the ensuing investigations and prosecutions, are important to our history as a nation—events that must be considered through appropriate public access to government records and through public discourse. But criminal discovery is not the appropriate mechanism to vindicate that interest. Lifting the discovery protective order would result in significant harm to the security of our nation and to countless others. Simply put, the defendant is seeking to abuse the discovery process. His counsel was given access to these materials to assist him in defending his criminal case, and that has now concluded. The defendant has no further right to, nor need of, the discovery in this matter. The Court should deny the defendant's motion.

<div style="margin-left: 50%;">

Respectfully submitted,

Edward Robert Martin, Jr.
United States Attorney
D.C. Bar No. 481866

_____/S/_____
Jennifer Leigh Blackwell
Assistant United States Attorney
D.C. Bar No. 481097
601 D Street, NW
Washington, D.C. 20530
Jennifer.blackwell3@usdoj.gov
(202) 252-7068

</div>