UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| Complainant | : | |
| | : | |
| v. | : | **Criminal Case No.** |
| | : | **1:21-cr-00191 (JEB)** |
| **RYAN ZINK,** | : | |
| | : | |
| Defendant. | : | |

_____

# DEFENDANT RYAN ZINK'S OPPOSITION TO THE GOVERNMENT'S FILING #154

Defendant RYAN ZINK ("Zink"), through the undersigned counsel, Roger Roots, presents this response and opposition to Document #154, the United States' inaccurately styled "Response to Defendant's Motion to Lift the Protective Order." Properly speaking, the government's filing is a motion for reconsideration or a motion to vacate this Court's order. However, the government inaccurately described the filing as a response to defendant's motion.

Almost every assertion in the government's filing is exaggerated or untrue, as described below. Zink and counsel attach exhibits to this filing illustrating the falsity of government claims and an exhibit sheet summarizing what the

government calls "highly sensitive." Note that some files marked "highly sensitive" among the discovery **are blank or missing and that defense counsel never saw or had access to them.**

## LEGAL STANDARD

Generally speaking, reconsideration is warranted if, for example, moving parties "present newly discovered evidence, show that there has been an intervening change in the law, or demonstrate that the original decision was based on a manifest error of law or was clearly unjust." See *Bernal v. United States*, 162 A.3d 128, 133 (D.C. 2017). However, "it is well-established that motions for reconsideration, whatever their procedural basis, cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier." *Ali v. Carnegie Institute of Washington*, 309 F.R.D. 77, 81 (D.D.C. 2015); *Estate of Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 9-10 (D.D.C. 2011). "The burden is on the moving party to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 268 (D.D.C. 2012).

Here the government's initial motion ("for *leave* to file a response to defendant's motion") failed to provide any hint of any grounds for reversing or vacating the Court's order. The most the government argued was that "There

have been substantive changes in the staffing in the government's office in relation to these cases . . ." and that the government wants to "provide a briefing of the issue."

Now, after the government's opportunity for "briefing the issue" is long over, the government asserts various arguments about discovery, such as "significant national security and privacy rights for hundreds of witnesses and victims . . ." Each of the government's claims is false or exaggerated. The materials contain almost no privileged or confidential information, and absolutely no details or identifying information about informants. Much of the evidence labeled 'highly sensitive' has already been released publicly and what remains is so trivial that Zink lists summaries of it in the attached appendix.

The government also asserts that Defendant Zink consented to the protective orders (at the beginning of the case; four years ago, by prior counsel[1]), and that his (currently very *live* case) is over and closed. These claims are also untrue.

**J6 defendants were <u>FORCED</u> to "consent" to the protective orders in order to obtain discovery.**

As a preliminary matter, any notion that Zink waved any rights by stipulating or consenting to the protective order (four years ago, through different counsel) can be dispatched. Every January 6 defendant was compelled to sign onto

---

[1] Zink asserts that he opposed consenting and that prior counsel's consent to the protective order was against Zink's wishes and partially led to Zink firing of his prior counsel.

such protective orders in order to see the discovery in his own case.

Defendants like Zink faced a take-it-or-leave-it ultimatum: accept the protective order or be denied access to the government's evidence against them. If Zink had refused, the court would have imposed the order anyway, leaving him unable to prepare a defense. This is not agreement; it's coercion.

Nothing in the Court's order or the government's pleading suggests mistake, inadvertence, surprise, or excusable neglect. Nor is there any suggestion about any newly discovered evidence or fraud, misrepresentation, or misconduct by the opposing party. Nor does the government suggest the Court's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**Zink has a First Amendment right to show and describe his wrongful prosecution.**

Counsel also disagrees with the government's assertion that defendants have "no constitutional right to discovery." This is true only to the extent that *the word* 'discovery' does not appear in the text of the Constitution. However, the right to be informed of the basis of a prosecution is plainly stated in the Sixth Amendment, and such rights are also inherent in constitutional due process under the 5th and 14th amendments.

Perhaps no right is more absolute under the constitutional order than the

right of an American to proclaim and criticize wrongful action by the United States government. Moreover, **the public has a First Amendment right** to observe, monitor, know, and critique the doings of the U.S. Justice Department. There is a need for the public to review the government's work in this case (and these cases.) The Government's handling of these nearly 1,600 cases has been marred by violations of *Brady v. Maryland*, 373 U.S. 83 (1963), the Jencks Act , and *Jencks v. United States*, 353 U.S. 657 (1957). These are not mere U.S. Supreme Court decisions and a statute implementing *Jencks*. The U.S. Supreme Court found these requirements to be Constitutional mandates to comply with Due Process and rights under the Sixth Amendment to the U.S. Constitution.

**The government's claims regarding "privacy rights for hundreds of witnesses and victims" are misleading and exaggerated.**
      The government paints a picture of the discovery databases being filled with private information regarding "witnesses and victims." But nothing in the discovery databases is remotely more private, sensitive, confidential, or unusual compared with thousands of other case files found publicly available in any courthouse in America. Of course there might be phone numbers or personal information here or there. But such information is hardly top secret or sensitive.



Of course, the Court is capable of carefully crafting conditions to protect truly sensitive information. The government can easily redact any personal information. (Undersigned counsel easily redacted a phone number from Exhibit A of this filing, for example.) If the government would stipulate that as long as personal contact information is redacted, the evidence is not under the protective order, Zink will agree to such a modification.

Yet the government seeks to bluntly shut down the entire availability of the materials in question.

**The databases contain no evidence or information which identifies any informants.**

Contrary to the government's claims, there is zero (0) identifying information regarding hidden or undercover informants in the discovery databases. In fact, J6 defendants had to beg and negotiate with prosecutors to obtain such information during their trials. During the Proud Boy trial, for example, the government only reluctantly admitted that there were eight (8) FBI informants among the defendants—in exchange for an agreement by one defense attorney not

to call a particular FBI case agent.  (After trial it was learned that the true number of undercover informants among the defendants was far higher than eight.)

**False claims of "witnesses and victims" are a reason <u>for</u> lifting the protective order and making the databases available to the public.**

Moreover, the government's many false claims about "witnesses and victims" of January 6 are a <u>reason for granting</u> public access to these databases. The United States made many false claims of victimhood throughout its January 6 prosecutions;--claims which the public has a right to review, examine and expose. For example, spokesmen for the government have repeatedly exaggerated the number, nature and extent of police injuries stemming from January 6.

**Lifting the protective order will expose government lies and exaggerations about the numbers and extent of police injuries.**

The government has systematically exaggerated police "injuries" from January 6 in order to perpetuate its "violent insurrection" narrative.  (Most such injuries were in the nature of *pain*, a handful of bruises, some sprained ankles, or mild cuts.) Metro PD's list of 56 injured officers contained just one broken bone (a compound fracture <u>of a finger</u>).

There were approximately **fifty-six (56)** MPD members with reported injuries:

Injuries included complaints of pain, OC exposure, a broken nose, and a concussion.

Eighteen members were treated at the hospital, one member (Ofc Fanone of 1d) remains admitted due to serious injuries.

1) ▓▓▓ reports severe injuries after being beaten up, trampled, and robbed. Admitted to ▓▓▓
2) ▓▓▓ reports pain and swelling to left knee after being struck with an unknown object and trampled by protestors. Transported to ▓▓▓
3) ▓▓▓ reports pain to the left knee after falling at the Capitol. Responding to ▓▓▓
4) ▓▓▓ reports contusions to the head inside the Capitol building.
5) ▓▓▓ reports a broken nose and broken teeth.
6) ▓▓▓ reports injury to the knee. Responding to the ▓
7) ▓▓▓ reports he was hit in the head and neck with a metal pole. Responding to the ▓
8) ▓▓▓ reports pain to the right leg at 1st & D Streets NE.
9) ▓▓▓ reports a hyperextended knee. Responding to the ▓
10) ▓▓▓ reports injury to the right ankle. Responding to the ▓
11) ▓▓▓ reports a laceration to the head and OC spray exposure. Transported to ▓
12) ▓▓▓ reports injury to the left knee. Transported to ▓
13) ▓▓▓ reports cuts to the right hand. Transported to ▓
14) ▓▓▓ reports OC spray exposure. Transported to ▓
15) ▓▓▓ reports pain to the right shoulder. Transported to ▓
16) ▓▓▓ reports pain to the body after being trampled.
17) ▓▓▓ reports that he was hit in the right arm with a pipe.
18) ▓▓▓ reports that she was struck in the head.

Approximately half of injuries reported by Metro officers were mere pain or swelling. Most of the remaining injuries were cuts, bruises or abrasions (scrapes).

18) ▓▓▓ reports that she was struck in the head.
19) ▓▓▓ reports cuts to the left eye.
20) ▓▓▓ reports an injury to the right thigh. Transported to ▓
21) ▓▓▓ reports a compound fracture to the right pointer. Transported to ▓
22) ▓▓▓ reports head pain.
23) ▓▓▓ reports pain to the head, neck, and left arm.
24) ▓▓▓ reports head pain.
25) ▓▓▓ reports back pain.
26) ▓▓▓ reports back pain.
27) ▓▓▓ reports head pain.
28) ▓▓▓ reports pain to the head.

Despite the relative mildness of these police injuries, the DOJ has routinely

trumpeted messaging that January 6 was a violent "attack" on law enforcement.

```
29)  ███████ reports pain to the right foot.
30)  ███████ reports pain to the left knee.
31)  ███████ reports pain to the head and left shoulder.
32)  ███████ reports pain to the left shoulder and head.
33)  ███████ reports a laceration to the pinky finger.
34)  ███████ reports swelling to the left hand. ███████
35)  ███████ reports pain to the back and burning eyes.
36)  ███████ reports a sprained left ankle after falling down the Capitol stairs. Transported to ███████
     CCN 20-002377
37)  ███████ reports laceration to the nose and swelling to the face after being struck with a metal
     pole. Transported to ███████.
38)  ███████ reports a laceration above the left eye and swelling after being speared with the end of a
     flag pole. Transported to ███████
39)  ███████ reports pain and swelling to the right hand after being struck with an unknown object.
     Will respond to the ███████
40)  ███████ reports pain and swelling to both hands and the neck after being struck with a wooden
     stick and a speaker. Will respond to the ███████
41)  ███████ reports a laceration to the head after being struck with a metal pole. Transported to
     ███████
42)  ███████ reports a concussion after being struck in the head with a metal baseball bat. Will
     respond to the ███████
43)  ███████ reports sprain and swelling to the right foot and ankle. Transported ███████.
44)  ███████ sustained a laceration to the face and eye during riotous events at the capitol building
     located at First St SE. Officer was treated at the hospital.
45)  ███████ sustained injury to the back during riotous events at the capitol building located at First St
     SE. Officer was treated at the ███████
46)  ███████ sustained injury to the back during riotous events at the capitol building located at First St
     SE. Officer was treated at the ███████
```

The public has obviously been misled and confused by the government's claims. And the public has a right to view the actual evidence from January 6 so that the record of history of January 6 may be clarified.



```
    SE. Officer was treated at the ███████
47) ███████ sustained injury to the left leg and has trouble breathing during riotous events at the
    capitol building located at First St SE. Officer was treated at the hospital.
48) ███████ sustained a head injury and reports trouble breathing during riotous events at the capitol
    building located at First St SE. Officer was treated at the hospital.
49) ███████ sustained a injury to the bottom of his foot during riotous events at the capitol building
    located at First St SE. Officer was treated at the ███████
50) ███████ reports pain to the right wrist after being struck by a bat. Will respond to the PFC.
51) ███████ reports a swollen right ankle after being struck by an unknown object. Will respond to
    the ███████
52) ███████ reports pain to the right shoulder. Responding to ███████
53) ███████ reported a laceration to the finger, treated at ███████ Hospital.
54) ███████ reported and abrasion to the left knee, treated at ███████
55) ███████ reported pain to the right shoulder, treated at ███████ Hospital.
```

Approximately **one-hundred and eighty (180)** members reported use of force incidents:

**Specific examples of deceptiveness and inaccuracy by the DOJ.**

A few specific additional examples illustrate the government's pattern of falsity and exaggeration which must be exposed to the public:

1. **The government's false claims regarding Metro Officer Michael Fanone** merit examination by the public.  Metropolitan Police Officer Michael Fanone testified numerous times in public venues about (varyingly) suffering a heart attack, suffering "traumatic brain injury," suffering beatings and/or burnings and/or tazings at the hands of 'insurrectionists' on January 6.[2]  However, Fanone's own bodycam footage belies his (and the government's) claims.  Fanone's bodycam recorded Fanone saying he was <u>not</u> hit, and was O.K. more than once (after the episode where he now claims he supposedly suffered heart attacks, unconsciousness and traumatic brain injury).  Fanone also participated in giggling conversations with fellow cops who *joked about concocting false claims* that J6ers stole police service guns so that Fanone could frame J6ers for false crimes.  See attached **Exhibit A** (Fanone Bodycam excerpt) under seal due to government's vehement objections to letting this be seen by the public.

2. **The government's false claims regarding Metro Officer Daniel Hodges**

---

[2] https://www.cbsnews.com/news/michael-fanone-lindsey-graham-jan-6-protesters-you-guys-should-have-shot-them-all-in-the-head/

are also belied by Officer Hodges' own bodycam footage. Officer Hodges claimed at the sentencing[3] of Patrick Montgomery, for example, that Hodges never swung his baton at anyone on January 6. However Hodges' own bodycam footage shows Hodges and other cops violently wading into a crowd of nonviolent protestors while punching, pushing, and swinging a police baton offensively. This footage shows J6 defendant Patrick Montgomery (and other brave J6ers) trying to stop the crazed, out-of-control Hodges, by grabbing Hodges' baton. https://rumble.com/v6sdspd-bwc-of-daniel-hodges.html



Michael Fanone, the DC Metropolitan Police officer who almost died defending the U.S. Capitol on Jan. 6, 2021, suffered burns, a heart attack and traumatic brain injuries after insurrectionists assaulted him that day. He got an electrical shock on his neck, and was beaten with a flagpole.

3. The government **falsely smeared Trump supporter Rosanne Boyland** by

---

[3] The government failed to present Officer Hodges at Montgomery's trial, where Hodges' false statements would have been subjected to cross-examination. Instead, Hodges made a false "victim impact statement" at sentencing, where Hodges avoided all questioning.

publicly saying that Boyland died from a drug overdose on January 6. However the bodycam footage of Metro Officer Henry Foulds (Exhibit B) shows that Boyland died from the violent abuse, and neglect, by Metro officers. See, e.g., exhibit B.  Boyland's dying screams for help can be heard on Officer Foulds video footage.

**THE GOVERNMENT'S CLAIMS OF 'NATIONAL SECURITY' ARE ALSO HIGHLY EXAGGERATED; AND THE PUBLIC HAS A RIGHT TO EVIDENCE DEBUNKING THE GOVERNMENT'S CLAIMS.**

Similarly, the government's claims regarding "national security" are greatly exaggerated at best; preposterous at worst. There is *nothing* in the discovery camera footage that poses any danger of exposing the United States to any danger or harm (short of mere embarrassment).  See "Building Facts "By the Numbers," U.S. Capitol Visitor's Center, https://www.visitthecapitol.gov/sites/default/files/documents/fact-sheets/building_facts_by_the_numbers.pdf .

Three million visitors are expected to come through the Visitor Center of the Capitol each year. During peak season, 15,000 – 20,000 people are expected to pass through the Capitol Visitor Center daily. Id. The U.S. Capitol Police has estimated the high end of the number of demonstrators on Capitol Hill on January 6, 2021, as around 10,000.

In Washington, D.C. the U.S. Capitol boasts that 3.5 million visitors from

around the world tour the U.S. Capitol every year. See Hantman testimony, U.S. Congress, House Committee on Appropriations, Subcommittee on Legislative, Legislative Branch Appropriations for 2004, hearings, part 1, 108th Cong., 1st sess., July 15, 2003 (Washington: GPO, 2003), p. 1464.

There is literally nothing mysterious or secretive about the layout or the locations of surveillance cameras at the U.S. Capitol. Untold millions of people have seen the cameras. Books and Lego sets for sale *at U.S. Capitol gift shops* provide excruciating details about the building. Further the public has a right to know what happens at the U.S. Capitol.

The only security issue one could imagine regarding camera locations is if there are "blind spots" in the camera coverage. But, (1) knowing where cameras are does not tell anyone where cameras are not, so no blind zones can be discerned, and (2) the answer to blind spots is to add more cameras, not to deny the public the right to know or deny defendants due process.

**Original grounds for the Protective Order no longer exist.**

Above all the protective order should be lifted because almost everything has changed over the past four years. The government itself has produced highly detailed and interactive video models and simulations of each floor of the Capitol, showing videos filmed at each location. The Government themselves have mapped every possible detail of the Capitol and released it to the public via the many January 6th

prosecutions. These productions have been used at trial and are available to the public. The government has published hundreds of hours of film footage at J6 trials.

**There is little or nothing sensitive about the government's "highly sensitive" discovery.**

In fact almost all of the discovery designated by the government as **"highly sensitive"** four years ago has now been released and shown at numerous trials. Much of the "highly sensitive" footage was nothing but footage of the Rotunda East doorway area. As of 2025, virtually every second of such footage has been shown to the public and used in various trials (including Zink's trial).

Zink's team has made an effort to view and summarize the 60 body worn camera videos listed in the discovery as "highly sensitive." We provide a summary of each exhibit (but not the exhibit) in **Exhibit C.**

**The public *wants* the full truth about January 6, and has a right to know the truth.**

Even more significant: a *Newsweek* poll published around the 3rd anniversary of January 6 "revealed that more people think the full truth about the incident has not been made public than those who do." See *Newsweek*, Jan. 5, 2024, "What Americans Really Think About Jan. 6,"

 https://www.newsweek.com/what-americans-really-think-january-6-poll-donald-trump-joe-biden-1857768 (accessed 4/9/2025) "Some 52 percent of respondents to *Newsweek*'s poll thought the full truth about the uprising had not been shared with

the public, compared to 29 percent who thought it had.

## CONCLUSION

In this case, the Zink filed the motion to lift the protective order on March 22, 2025. The government had fourteen days to file a response but chose not to. Now, after the order lifting the protective order has been issued, the government responds with the same stale, worn-out arguments it used four years ago to unnecessarily conceal information and evidence from the public. The government's untimely motion should be denied.

April 21, 2025                                   **RESPECTFULLY SUBMITED,**
                                                 Roger Roots, Esq.
                                                 *Counsel for Defendant*

                                                 _____/s/  Roger Roots_____
                                                 Roger I. Roots, Esq.
                                                 10 Dorrance Street, Suite 700
                                                 Providence, Rhode Island 02903
                                                 Telephone: (775) 764-9347
                                                 Email: roger@rootsjustice.com


### CERTIFICATE OF SERVICE

I hereby certify that on this date my law firm is filing the foregoing with the Court by its ECF record-keeping and filing system, which automatically provides a copy to:

MATTHEW M. GRAVES, Esq.
UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA

*By:*

JENNIFER BLACKWELL, Esq.
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7566
Email: jennifer.blackwell3@usdoj.gov

                              */s/ Roger Roots*
                              Roger I. Roots, Esq.

## ATTACHMENTS:

**Exhibit A**: Excerpts of Michael Fanone bodycam footage.

**Exhibit B**:: Excerpts of Officer Henry Folds bodycam footage.

**Exhibit C**: Summary of 60 "Highly Sensitive BWC"